# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| **JUNG WOOK NA,**<br>Petitioner-Appellee,<br>v.<br>**JASMINE PEARL NA,**<br>Respondent-Appellant. | **No. 26-6105**<br>D.C. No. 8:25-cv-02479-DOC-ADS<br><br>**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR STAY PENDING APPEAL AND IMMEDIATE ADMINISTRATIVE STAY** |

## EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR STAY PENDING APPEAL AND IMMEDIATE ADMINISTRATIVE STAY

**RELIEF REQUESTED IMMEDIATELY AND NO LATER THAN SEPTEMBER 25, 2026, BEFORE THE DISTRICT COURT'S BRIDGE STAY EXPIRES**

Appeal from the United States District Court
for the Central District of California
Hon. David O. Carter, District Judge

STEPHANE QUINN, CFLS (SBN 278188)
DAVID DWORAKOWSKI, CFLS, CALS (SBN 135285)
QUINN & DWORAKOWSKI, LLP
2050 Main Street, Sixth Floor, Suite 600
Irvine, California 92614
Telephone: (949) 660-1400
quinn@orangecountyfamilylaw.com
david@orangecountyfamilylaw.com

Attorneys for Respondent-Appellant Jasmine Pearl Na

## Circuit Rule 27-3 Certificate

Counsel for Respondent-Appellant Jasmine Pearl Na certifies as follows:

**1. Counsel for the parties**

- **For Respondent-Appellant:** Stephane Quinn, CFLS, and David Dworakowski, CFLS, CALS, Quinn & Dworakowski, LLP, 2050 Main Street, Sixth Floor, Suite 600, Irvine, California 92614; telephone (949) 660-1400; quinn@orangecountyfamilylaw.com; david@orangecountyfamilylaw.com.
- **For Petitioner-Appellee:** Merritt McKeon, Reel Fathers Rights APC, 18881 Von Karman Avenue, Suite 1600, Irvine, California 92612; telephone (951) 460-2003; TeamMerritt@reelfathersrights.com; merrittmck@hotmail.com.

**2. Nature of the emergency**

The district court ordered seven-year-old S.A.N. returned from California to the Republic of Korea to reside with Father, while ordering her older sister K.E.N. to remain in California because returning K.E.N. would expose her to grave risk. The district court's bridge order bears a September 18, 2026 filing date, denies a stay pending appeal, and stays

the return provision only until September 25, 2026, to permit this emergency application. Dkt. 75 at 1. The CM/ECF notice, however, states that the transaction was not entered until September 21, 2026, at 8:51 a.m. Pacific Time and was filed as of September 18. App. APP-125. Counsel therefore had no notice of the bridge order until Monday, September 21. When the bridge stay expires, the international return order becomes enforceable. Appellant therefore needs an immediate administrative stay and a stay pending appeal no later than September 25, 2026.

### 3. Why the motion could not have been filed earlier

The bridge order bears a Friday, September 18, 2026, filing date, but the CM/ECF transaction was not entered until Monday, September 21, 2026, at 8:51 a.m. Pacific Time. App. APP-125. The Ninth Circuit assigned appeal number 26-6105 later that morning. Lead counsel was engaged throughout September 21 in a previously scheduled trial and could not begin preparing this emergency motion until September 22. Counsel began work that morning and is filing at the earliest practicable time. Because the bridge expires September 25, the delayed notice left only four calendar days after notice—September 22 through

September 25, including the expiration date—to obtain Circuit relief. This motion is filed within the seven-day period required by Circuit Rule 27-2.

**4. Notice and service**

On September 22, 2026, at 8:45 a.m. Pacific Time, Appellant's counsel notified Appellee's counsel by email at merrittmck@hotmail.com that this emergency motion would be filed that morning, identified the relief requested, and stated that relief is needed immediately and no later than September 25, 2026. At 9:28 a.m. Pacific Time, Ms. McKeon responded in writing: "My client opposes the stay." Appellee therefore opposes the relief requested. At 2:03 a.m. Pacific Time on September 23, 2026, counsel notified the Ninth Circuit emergency motions unit by email at Emergency@ca9.uscourts.gov. The motion and accompanying appendix will be served through the Court's appellate electronic filing system and by email.

**5. Relief first sought below**

Appellant first sought an immediate administrative stay and a stay pending appeal in the district court. Dkts. 71-72. Appellee opposed. Dkt. 73. By an order bearing a September 18, 2026 filing date—but not

entered or transmitted through CM/ECF until September 21—the district court denied the requested stay without stating reasons, but granted a bridge stay through September 25, 2026, imposed protective conditions, required no bond, and found those conditions adequately protected Appellee's interests. Dkt. 75 at 1-2.

Dated: September 23, 2026
/s/ Stephane Quinn
STEPHANE QUINN
Counsel for Respondent-Appellant

## Table Of Contents


Circuit Rule 27-3 Certificate........................................................ 2

I. Introduction and Relief Requested.............................................. 8

II. Background.............................................................................10

III. Governing Standard.................................................................13

IV. Argument.................................................................................. 14

A. The Appeal Presents Serious Legal Questions.........................  14

1. Article 13(b) Requires a Prospective Risk Assessment............. 14

2. The Order Does Not Reconcile Its Own Child-Protection Findings............................................................................. 16

3. The Order Does Not Address the Intolerable-Situation and Sibling-Separation Issues................................................ 17

4. The Return Remedy and Child-Specific Findings Require Clarification................................................................. 18

B. Irreparable Harm Is Probable Without a Stay......................... 19

C. The Balance of Hardships and Public Interest Favor a Conditioned Stay...........................................................................21

V. Conclusion................................................................................ 22

## TABLE OF AUTHORITIES

*Chafin v. Chafin*, 568 U.S. 165 (2013)................................. 13, 19, 22

*Colchester v. Lazaro*, 16 F.4th 712 (9th Cir. 2021)........................... 16

*Ermini v. Vittori*, 758 F.3d 153 (2d Cir. 2014)................................. 17

*Golan v. Saada*, 596 U.S. 666 (2022)............................................ 14

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011) (per curiam)........ 13

*Nken v. Holder*, 556 U.S. 418 (2009).............................................. 13

*Radu v. Shon*, 62 F.4th 1165 (9th Cir. 2023)......................... 14, 18–19

*Silva v. Dos Santos*, 68 F.4th 1247 (11th Cir. 2023).......................... 15

*Simcox v. Simcox*, 511 F.3d 594 (6th Cir. 2007)............................... 15

Hague Convention on the Civil Aspects of

International Child Abduction, art. 13(b).............. 8–10, 14–17, 19–22

Fed. R. App. P. 8(a)(2)....................................................................... 13

Fed. R. App. P. 27(d)(2)(A).................................................................. 24

Fed. R. Civ. P. 52(a)...................................................................... 9, 16

9th Cir. R. 27-2............................................................................. 4, 13

9th Cir. R. 27-3............................................................................... 1–2

## I. INTRODUCTION AND RELIEF REQUESTED.

The district court found that Father struck the parties' older daughter, K.E.N., with a stick and caused bruising; concealed the injuries; instructed her not to disclose the abuse; kept her from mandated reporters; and created an environment of secrecy. Dkt. 69 at 12-13, 16, 22. It further found that Father gave "materially incomplete sworn testimony" and that school, therapist, or guardian reporting could not sufficiently protect "the children." *Id.* at 22. The court therefore ordered K.E.N. to remain in the United States because returning her to Father would expose her to grave risk. *Id.* at 13-14, 22-23.

The same order directs seven-year-old S.A.N. to leave her mother and sister in California and return alone to Father's household in Korea. The district court distinguished her primarily because there was no evidence Father had already hit her, no physical abuse was alleged during a recent summer visit, and her "experiences" differed from her sister's. *Id.* at 13. But Article 13(b) asks whether return **would expose** the child to physical or psychological harm or otherwise place her in an

intolerable situation. It does not require the younger child to become the next direct victim before the Convention protects her.

The appeal presents serious questions about the application of that prospective standard, the unexplained conflict between S.A.N.'s return and the court's findings concerning secrecy and the failure of reporting safeguards, the absence of findings concerning international sibling separation and the "intolerable situation" clause, and an ambiguous child-specific finding containing a material double negative. Those are legal and Rule 52 questions that this Court reviews independently or that require clarification before an irreversible transfer occurs.

Appellant first sought relief below. The district court denied a full stay without giving reasons, but granted the precise bridge stay requested so that Appellant could apply here. Dkt. 75. It preserved the status quo through September 25, barred international travel and passport activity, imposed school, therapy, and communication conditions, required no bond, and expressly found that those conditions "adequately protect Petitioner's interests." *Id.* at 1-2. Appellant asks this Court to (1) enter an immediate administrative stay before that

bridge expires; (2) stay the return provision pending appeal on the same conditions; and (3) direct expedited appellate treatment. If the Court cannot resolve the full motion by September 25, Appellant requests continuation of the administrative stay until the motion is decided.

## II. Background.

After an eleven-day evidentiary hearing, the district court found Korea was both children's habitual residence and that Mother wrongfully removed them. Dkt. 69 at 5-10, 15. The appeal does not ask this motions panel to retry those determinations. The immediate issue is whether the child-specific Article 13(b) ruling and resulting split return order present a sufficiently substantial appellate case to preserve the present placement during expedited review.

The district court's findings concerning Father were grave. It found that he struck K.E.N. with a stick, leaving bruises and marks; covered the injuries with bandages; instructed her not to tell; kept her from school so mandated reporters would not see the injuries; and knew that disclosure could lead to criminal and custody consequences. *Id.* at 12, 16. The court also credited the hanger, forced-kneeling, and leg-brace incidents and found K.E.N. feared Father would hit her again. *Id.*

at 12, 16. It credited expert testimony that concealment, avoidance of mandated reporters, and reframing violence as discipline make safeguards dependent on reporting and voluntary compliance less reliable. *Id.* at 13, 17.

As to S.A.N., the court wrote: "There is no evidence that Father ever hit S.A.N" and "she did not express that Father had never hit her." *Id.* at 13. It also noted that no physical abuse of S.A.N. was alleged during her two-month summer 2026 visit. *Id.* The court nevertheless found that "[e]ven S.A.N was unwilling to answer questions about the disciplinary actions her father took against K.E.N" and that Father created "an environment of secrecy around the hitting of K.E.N." *Id.* at 13. Its additional conclusions later stated that school, therapist, or guardian reporting "cannot sufficiently protect the children" because Father previously defeated those systems through concealment. *Id.* at 22 (emphasis added).

The court ordered S.A.N. returned "to reside with Father" but did not set a return date or prescribe a transition, escort, interim-placement, therapy-continuity, safety, or sibling-contact plan. *Id.* at 14, 23. Immediately after notice, Father demanded that Mother return

S.A.N. “asap” and “by this Saturday,” proposed an airline escort, and invoked a District Attorney pickup. Dkt. 72-2 at 2; Dkt. 72-1 at 2-3. Father refused a voluntary standstill while the stay request was considered. Dkt. 72-1 at 3-4.

Mother appealed and moved first in the district court under Rule 8(a)(1). Dkts. 70-72. After opposition and reply, the district court denied a stay pending appeal and immediate administrative stay, without stating why, but granted a bridge stay through September 25 to permit emergency relief in this Court. Dkt. 75 at 1. Although the order bears a September 18 filing date, the CM/ECF notice states that the transaction was not entered until September 21 at 8:51 a.m. Pacific Time. App. APP-125. Lead counsel received the notice that morning while engaged in a previously scheduled trial and could not begin preparing this emergency motion until September 22. Counsel began work that morning and is filing at the earliest practicable time. The nominal seven-day bridge therefore left only four calendar days after notice, including the expiration date, to obtain Circuit relief. The bridge order bars implementation, passport activity, and international travel; requires school attendance, therapy and assessment, and reasonable

electronic communication; requires no bond; and finds those conditions adequately protect Father. Dkt. 75 at 1-2.

## III. GOVERNING STANDARD.

Rule 8(a)(2) permits this motion because Appellant first sought the same relief below and the district court denied a full stay. The motion identifies the district court's action and includes the relevant record. Fed. R. App. P. 8(a)(2). It is timely under Circuit Rule 27-2 because it is filed within seven days of the bridge stay.

"Courts should apply the four traditional stay factors in considering whether to stay a return order": (1) likelihood of success; (2) irreparable injury; (3) injury to other parties; and (4) the public interest. *Chafin v. Chafin*, 568 U.S. 165, 179 (2013) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). The first two factors are most critical. *Nken*, 556 U.S. at 434. In this Circuit, a movant may satisfy the merits factor by presenting a substantial case or serious legal questions when the balance of hardships tips sharply in her favor, but irreparable harm must be probable, not merely possible. *Leiva-Perez v. Holder*, 640 F.3d 962, 966-70 (9th Cir. 2011) (per curiam).

On the merits, factual findings are reviewed for clear error, while application of the Convention to the facts is reviewed de novo. *Radu v. Shon*, 62 F.4th 1165, 1172 (9th Cir. 2023). The present motion does not ask the Court to decide the appeal. It asks whether the appeal presents serious questions and whether the child should remain where she is while those questions receive expedited review.

## IV. Argument

### A. The Appeal Presents Serious Legal Questions

#### *1. Article 13(b) requires a prospective risk assessment.*

Article 13(b) asks whether return "would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b). The Supreme Court has recognized that physical or psychological abuse, serious neglect, and domestic violence in the home may create an obvious grave risk that cannot readily be ameliorated. *Golan v. Saada*, 596 U.S. 666, 680 (2022). The inquiry is forward-looking: the court assesses the magnitude and probability of harm upon return, not simply whether the child has already suffered the same abuse.

The order's child-specific analysis raises a serious question because its principal distinction was the absence of evidence that

Father had already hit S.A.N. Dkt. 69 at 13. Other courts applying Article 13(b) have rejected a first-harm requirement. As *Simcox* explained, "nothing in the Convention requires that a child must first be traumatized by abuse before the Article 13b exception applies." *Simcox v. Simcox*, 511 F.3d 594, 609 (6th Cir. 2007). *Silva* similarly recognized that a court need not find prior harm to assess present grave risk. *Silva v. Dos Santos*, 68 F.4th 1247, 1254-56 (11th Cir. 2023).

That issue is consequential here because the district court did not merely find that Father once used excessive discipline against a different child. It found a pattern involving objects, concealment, suppression of disclosure, awareness of reporting laws, and continuing lack of reliable safeguards. Dkt. 69 at 12-13, 16-17, 22. And it found that S.A.N. herself was unwilling to answer questions about Father's discipline of her sister. *Id.* at 13. Whether Article 13(b) permits return based chiefly on the younger child's lack of prior direct injury, without evaluating how the established pattern bears on future risk to her, is at least a serious legal question.

### 2. *The order does not reconcile its own child-protection findings.*

The order found that reporting safeguards could not sufficiently protect "the children" because Father had previously kept K.E.N. from school and directed her not to report. Dkt. 69 at 22. It also found that Father gave materially incomplete sworn testimony, concealed abuse because he feared legal consequences, and created a household environment of secrecy. *Id.* at 13, 16, 22. Yet it returned S.A.N. to that same household without identifying a safeguard capable of protecting her if Father again suppresses disclosure.

That unresolved conflict presents both an Article 13(b) application question and a Rule 52 issue. Findings must be explicit enough to provide a clear understanding of the basis for decision and permit meaningful review. *Colchester v. Lazaro*, 16 F.4th 712, 727 (9th Cir. 2021). The order does not explain whether "the children" meant both children, why the identified failure of reporting systems ceases to matter for S.A.N., or what mechanism protects her when the court simultaneously found she would not discuss Father's treatment of K.E.N. This Court need not resolve that conflict now to conclude it warrants preservation of the status quo.

### *3. The order does not address the intolerable-situation and sibling-separation issues.*

Article 13(b) separately asks whether return would "otherwise place the child in an intolerable situation." The order quotes that language but does not apply it to the ordered return of a seven-year-old, without her mother or sister, to live with the parent the court found abused and silenced her sister. Dkt. 69 at 11, 13-14. Nor does the order make findings concerning the impact of dividing the sisters between countries after ordering one to remain because of grave risk.

Sibling separation is not automatically dispositive, but it is legally relevant when combined with independent risk. In *Ermini*, the Second Circuit upheld refusal to separate siblings "[i]n light of the children's close relationship to each other, and, significantly," the abuse findings. 758 F.3d 153, 167 (2d Cir. 2014). The court recognized the sibling relationship could be protected "even if only one of the children can properly raise an affirmative defense under the Hague Convention." *Id.* Appellant does not contend *Ermini* controls or that separation alone establishes Article 13(b). The serious question is whether the Convention permitted this split return without findings addressing the

sisters' relationship and the effect of placing the younger child alone into the household from which the older child was protected.

#### *4. The return remedy and child-specific findings require clarification.*

The order contains a material ambiguity: it states that, in chambers, S.A.N. "did not express that Father had never hit her." Dkt. 69 at 13. The double negative could mean she did not deny being hit, or it could be a drafting error intended to say she did not report being hit. The meaning matters because the court relied on the absence of prior harm as the central child-specific distinction. Clarification is necessary before the statement can support an international transfer.

The remedy also requires clarification. The court properly stated that ICARA does not authorize a custody adjudication, yet ordered S.A.N. returned "to reside with Father" without transition or safety terms. Dkt. 69 at 2, 14. *Radu* demonstrates that unresolved safety-related implementation terms may require clarification before return. 62 F.4th at 1171. There, this Court remanded for clarification of matters including travel, housing, interim custody, consequences if the mother could not remain, and notification of child-protection authorities, and later affirmed return after clarification. *Id.* Appellant

invokes *Radu* narrowly: it confirms that a return order may require clarification before implementation where unresolved terms bear directly on child safety. The absence of any return date, escort, transition, therapy, protection, or sibling-contact terms presents such a question here.

### B. Irreparable Harm Is Probable Without a Stay.

The threatened harm is concrete. When the bridge stay expires, the judgment directs an international transfer that will immediately separate S.A.N. from her mother and sister, interrupt her present school and therapeutic supports, and place her in Father's household before this Court can review whether Article 13(b) was properly applied. A later re-return order would not erase the period of separation or undo the disruption already experienced.

*Chafin* holds that return does not constitutionally moot an appeal, but it also recognizes that "shuttling children back and forth between parents and across international borders may be detrimental to those children." 568 U.S. at 178. Appellant therefore does not rely on mootness. She relies on the immediate, noncompensable consequences

of an international transfer followed by possible re-transfer, and on the loss of the present sibling relationship during the appeal.

The harm is individualized. On September 10, S.A.N. experienced school-separation distress: she became extremely upset, cried, and could not separate from Mother. Dkt. 72-2 ¶ 6. The school later implemented counseling support, preferred seating, frequent breaks, and transition assistance; she returned to full-day attendance and was reported to be doing well with those supports. Dkt. 74-1 ¶ 10 & Ex. C. Those facts do not independently establish the ultimate Article 13(b) defense, but they show that abrupt displacement now would disturb a functioning support structure during a period of documented transition anxiety.

The district court's bridge order itself recognizes the need to preserve the status quo long enough for this Court to act. It bars removal and passport activity, maintains school and therapy, and protects electronic contact. Dkt. 75 at 1-2. A short administrative continuation is necessary to keep that protection from expiring before the motions panel can decide the full stay request.

### C. The Balance of Hardships and Public Interest Favor a Conditioned Stay.

The district court has already fashioned conditions that protect Father. It required Mother to keep S.A.N. in the United States, maintain school attendance absent ordinary reasons, continue therapy and assessment, and permit reasonable electronic communication with Father and both children. Dkt. 75 at 2. It barred both parties from passport activity and international travel. *Id.* at 1-2. It required no bond because the judgment is nonmonetary and expressly found that the conditions "adequately protect Petitioner's interests." *Id.* at 2. Appellant accepts continuation of every condition.

Father's countervailing interest is prompt enforcement of a Hague return order and resumption of in-person parenting. That interest is substantial, but a conditioned and expedited stay delays implementation rather than defeating it. Father can continue frequent electronic communication, and Appellant will comply with an expedited schedule. By contrast, denying a stay causes the transfer and separation before appellate review and may require a second international move if Appellant prevails.

The public interest includes both expeditious enforcement of the Convention and faithful application of its safety exception. *Chafin* counsels expedition, not automatic return before review. 568 U.S. at -178-179. A stay tied to an expedited appeal serves both interests: it prevents harmful international shuttling while ensuring that the legal questions are resolved promptly rather than through ordinary appellate timing.

This is not a request for a routine Hague stay. It rests on this court's own grave-risk findings, its finding that reporting cannot protect "the children," the split international disposition, and unresolved child-specific and remedial questions. The present conditions eliminate flight risk and preserve Father's communication. The equities therefore tip sharply toward maintaining the current placement during expedited review.

## V. Conclusion

Appellant respectfully requests that the Court:

- immediately continue the district court's bridge stay administratively while this motion is considered;
- stay the portion of Dkt. 69 directing S.A.N.'s return to Korea pending appeal;

- continue the conditions in Dkt. 75, including no international travel or passport activity, school attendance, therapy and assessment, and reasonable electronic communication;
- require no bond; and
- set or invite an expedited merits schedule. If the Court cannot decide the full motion by September 25, Appellant requests that the administrative stay remain in effect until the motion is resolved.

Dated: September 23, 2026 Respectfully submitted,

QUINN & DWORAKOWSKI, LLP
/s/ Stephane Quinn
STEPHANE QUINN
DAVID DWORAKOWSKI
Attorneys for Respondent-Appellant
JASMINE PEARL NA

## Certificate Of Compliance

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts exempted by Rule 27(a)(2)(B) and Rule 32(f), it contains 2,868 words. This motion complies with the typeface and type-style requirements of Rules 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared in a proportionally spaced 14-point Century Schoolbook typeface.

/s/ Stephane Quinn
STEPHANE QUINN

## Certificate Of Service

I certify that on September 23, 2026, I electronically filed the foregoing motion and accompanying appendix with the Clerk of the United States Court of Appeals for the Ninth Circuit using the appellate electronic filing system, which will serve registered counsel. I also transmitted copies by email to Merritt McKeon at TeamMerritt@reelfathersrights.com and merrittmck@hotmail.com.

/s/ Stephane Quinn
STEPHANE QUINN

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**JUNG WOOK NA,**
Petitioner-Appellee,

v.

**JASMINE PEARL NA,**
Respondent-Appellant.

**No. 26-6105**
**D.C. No. 8:25-cv-02479-DOC-ADS**

# APPENDIX TO EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR STAY PENDING APPEAL

Appeal from the United States District Court
for the Central District of California
Hon. David O. Carter, District Judge

**QUINN & DWORAKOWSKI, LLP**
2050 Main Street, Sixth Floor, Suite 600
Irvine, California 92614 | (949) 660-1400
Attorneys for Respondent-Appellant Jasmine Pearl Na

# APPENDIX INDEX


| Docket | Document | Appendix Pages |
|---|---|---|
| Dkt. 75 | Order Denying Stay Pending Appeal and Granting Seven-Day Bridge Stay | APP-001–002 |
| Dkt. 69 | Order and Judgment Granting Petition in Part; Findings of Fact and Conclusions of Law | APP-003–025 |
| Dkt. 72 | Respondent-Appellant’s Motion for Stay Pending Appeal | APP-026–044 |
| Dkt. 71 | Respondent-Appellant’s Ex Parte Application for Immediate Administrative Stay | APP-045–051 |
| Dkt. 72-1 | Declaration of Stephane Quinn in Support of Stay (declaration pages) | APP-052–055 |
| Dkt. 72-2 | Declaration of Jasmine Pearl Na in Support of Stay, with Exhibit | APP-056–072 |
| Dkt. 73 | Petitioner-Appellee’s Opposition to Ex Parte Application | APP-073–079 |
| Dkt. 73-1 | Declaration of Jung Wook Na in Opposition, with Exhibits | APP-080–100 |
| Dkt. 74 | Respondent-Appellant’s Reply in Support of Ex Parte Application | APP-101–109 |
| Dkt. 74-1 | Supplemental Declaration of Jasmine Pearl Na | APP-110–114 |
| Dkt. 74-2 | Exhibit A – TalkingParents Passport Messages | APP-115–117 |
| Dkt. 74-3 | Exhibit B – Emergency United States Passport | APP-118 |
| Dkt. 74-4 | Exhibit C – Selected School Communications | APP-119–120 |
| Dkt. 74-5 | Exhibit D – TalkingParents Medical and School Messages | APP-121–124 |
| CM/ECF NEF | Notice of Electronic Filing for Dkt. 75 (transaction entered September 21, 2026) | APP-125 |
| Sept. 22, 2026 | Email from Petitioner’s counsel to Appellant’s counsel, 9:28 a.m. PDT (confirming opposition; advising that Petitioner’s father has traveled to Orange County) | APP-126 |
| Dkt. 72-1, Ex. A (excerpt) | Emails of September 9, 2026 between Petitioner’s counsel and the District Attorney’s Child Abduction Unit | APP-127–128 |


*Minors are identified by initials throughout, including in documents filed by Petitioner-Appellee. Fed. R. App. P. 25(a)(5); Fed. R. Civ. P. 5.2(a).*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

JUNG WOOK NA,
*Petitioner*,

vs.

JASMINE PEARL NA,
*Respondent*.

CASE NO.: 8:25-CV-02479-DOC-ADS

Order Denying Respondent's Motion for Stay Pending Appeal and Ex Parte Application for Administrative Stay and Granting Respondent's Request for a Seven-Day Bridge Stay As To Minor Child S.A.N.

The Court has considered Respondent Jasmine Pearl Na's Motion for Stay Pending Appeal and Ex Parte Application for Immediate Administrative Stay, the supporting declarations, the record, and the parties' submissions. Good cause appearing, IT IS ORDERED:

1. The portion of the September 4, 2026, Order and Judgment (Dkt. 69) directing that S.A.N. be returned to the Republic of Korea and reside with Petitioner is STAYED until September 25, 2026, pending the Respondent's filing to seek emergency relief from the Ninth Circuit.

2. While the stay remains in effect, neither party, nor any person acting at a party's direction or in active concert with a party who

receives actual notice of this Order, shall remove or facilitate the removal of S.A.N. from the United States or arrange international travel implementing the return provision.

3. Neither party shall use, release, transfer, replace, or seek any passport or travel document for S.A.N. to facilitate international travel for the duration of the stay.

4. Respondent shall not remove S.A.N. from the United States; shall maintain her school attendance absent illness or another ordinary reason; shall continue existing therapy and assessment arrangements subject to provider availability and clinical recommendations; and shall not interfere with reasonable electronic communication between Petitioner and both children.

5. This Order preserves the status quo until September 25, 2026, and does not adjudicate permanent custody, parenting time, or the ultimate merits of the appeal.

6. No bond or other monetary security is required. The Judgment is nonmonetary, and the conditions imposed by this Order adequately protect Petitioner's interests.

7. The hearing date for October 19, 2026, is hereby vacated.

**IT IS SO ORDERED.**

Dated: September 18, 2026

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

JS-6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **JUNG WOOK NA,**<br>**Petitioner,**<br><br>**vs.**<br><br>**JASMINE NA,**<br>**Respondent.** | **Case No. 8:25-CV-02479-DOC-ADS**<br><br>**ORDER AND JUDGMENT GRANTING PETITION IN PART[1]; FINDINGS OF FACT & CONCLUSIONS OF LAW** |

[1] This opinion serves as a Findings of Fact and Conclusions of Law. Additional enumerated Findings of Fact and Conclusions of Law are appended to this order.

This case arises under the Hague Convention's International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§9001 *et seq.* The parties are the parents of K.E.N and S.A.N. They disagree regarding which country—the United States or South Korea—is the home of their shared children. The Court held an eleven-day evidentiary hearing (the "trial"). For the reasons described below, the Court **ORDERS** the return of S.A.N to South Korea, while K.E.N shall remain in the United States. The Court will not be addressing custody arrangements, as this is an inappropriate use of judicial power under ICARA.

## I. BACKGROUND

### A. Facts

The parties' met in the United States and they married while residing in Asia. Dkt. 26 at 3. Both children were both in South Korea and are dual citizens of South Korea and the United States. *Id*. K.E.N was born on December 22, 2014 and S.A.N was born on April 15, 2019. *Id.* Jasmine Na, ("Mother" and "Respondent"), currently resides in the United States and is an United States citizen. *Id*. at 1. Jung Wook Na, ("Father" and "Petitioner"), is a South Korean citizen who resides in South Korea. *Id.* The family resided in South Korea before Mother and Father separated. *Id. at 3*.

Mother moved out of the marital residence around 2020. *Id.* at 4. Since then, the parties have been separated, but are still legally married. Mother moved back to the United States around May 2021 without the children. *Id*. Around July 2021 both children started residing in the United States with Mother. *Id*. S.A.N returned to South Korea in December 2021 to reside with Father and K.E.N returned to South Korea in June 2022 to reside with Father too. *Id.* The children came to the United States for a brief visit in December 2024. *Id.* Since 2021, Mother has visited the children in South Korea on multiple occasions such as trips in August 2022, June 2023, July 2023, March 2025, and July 2025. *Id*. She has also since June 2023 visited the children in Taiwan on multiple occasions. *Id.*

Around July 18, 2025 Mother traveled to South Korea to visit the children. *Id.* at 6. On July 31, 2025 Mother removed both children from South Korea to the United States. Father was away on a church retreat and Mother asked to take both children to Disneyland in Tokyo while

he was away. *Id.* Father consented to this trip. Instead of taking the children to Japan, Mother took the children to the United States. *Id.* at 6. Both children had been residing in the United States since then until the Court ordered S.A.N to return to South Korea for two months in Summer 2026. S.A.N has since returned to the United States and both children are currently residing in the United States.

On October 13, 2025, Father, through the Orange County District Attorney, filed a petition under the Hague Convention in the Superior Court of California, County of Orange. Dkt. 26 at 6.

The Court notes that neither parent has visited each other's respective country since this case began. For Father, a previous criminal record in the United States has made it impossible for him to receive a visa to the United States for the past twenty years. *Id.* at 3. Due to ongoing custody determinations being made in South Korea, Mother has expressed fear to this Court about returning to South Korea.

### B. Procedural History

Respondent removed this case from Orange County Superior Court ("Notice") (Dkt. 1) on November 4, 2025. Petitioner filed his Motion to Remand ("Motion to Remand") (Dkt. 9) the case back to state court on November 19, 2025. Respondent opposed the Motion to Remand (Dkt. 11) on November 25, 2025. The Court denied Petitioner's Motion to Remand on December 5, 2025. Petitioner filed his Amended Summary of Evidence (Dkt. 15) on January 5, 2026, and Respondent filed her Trial Brief on the same day (Dkt. 16). The parties' filed their Joint Statement of Stipulated Facts (Dkt. 26) on January 21, 2026. Loni Jo Poyner Klein was appointed the Guardian ad Litem ("Guardian ad Litem") for K.E.N and S.A.N on January 28, 2026. The Court held a non-consecutive, eleven-day evidentiary hearing.

## II. LEGAL STANDARD

The 1980 Hague Convention on the Civil Aspects of International Child Abduction is a multilateral treaty that provides authority for the expeditious physical return of a child who has been removed or retained from the habitual residence, in violation of the custody rights of the left-behind parent. Hague Convention on the Civil Aspects of International Child Abduction

pmbl., arts. 1, 3, Oct. 25, 1980, 1343 U.N.T.S. 89. The United States signed the 1980 Hague Convention in 1981, and Congress ratified the Convention in 1986. Hague Convention, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89. South Korea is also a party to the convention. *Id.*; Hague Conference on Private International Law, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (Feb. 11, 2025). Congress then passed implementing legislation, the International Child Abduction Remedies Act (ICARA) in 1988. 22 U.S.C. §§ 9001–9011 (1988), Pub. L. 100–300, § 2, Apr. 29, 1988, 102 Stat. 437. The primary purpose of the Hague Convention was to preserve the status quo that existed before a child's removal, and to deter would-be abductors from removing children to other jurisdictions in search of a more sympathetic court. Pub. Notice 957, 51 Fed.Reg. 10494, 10505 (1986). The policy underlying the Convention is "the interest of children . . . in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (internal citation and quotation omitted).

It is important to note at the outset that the Court's purview is limited under the Convention. The Court is not to stand as a judge of who is the better parent, as a Hague Convention case is not a child custody case. *Golan v. Saada*, 596 U.S. 666, 671 (2022) (citing 22 U.S.C. § 9001(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims.")). Rather, because the country that is the habitual residence of the child is a better judge of that issue, the Court is to provide a "provisional remedy." *Id*. (quoting *Monasky*, 589 U.S. at 72). This remedy is to determine if a child was wrongfully removed or retained away from their habitual residence, and if so, to order the child's return to that nation. *Id.* at 671-72 (citing 22 U.S.C. § 9003(e)(1), § 9001(a)(4)). Whether the taking is wrongful is determined by the law of the habitual residence. *See* Hague Convention art. 3-4, Oct. 25, 1980, 1343 U.N.T.S. 89.

Upon return of the child to their habitual residence, the custody adjudications will proceed in that forum. *Monasky,* 589 U.S. at 72. The elements of the case for return are that the

person or parent petitioning for the return must show by a preponderance of the evidence that the child:

1. Is under the age of sixteen;
2. Has been wrongfully removed or retained;
3. Has been wrongfully removed or retained from his or her habitual residence; and
4. Has been wrongfully removed or retained in violation of the custody rights of the left-behind parent.

Hague Convention art. 3-4, Oct. 25, 1980, 1343 U.N.T.S. 89; 22 U.S.C. § 9003(e)(1) (establishing the burden of proof).

If the petitioner has proven the elements above in accordance with their burden, the Court must order the return of the child unless a defense to return is established. Hague Convention arts. 12–13, 20, 1343 U.N.T.S. 89; 22 U.S.C. § 9003(e)(2). There are five narrow defenses to return, however, the only defense raised in this case is that return of the child would cause grave risk of harm to the child. Hague Convention arts. 12–13, Oct. 25, 1980, 1343 U.N.T.S. 89; 22 U.S.C. § 9003(e)(2)(A); *see* Trial Tr. Feb. 3, 2025 Rep Tr., 8. Respondent must establish this defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

**III. DISCUSSION**

Element one for return is not disputed because K.E.N is twelve-years old and S.A.N is seven-years old, making them both under the age of sixteen. Dkt. 26 at 3. The Court finds that when K.E.N and S.A.N were taken from South Korea, and flown to the United States without Father's consent, South Korea was the children's habitual residence. The Court also finds that Mother's taking of the children was in breach of Father's custodial rights under South Korean law, which he was exercising at the time of the wrongful taking. However, a defense to turn has been clearly established for K.E.N.

**A. Habitual Residence**

The term "habitual residence" is not explicitly defined by the Hague Convention itself. A substantial body of caselaw has developed, however, to establish a standard for determining habitual residence. *Mendez v. May*, 778 F.3d 337, 346-347 (1st Cir. 2015);

*Blackledge v. Blackledge*, 866 F.3d 169, 179-180 (3d Cir. 2017); *Friedrich v. Friedrich,* 983 F.2d 1396, 1401 (6th Cir. 1993); *Robert v. Tesson*, 507 F.3d 981, 989 (6th Cir. 2007); *Pfeiffer v. Bachotet*, 913 F.3d 1018, 1024 (11th Cir. 2019). A frequently cited case is *In re Bates,* a United Kingdom decision that helped define the concept of habitual residence and states: "[a]ll the law requires is that there is a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely. Indeed, his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode, and there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled." No. CA 122.89 at 9-10, High Court of Justice, *9 Fam. Div'n Ct. Royal Court of Justice, United Kingdom (1989).

The Supreme Court in *Monasky,* further emphasized that courts should consider a broad range of factors when determining habitual residence, as this determination is "a fact-driven inquiry into the particular circumstances of the case." 589 U.S. at 79. The totality-of-the-circumstances approach often examines the "family and social environment in which [the child's] life has developed." *Id.* at 77 (internal citation omitted). The Court clarified that "[t]here are no categorical requirements for establishing a child's habitual residence—least of all an actual-agreement requirement for infants." *Id.* at 80-81. Among the factors the Court cited as relevant in this analysis are the child's age, meaningful connections with the people and place in the new country, immigration status of the caregiving parents, and the length of time the child was physically located in a particular place. *Id.* at 78 n.3 (internal citations omitted). But this is not an exhaustive list.

Father argues that South Korea is the children's habitual residence, while Mother asserts that South Korea was never meant to be the family's permanent residence. The Court finds that children's habitual residence is South Korea. The evidence supporting this conclusion is substantial.

**1. Physical Presence**

The Court will first address the physical presence of the parties and relevant family members. The Ninth Circuit in *Nisbet v. Bridger,* 124 F.4th 577, 584 (9th Cir. 2024) defined a child's habitual residence as "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." (internal quotations and citations omitted). Further, the Court stated that this approach considers whether the child "acquired a sense of environmental normalcy by forming meaningful connections and the people and places he encountered." *Id.*; *see also Monasky,* 589 U.S. at 77 (noting the Hauge Convention's explanatory report referred to a child's habitual residence as "the family and social environmental in which [the child's] life has developed" (alternation in original) (citation omitted)).

While physical presence of the child alone is not dispositive, it must be considered alongside meaningful social connections and a sense of environmental normalcy. *See id.* at 588 (citing *Monasky,* 589 at 81). However, when physical presence fails to yield meaningful social connections, courts assign it little weight in habitual-residence determinations. *Id.*

Both children were born in South Korea and spent most of their childhoods there. Dkt. 26 at 4. With this background in mind, the Court focuses first on examining the children's familial presence in South Korea. Given that habitual residence is determined by assessing the child's meaningful connections and environmental normalcy, it is necessary to analyze the familial and social environment in South Korea, as this is where the children resided for most of their lives.

**Mother's Presence in South Korea**

Though Mother has visited South Korea several times since her return to the United States in 2021, the children have remained in South Korea other than a short visit in 2024. Dkt. 26 at 4.

**Extended Family in South Korea**

The children live with their paternal grandparents and nanny in South Korea. Dkt. 66 at 2. Though the children have maternal grandparents in the United States, they did not grow up living with them. Therefore, the children's closer familial connections would be in South Korea.

**Connections to South Korea**

In *Nisbet,* the Ninth Circuit examined whether two children had acclimatized to Scotland by assessing their connections to the people in their physical social environment, including family, friends, and parents. 124 F.4th at 585. Unlike this case, the court there affirmed that the children lacked meaningful ties to Scotland even though they were physically present there because they had not formed friendships at nursery school, had no contact with their extended family, and had a father who had been incarcerated since birth. *Id.* By contrast, here both children have strong relationships with their grandparents, nanny, extended cousins, and friends whom they have known since birth. Dkt. 66 at 2. The children can speak Korean and have all of their personal belongings in Korea. Even Respondent admits in her briefing the "substantial facts favoring Korea" as the habitual residence such as the children having "lived there for years, attended school, had familiar routines, and maintained relationships." Dkt. 65 at 11.

**2. Intentions and Circumstances of Parents**

The Court next addresses the parents' intent and circumstances regarding establishing a home for both children. Because parents often dispute their intentions during litigation, "the court should look at actions as well as declarations in determining [parental intent]." *Olivia v. Espinoza,* No.: 20CV01133-JAH-DEB, 2021 WL 4554579 at *6 (S.D. Cal. Oct. 5, 2021) (citing *Walker v. Walker,* 701 F.3d 1110, 1119 (7th Cir. 2012). Mother contends that Father's retention of immigration counsel to facilitate a return to the United States, communication between the parties about eventually raising the children in the United States, and the children's English-language curriculum point towards South Korea not being the children's habitual place of residence. Dkt. 65 at 3-4. Though these things may have been true, the fact of the matter remains that the children had only lived in the United States for about a year prior to being taken by

Mother in 2025. The have known no other country as their home, other than South Korea, since their birth. It is clear to the Court that the children's habitual residence was South Korea at the time of their taking, despite what any future intent may have been for the children's residence in the United States.

**B. Violation of Custody Rights Under South Korean Law**

Having established that the children's habitual residence was South Korea, the Court must now determine (1) whether Mother's removal of the child breached Father's custody rights under South Korean law and (2) whether Father was exercising those rights at the time of removal. *See* Hague Convention art. 3-4, Oct. 25, 1980, 1343 U.N.T.S. 89; 22 U.S.C. §9003(e)(1) (establishing the burden of proof).

**Custody Rights Under Korean Law**

Under the Hague Convention, removal is wrongful if it violates the custody rights of the left-behind parent as recognized by the child's habitual residence. *Id.* Custody rights can be established by (1) operation of law, (2) judicial or administrative decision, or (3) agreement between the parents. Hague Convention art. 3, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89.

Korean law mandates that parental authority is exercised jointly over minor children. *See* Korean Civil Act art. 909(2) (S. Kor.). If parents are unable to reach an agreement, the Korean family court steps in. *Id.* At no point did mother appeal to the Korean family court for guidance over where the children shall reside. Instead, she simply took the children in violation of Korean law.

**International Comity and the Hague Convention**

The Hague Convention was founded on principles of international comity, ensuring that courts respect the custody determination of other signatory nations. *Souratgar v. Fair*, 720 F.3d 96, 108 (2nd Cir., 2013) ("the careful and thorough fulfillment of our treaty obligations stands not only to protect children abducted to the United States, but also to protect American children abducted to other nations-whose courts, under the legal regime created by this treaty, are expected to offer reciprocal protection.") (international citation and quotation omitted). ("In the exercise of comity, we are required to place our trust in the court of the home country to

issue whatever orders may be necessary to safeguard children who come before it.") (internal quotation and citation omitted). It would go against the Hauge Convention to allow parents to conceive children in one country, establish a home there, and then, upon dissatisfaction with the relationship or living situation, remove the children to another country in hopes of securing a more favorable outcome in a foreign jurisdiction.

At the time of Mother's departure with the children, there was no court order governing the parents' custody rights. However, the evidence establishes that there was an agreement for the children to remain in South Korea for the time being. Otherwise, Mother would have never consented to send the children back to South Korea in 2021 and 2022. By disregarding South Korean law and removing the child without legal authorization, Mother acted in clear violation of Father's custodial rights.

**C. Father's Defenses**

**1. Grave Risk of Harm**

There is a uniform acknowledgement among courts that the defenses available under the Convention should be interpreted narrowly. *See, e.g., Nicolson v. Pappalardo*, 605 F.3d 100, 107 (1st Cir. 2010); *Asvesta v. Petroutsas*, 580 F.3d 1000, 1004 (9th Cir. 2009); *Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008) (using Article 13(b) defense); *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 271 (3d Cir. 2007) (using Article 13 defense); *Karkkainen v. Kovalchuk*, 445 F.3d 280, 288 (3d Cir. 2006); *Miller v. Miller,* 240 F.3d 392, 402 (4th Cir. 2001); *Diorinou v. Mezitis*, 237 F.3d 133, 145 (2d Cir. 2001); *England v. England*, 234 F.3d 268, 272 (5th Cir. 2000); *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996); *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995). This is to prevent the Convention from becoming "a dead letter." *See* Elisa Pérez-Vera, Explanatory Report, in 3 Actes et Documents de la Quatorzième session, 434-35 (1982), https://www.fjc.gov/content/311576/explanatory-report-eliza-perezvera-report (the Pérez-Vera Report is the official commentary of the reporter to the proceedings leading to the adoption of the 1980 Hague Convention by the Hague Conference on Private International Law). In fact, Article 18 provides that the defenses "do not limit the power of a judicial or administrative authority to order the return of the child at any time." Hague Convention art. 18.

Thus, if the return of a child would further the aims of the Convention, Article 18 confers discretion to return a child even if a defense to return has been proven. *Id.*

Article 13(b) provides that a child need not be returned if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b). Grave risk is an affirmative defense that must be proved by clear and convincing evidence. 22 U.S.C. § 9003(e)(2). Concern with comity among nations argues for a narrow interpretation of the 'grave risk of harm' defense, but the safety of children is paramount. *Van De Sande v. Van De Sande*, 431 F.3d 567, 572 (7th Cir. 2005) (quotation omitted); *Danaipour v. McLarey*, 286 F.3d 1, 22 (1st Cir. 2002); *see also Colchester v. Lazaro*, 16 F.4th 712, 717 (9th Cir. 2021). In deciding whether grave risk exists, courts are to consider "both the magnitude of the potential harm and the probability that the harm will materialize." *Colon v. Montufar*, F. Supp. 3d 1280, 1292 (S.D. Fla. July 2, 2020) (citing *Souratgar v. Fair*, 720 F.3d 96, 103 (2d Cir. 2013)). A respondent parent can establish a grave risk of harm from abuse "where the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question." *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014). Spousal violence may also "establish a grave risk of harm to the child, particularly when it occurs in the presence of the child." *Id.*; *see also Gomez v. Fuenmayor*, 812 F.3d 1005, 1007 (2016).

Here, Mother accused Father of domestic violence, as well as use of physical discipline against the children. Dkt. 26 at 5. The Court will address each accusation in turn.

**2. Domestic Violence**

Mother alleges that during a 2017 altercation, Father pushed Mother to the ground, shattered a nearby nightstand, and dragged her into the balcony area of their twelfth-floor residence. Dkt. 65 at 6. Father, later texted Mother to say that he "can't believe [he] let it go that far" corroborates the seriousness of the incident and is inconsistent with his later effort to characterize the conduct as protective or justified. Joint Exs. 101-109. Father admits that he broke a nightstand and pushed Mother out of the room, but disputes dragging Mother to the balcony. Dkt, 34-1 at 3.

During a later altercation in 2023, Mother says Father punched her in the chest, resulting in a visit to the emergency room. Joint Exs. 113, 120. Father claims there was a tussle with Mother because she tried to take his phone and that mother's own hand hit her chest. Dkt. 66 at 5.

Father presented evidence that Mother threatened to harm him via text and that she sent him inflammatory messages regarding her relations with other men. Dkt. 66 at 4. The Court does not condone Mother's behavior, however this is not sufficient evidence that Mother was abusive towards Father.

Mother's expert on domestic violence, Dr. Dobson, said that Mother showed signs of having experienced "extreme abuse" by Father. *Id.* Though the Court cannot know exactly what transpired between Father and Mother in 2017 and 2023, the Court credits the testimony of Dr. Dobson in that Mother is clearly fearful of Father and finds that at least one of the children may have been present to witness Father's actions.

**3. Physical Discipline**

Father admits that he utilized physical discipline a single time against K.E.N. Mother claims there were several more instances. Dkt. 26 at 5. The incident Father admits to involved Father striking K.E.N with a stick—resulting in bruising and marks that Father covered with bandages. Dkt. 34-1 at 2. K.E.N was further kept from going to school and told that when she returned to school, not to tell anyone about the incident according to testimony by the Guardian ad Litem, which the Court credits. *Id.* When K.E.N was perceived to have misbehaved by her Father, she was made to kneel as punishment. The Court also finds that K.E.N was likely hit by a coat hanger during one of the instances she was kneeling and that Father also made contact with K.E.N's head with one of her metal leg braces, further crediting the testimony of the Guardian ad Litem. *See Id.* The Court is deeply alarmed by the pattern of physical harm to K.E.N, alongside Father's conduct concealing injury. K.E.N also expressed to the Court during her March 11, 2026 interview that she did not believe her Father was going to change his behavior towards her if she misbehaved in the future.

There is no evidence that Father ever hit S.A.N and in the Court's interview with S.A.N on March 11. 2026 she did not express that Father had never hit her. During the two months that S.A.N was in South Korea during summer 2026, there are similarly no allegations of physical abuse of S.A.N by Father.

Father's admitted physical abuse of K.E.N and avoidance of mandated reporters, alongside K.E.N's fear of her father hitting her makes it untenable that K.E.N would be able to safely live with Father without risk of grave danger. The evidence presented by Mother meets the clear and convincing standard required to establish a grave risk of harm under Article 13(b). *See* Hague Convention art. 13(b). However, given S.A.N's differing experiences, the Court finds that unlike K.E.N, S.A.N should be returned to South Korea.

**D. Remedial Measures**

Father has said he voluntarily enrolled in a Batterer Intervention Program in Los Angeles, completing 25 of 52 weeks of the program as of the time of closing arguments. Dkt. 66 at 7. He has further represented that he has undergone parenting classes, personal therapy, and courses in parenting adolescents and children. *Id.*

Should the Court find grave risk of harm by clear and convincing evidence, Father has said that he would be willing to submit to ameliorative measures such as: the appointment of a guardian ad litem in Korea, therapy for the children with a psychologist able to communicate with the guardian ad litem, a separate and safe apartment for Mother to live in South Korea when visiting, holiday travel for the children to the United States, and an order that Mother not be arrested for removing the children from South Korea. *Id.* at 18-19.

Dr. Dobson explained that concealing injuries, avoiding mandated reporters, and reframing violence as loving discipline reduce the visibility of harm and make safeguards dependent on reporting and voluntary compliance less reliable. (Dobson Decl., paragraphs 5-12.) The Court finds this testimony to be credible. Even S.A.N was unwilling to answer questions about the disciplinary actions her father took against K.E.N and Father has admitted that he has created an environment of secrecy around the hitting of K.E.N. In the face of these

factors, the Court does not find that the ameliorative measures suggested by Father would suffice in keeping K.E.N safe.

**V. CONCLUSION**

A child must be returned to its habitual residence if Petitioner has proven their case by a preponderance of the evidence. Petitioner has met their burden, thus the duty to return is mandatory for S.A.N. only.

This Court **ORDERS** that S.A.N be returned to South Korea to reside with Father and that due to grave risk, K.E.N remain in the United States with Mother.

DATED: September 4, 2026

David O. Carter

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

## ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

**Wrongful Taking of S.A.N and K.E.S**

In August 2021, with Father's express consent, Mother relocated with both children to Irvine, California. K.E.N. enrolled in school, and the children lived in California for nearly one year. They were enrolled in Irvine schools from July 2021 to December 2021, when S.A.N. returned to Korea. K.E.N. was returned to Korea in June 2022 to reside with Father. The children resided in South Korea ever since their return.

During a visit with K.E.N. and S.A.N., on July 31, 2025, Mother wrongfully removed the children from Korea when Father was out of town on a church retreat. Rather than taking the children to an agreed upon holiday to Tokyo Disneyland, located in Tokyo, Japan, Mother instead took the children to California on an airplane, using their Korean passports, to enter the United States of America.

**Habitual Residence**

The Court finds that Father has proven by a preponderance of the evidence that the parties' minor children, K.E.N. and S.A.N. were habitual residents of the Republic of Korea at the time Mother removed them from Korea to California on July 31, 2025.

Immediately before July 31, 2025, the children had lived in Korea for substantial periods, attended school there, developed routines, and maintained friends and family relationships there. The Court has given those circumstances substantial weight because they favor Father's claim that Korea was the children's habitual residence.

Father also meets his burden of establishing by a preponderance of the evidence that the removal of the children by Mother was in breach of Father's custody rights under the laws of Korea, and that Father was exercising those rights at the time of the removal.

**Physical Abuse and Concealment**

In 2024, Father struck K.E.N. with a stick. Father admitted that conduct at trial and again in his February 2, 2026 declaration. (Dkt. 34-1, paragraph 3; Joint Ex. 124.)

Father has readily admitted that in April of 2024, he physically disciplined K.E.N., when she was nine years old, by having her kneel before him and he hit her with a plastic stick. Father testified he kept K.E.N. out of school and took her to a children's park, and clearly recalls placing bandages on the red marks left by the discipline.

Father instructed K.E.N. not to tell anyone about the incident and did not disclose the abuse to Mother. Father admitted both concealment decisions in his February 2 declaration. (Dkt. 34-1, paragraphs 3, 7.)

Father knew that Korean law prohibited the conduct and that disclosure could result in loss of custody and criminal prosecution. He also knew that teachers and medical professionals were required to report suspected abuse. (Dkt. 34-1, paragraph 8.)

The Guardian ad Litem testified that Father kept K.E.N. out of school so teachers and other mandated reporters would not see the marks and bruises. The Court credits the Guardian ad Litem's testimony and K.E.N.'s disclosure on this point.

The stick incident was not isolated. The Guardian ad Litem testified that Father struck K.E.N. with a wire hanger while forcing her to kneel. The Court credits that testimony and finds that the hanger incident occurred.

The Court also credits K.E.N.'s disclosure that Father struck her on the head with her metal leg brace in 2023.

The Court interviewed the children on March 11, 2026. K.E.N. testified that Father had hit her in 2024, with a plastic stick, covered marks on her skin with band aids, and told her not to tell anyone. She testified she went to school, was questioned by her teachers about the bandages, went home, and Father took her to a children's park. She also recalled, after direct questions, that when she was much younger, maybe in Kindergarten, that Father had made her kneel and hold out her hands, and had hit her with children's clothing hangers, rice paddles or spoons, and other small objects. She said he had promised never to do it again so when he hit her in 2024, it made her distrust her Father. She also testified that she was afraid her father would hit her again if she did something wrong.

The Court credits the portions of Dr. Leslie Dobson's testimony and declaration admitted for the limited purpose of evaluating concealment, trauma-based silence, and the practical operation of protective measures. Dr. Dobson explained that concealing injuries, avoiding mandated reporters, and reframing violence as loving discipline reduce the visibility of harm and make safeguards dependent on reporting and voluntary compliance less reliable. (Dobson Decl., paragraphs 5-12.)

**Domestic Violence**

In 2017, Mother alleges that Father pushed Mother to the ground, shattered a glass table or nightstand during the altercation, and dragged or forced her onto the balcony area of the parties' twelfth-floor residence. Father's contemporaneous message that he "can't believe [he] let it go that far" corroborates the seriousness of the incident. (Joint Exs. 101-109.)

In 2023, Mother alleges that Father punched Mother in the chest during an argument. Mother thereafter sought emergency medical care. (Joint Exs. 113, 120.) Father claims that Mother injured herself while attempting to retrieve a cellular telephone in a tussle between them.

Mother sent insulting and disparaging communications during the parties' acrimonious relationship. That conduct was inappropriate. However, this behavior did not involve physical violence toward the children, concealment of injuries, or evasion of child-protection systems, and it does not negate the risk established by Father's conduct.

**Ameliorative and Protective Measures**

Father proposed counseling, parenting classes, school reporting, child therapy, appointment of a Korean guardian ad litem, transmission of this Court's order to schools and professionals, separate housing for Mother, and promises of compliance as ameliorative measures.

Father voluntarily enrolled in a Batterer Intervention Program in Los Angeles, and has participated each week, completing 25 of 52 weeks of the program as of the time of closing arguments. He has undergone parenting classes, personal therapy, and courses in parenting adolescents and children.

Mother has undergone personal therapy.

## CONCLUSIONS OF LAW

**Legal Background- Hague Convention**

This case arises under the Hague Convention's International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§9001 *et seq.*

The 1980 Hague Convention on the Civil Aspects of International Child Abduction is a multilateral treaty that provides authority for the expeditious physical return of a child who has been removed or retained from the habitual residence, in violation of the custody rights of the left-behind parent. Hague Convention on the Civil Aspects of International Child Abduction pmbl., arts. 1, 3, Oct. 25, 1980, 1343 U.N.T.S. 89.

The United States signed the 1980 Hague Convention in 1981, and Congress ratified the Convention in 1986. Hague Convention, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89. South Korea is also a party to the convention. *Id.*; Hague Conference on Private International Law, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (Feb. 11, 2025). Congress then passed implementing legislation, the International Child Abduction Remedies Act (ICARA) in 1988. 22 U.S.C. §§ 9001–9011 (1988), Pub. L. 100–300, § 2, Apr. 29, 1988, 102 Stat. 437.

The primary purpose of the Hague Convention was to preserve the status quo that existed before a child's removal, and to deter would-be abductors from removing children to other jurisdictions in search of a more sympathetic court. Pub. Notice 957, 51 Fed.Reg. 10494, 10505 (1986).

The policy underlying the Convention is "the interest of children . . . in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (internal citation and quotation omitted).

The Court's purview is limited to deciding if a child was wrongfully removed or retained away from their habitual residence, and if so, to order the child's return to that nation. *Id.* at 671-72 (citing 22 U.S.C. § 9003(e)(1), § 9001(a)(4)).

The elements of the case for return are that the person or parent petitioning for the return must show by a preponderance of the evidence that the child:

1. Is under the age of sixteen;
2. Has been wrongfully removed or retained;
3. Has been wrongfully removed or retained from his or her habitual residence; and
4. Has been wrongfully removed or retained in violation of the custody rights of the left-behind parent.

Hague Convention art. 3-4, Oct. 25, 1980, 1343 U.N.T.S. 89; 22 U.S.C. § 9003(e)(1) (establishing the burden of proof).

If the petitioner has proven the elements above in accordance with their burden, the Court must order the return of the child unless a defense to return is established. Hague Convention arts. 12–13, 20, 1343 U.N.T.S. 89; 22 U.S.C. § 9003(e)(2).

**Habitual Residence**

The determination of habitual residence is "a fact-driven inquiry into the particular circumstances of the case." *Monasky,* 589 U.S. at 79. It is a totality-of-the-circumstances approach that examines the "family and social environment in which [the child's] life has developed." *Id.* at 77 (internal citation omitted).

Factors relevant in this analysis are the child's age, meaningful connections with the people and place in the new country, immigration status of the caregiving parents, and the length of time the child was physically located in a particular place. *Id.* at 78 n.3 (internal citations omitted).

**Habitual Residence - Physical Presence**

While physical presence of the child alone is not dispositive, it must be considered alongside meaningful social connections and a sense of environmental normalcy. *See Nisbet,* 124 F. 4th at 584 (citing *Monasky,* 589 at 81). When physical presence fails to yield meaningful social connections, courts assign it little weight in habitual-residence determinations. *Id.*

This case is distinct from *Nisbet,* where the Ninth Circuit held that children lacked meaningful ties to Scotland despite physical presence, because, in that case, the children had not formed friendships at nursery school, had no contact with their extended family, and had a father who had been incarcerated since birth. *See* 124 F.4th at 585.

Both children's physical presence for the majority of their lives was in South Korea—where their paternal family resides. The children have significant familial and social ties to South Korea, which strongly supports the conclusion that South Korea, rather than the United States, is their habitual residence.

**Violation of Custody Rights Under South Korean Law**

After determining habitual residence, the Court must determine (1) whether Mother's removal of the child breached Father's custody rights under South Korean law and (2) whether Father was exercising those rights at the time of removal. *See* Hague Convention art. 3-4, Oct. 25, 1980, 1343 U.N.T.S. 89; 22 U.S.C. §9003(e)(1) (establishing the burden of proof).

Custody rights can be established by (1) operation of law, (2) judicial or administrative decision, or (3) agreement between the parents. Hague Convention art. 3, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89.

Korean law mandates that parental authority is exercised jointly over minor children. *See* Korean Civil Act art. 909(2) (S. Kor.). If parents are unable to reach an agreement, the Korean family court steps in. *Id.* At no point did mother appeal to the Korean family court for guidance over where the children shall reside. Instead, she simply took the children in violation of Korean law.

Father had custody rights under South Korean law, and Mother's unilateral removal of the children without Father's consent or court authorization constituted a breach of those rights.

**International Comity and the Hague Convention**

The Hague Convention was founded on principles of international comity, ensuring that courts respect the custody determination of other signatory nations. *Souratgar v. Fair*, 720 F.3d 96, 108 (2nd Cir., 2013) ("the careful and thorough fulfillment of our treaty obligations stands not only to protect children abducted to the United States, but also to protect American

children abducted to other nations-whose courts, under the legal regime created by this treaty, are expected to offer reciprocal protection.") (international citation and quotation omitted).

By disregarding South Korean law and removing the children without legal authorization, Mother acted in clear violation of Father's custodial rights.

**Mother's Defenses- Grave Risk of Harm**

There is a uniform acknowledgement among courts that the defenses available under the Convention should be interpreted narrowly. *See, e.g., Nicolson v. Pappalardo*, 605 F.3d 100, 107 (1st Cir. 2010); *Asvesta v. Petroutsas*, 580 F.3d 1000, 1004 (9th Cir. 2009); *Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008) (using Article 13(b) defense); *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 271 (3d Cir. 2007) (using Article 13 defense); *Karkkainen v. Kovalchuk*, 445 F.3d 280, 288 (3d Cir. 2006); *Miller v. Miller,* 240 F.3d 392, 402 (4th Cir. 2001); *Diorinou v. Mezitis*, 237 F.3d 133, 145 (2d Cir. 2001); *England v. England*, 234 F.3d 268, 272 (5th Cir. 2000); *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996); *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995).

Article 18 provides that the defenses "do not limit the power of a judicial or administrative authority to order the return of the child at any time." Hague Convention art. 18. Thus, if the return of a child would further the aims of the Convention, Article 18 confers discretion to return a child even if a defense to return has been proven. *Id.*

Article 13(b) provides that a child need not be returned if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Id.* at art. 13(b).

Grave risk is an affirmative defense that must be proved by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). In deciding whether grave risk exists, courts are to consider "both the magnitude of the potential harm and the probability that the harm will materialize." *Colon v. Montufar*, F. Supp. 3d 1280, 1292 (S.D. Fla. July 2, 2020) (citing *Souratgar v. Fair*, 720 F.3d 96, 103 (2d Cir. 2013)).

A respondent parent can establish a grave risk of harm from abuse "where the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in

question." *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014). Spousal violence may also "establish a grave risk of harm to the child, particularly when it occurs in the presence of the child." *Id.*; *see also Gomez v. Fuenmayor*, 812 F.3d 1005, 1007 (2016).

The evidence presented by Mother does meet the clear and convincing standard required to establish a grave risk of harm under Article 13(b) for K.E.N only. The clear-and-convincing showing rests on direct evidence, not speculation: Father admitted striking K.E.N. with a stick, causing bruises, instructing her not to tell, and failing to inform Mother. He understood the conduct was unlawful and that teachers and doctors were mandated reporters. The Guardian ad Litem corroborated that Father kept K.E.N. home while the injuries were visible. The Court also credited the hanger, forced-kneeling, and leg-brace incidents.

**<u>Ameliorative Measures Do Not Lead to Return</u>**

Once grave risk is established, Article 13(b) lifts the Convention's otherwise-applicable return mandate and leaves the Court with discretion to grant or deny return. *Golan v. Saada*, 596 U.S. 666, 676-82 (2022). A court is not categorically required to examine every imaginable measure before denying return. It ordinarily should address measures raised by the parties or obviously suggested by the circumstances, but it may reject measures that are unworkable, ineffective, would intrude into custody merits, or would prolong the proceeding without reliably protecting the child. *Id.*; *Radu v. Shon*, 62 F.4th 1165, 1169-77 (9th Cir. 2023).

The Court has considered each category of measure Father proposed. Promises against corporal punishment are inadequate because Father previously concealed the abuse and gave materially incomplete sworn testimony. Therapy and a batterer's program do not eliminate the risk because Father began them only after litigation exposure and there is no guarantee that completion will lead to durable change. School, therapist, or guardian reporting cannot sufficiently protect the children because Father previously kept K.E.N from school and directed her not to report. The existence of Korean child-protection laws does not resolve the case specific problem. Father admitted that he knew those laws, feared their consequences, and concealed the abuse for that reason. The question is not whether Korean law prohibits abuse; it

does. The question is whether the measures proposed here would sufficiently mitigate the proven risk before and after a violation. The record shows they would not.

## IV. CONCLUSION

A child must be returned if Petitioner's burden is met, and the wrongful removal or retention took place within twelve months of the commencement of the proceedings. The duty to return is mandatory.

This Court **ORDERS** that S.A.N be returned to South Korea to live with her Father. K.E.N will remain in the United States with her Mother.

STEPHANE QUINN CFLS (SBN: 278188)
DAVID DWORAKOWSKI CFLS, CALS (SBN: 135285)
**QUINN & DWORAKOWSKI, LLP**
IRVINE CONCOURSE
2050 Main Street, 6th Floor, Suite 600
Irvine, California 92614
Telephone: (949) 660-1400
E-Mail: quinn@orangecountyfamilylaw.com
E-Mail: david@orangecountyfamilylaw.com

Attorneys for Respondent JASMINE PEARL NA

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

| | |
|---|---|
| JUNG WOOK NA,<br>*Petitioner*,<br><br>vs.<br><br>JASMINE PEARL NA,<br>*Respondent*. | **CASE NO.: 8:25-CV-02479-DOC-ADS**<br><br>**NOTICE OF MOTION AND MOTION FOR STAY PENDING APPEAL AS TO MINOR CHILD S.A.N.; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: October 19, 2026<br>Time: 8:30 a.m.<br>Judge: Hon. David O. Carter<br>Courtroom: 10A |

**TO THE HONORABLE DAVID O. CARTER, UNITED STATES DISTRICT JUDGE, PETITIONER JUNG WOOK NA, AND HIS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on October 19, 2026, at 8:30 a.m., or as soon thereafter as the matter may be heard in Courtroom 10A of the Ronald Reagan Federal Building and United States Courthouse, 411 West Fourth Street, Santa Ana, California 92701, Respondent Jasmine Pearl Na will move under Federal Rule of Appellate Procedure 8(a)(1)(A) and Federal Rule of

Civil Procedure 62(d) to stay the portion of the September 4, 2026, Order and Judgment (Dkt. 69) directing S.A.N. to return to the Republic of Korea and reside with Petitioner. Respondent is contemporaneously filing a Notice of Appeal and seeks a stay through issuance of the Ninth Circuit's mandate or further order.

Alternatively, Respondent requests a seven-day bridge stay. A companion ex parte application seeks an immediate administrative stay and an order shortening time.

This motion follows Respondent's good-faith attempt to confer by telephone under Local Rule 7-3 on September 14, 2026. Petitioner's counsel confirmed that Petitioner opposes a stay, but terminated the call before stating Petitioner's position on the request to shorten time, the alternative seven-day bridge stay, the proposed interim passport and travel restrictions, or mediation, and before the parties could resolve or narrow the dispute. Because Petitioner seeks an international transfer within days, Respondent could not wait seven days before filing.

## TABLE OF CONTENTS

I. INTRODUCTION .......... 6
II. RELEVANT BACKGROUND .......... 7
III. GOVERNING STANDARD .......... 8
IV. THE STAY FACTORS FAVOR RELIEF .......... 8
A. The Appeal Presents Serious Legal Questions .......... 8
1. The Article 13(b) Inquiry Is Prospective .......... 8
2. The Order Does Not Reconcile Its Child-Protection Findings .......... 11
3. The Order Does Not Address the "Intolerable Situation" Clause .......... 12
4. The Order Does Not Address International Sibling Separation .......... 12
5. The Child-Specific Findings Present a Substantial Rule 52 Issue .......... 13
6. The Remedy Requires Clarification Before Transfer .......... 14
B. Irreparable Harm Is Probable Without a Stay .......... 14
C. A Conditioned Stay Will Not Substantially Injure Father .......... 16
D. The Public Interest Favors a Stay and Expedited Review .......... 17
E. Alternatively, Grant a Seven-Day Bridge Stay .......... 17
CONCLUSION .......... 18

## TABLE OF AUTHORITIES

**Cases** **Page**

*Chafin v. Chafin*
568 U.S. 165 (2013) .......... 9, 15, 17

*Colchester v. Lazaro*
16 F.4th 712 (9th Cir. 2021) .......... 13

*Dominguez Ochoa v. Ochoa Perez*
No. 7:24-cv-04736-NSR, ECF No. 59 (S.D.N.Y. July 31, 2025) .......... 13

*England v. England*
234 F.3d 268 (5th Cir. 2000) .......... 12

*Ermini v. Vittori*
758 F.3d 153 (2d Cir. 2014) .......... 12, 13

*Golan v. Saada*
596 U.S. 666 (2022) .......... 10, 17

*Leiva-Perez v. Holder*
640 F.3d 962 (9th Cir. 2011) (per curiam) .......... 9, 15

*Nken v. Holder*
556 U.S. 418 (2009) .......... 9

*Radu v. Shon*
62 F.4th 1165 (9th Cir. 2023) .......... 10, 14

*Silva v. Dos Santos*
68 F.4th 1247 (11th Cir. 2023) .......... 10

*Simcox v. Simcox*
*511 F.3d 594 (6th Cir. 2007)* .......... 10

**Treaty**
Hague Convention on the Civil Aspects of International Child Abduction, art. 13(b), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 .......... 9, 15

## TABLE OF AUTHORITIES
## (Continued)

**Rules**

Fed. R. App. P. 8(a)(1)(A)........................................................ 1, 8
Fed. R. App. P. 8(a)(2)........................................................... 18
Fed. R. Civ. P. 52(a)................................................ 6, 13, 14, 17
Fed. R. Civ. P. 62(d).............................................................. 8
C.D. Cal. L.R. 7-3.................................................................. 2
C.D. Cal. L.R. 11-6.1.............................................................. 19

## I. INTRODUCTION.

This Court made grave and detailed findings concerning Father. It found that he struck K.E.N. with a stick and caused bruising, concealed the injuries, instructed her not to tell anyone, kept her from school and mandated reporters, and created an environment of secrecy surrounding the abuse. It further found that Father gave materially incomplete sworn testimony and that proposed reporting safeguards could not sufficiently protect “the children.” (Dkt. at 12–13, 15–17, 22–23.) The Court therefore found clear and convincing evidence of grave risk and ordered K.E.N. to remain in the United States. All citations to the Order use the CM/ECF PDF page numbers.

The Order reached the opposite result for seven-year-old S.A.N. It emphasized that there was no evidence Father had already hit her, that no physical abuse of S.A.N. was alleged during her two-month summer 2026 visit, and that her experiences differed from K.E.N.’s. (Dkt. at 13.) But Article 13(b) asks what risk return would create, not merely whether the younger child has already suffered the same injury. The Order also does not reconcile S.A.N.’s return with its findings that she would not discuss Father’s discipline of K.E.N., that Father controlled disclosure through secrecy, and that school, therapist, or guardian reporting could not sufficiently protect “the children.”

For purposes of this stay motion, Mother relies principally on the Court’s own findings. She does not ask the Court to retry the eleven-day evidentiary hearing. She asks the Court to preserve the present placement while the Ninth Circuit considers whether Article 13(b) was fully applied to S.A.N., whether Rule 52 required additional child-specific findings, and whether the international separation of the sisters and the unresolved conditions of return were adequately addressed.

Immediate relief is necessary. Within hours of receiving electronic notice of the Judgment, Father directed Mother to return S.A.N. "asap" and "by this Saturday," proposed that airline personnel escort her, and told Mother to act before "the DA picks her up." (J. Na Decl. ¶ 5, Ex. 1 at 119; Quinn Decl. ¶¶ 4–5.) That deadline has passed without any withdrawal of the demand, and no agreement preserves the status quo. (Quinn Decl. ¶¶ 9, 12.) The Judgment sets no return date and contains no passport, escort, transition, school, therapy, protective, or sibling-contact protocol. A stay will not decide custody. It will preserve the children's present placement long enough for individualized and expedited appellate review.

## II. RELEVANT BACKGROUND.

Following an eleven-day evidentiary hearing, the Court entered the Order and Judgment on September 4, 2026. It found Korea to be the children's habitual residence and Mother's removal wrongful. It also found a grave risk to K.E.N. based on Father's admitted abuse, concealment, avoidance of mandated reporters, and K.E.N.'s fear of future abuse. (Dkt. at 5–14, 21–23.) The Court rejected the proposed ameliorative measures as insufficient to protect K.E.N. (Dkt. at 13–14, 22–23.)

As to S.A.N., the Court stated that there was "no evidence that Father ever hit S.A.N" and that no physical abuse of S.A.N. had been alleged during her two-month summer 2026 visit. It then concluded that "given S.A.N's differing experiences," she should be returned. (Dkt. at 13.) In the same section, however, the Court found that S.A.N. was unwilling to answer questions concerning Father's discipline of K.E.N. and that Father had created an environment of secrecy surrounding the hitting. (*Id.*) The additional conclusions further state: "School, therapist, or guardian reporting cannot sufficiently protect the children because Father previously kept K.E.N from school and directed her not to report." (Dkt. at 22 (emphasis added).)

On September 8 and 9, Father demanded that Mother send S.A.N. to Korea within days, proposed an airline escort, and invoked the prospect of the District Attorney taking custody. (J. Na Decl. ¶ 5, Ex. 1 at 119; Quinn Decl. ¶ 4.) Father's counsel separately asked the Orange County District Attorney's Office to assist with the return and sought turnover of the child's passport and immediate travel arrangements. (Quinn Decl. ¶ 6, Ex. A.) The Senior Deputy District Attorney responded that the return would not occur that day or that week, asked whether mediation could avoid separating the children, and recommended that implementation issues, including therapy and passports, be placed promptly before Department L65. (*Id.* ¶ 7.) The Guardian ad Litem stated that settlement would be the best option and that there must be a plan for the sisters to see one another. (*Id.* ¶ 8.)

On September 10, Mother requested that Father agree to a brief standstill. On September 14, Petitioner's counsel confirmed in writing and by telephone that Father opposes a stay and will not voluntarily refrain from taking steps to implement the return absent a court order. During the required conference, counsel terminated the call before the parties could address the remaining requested relief or narrow the dispute. (Quinn Decl. ¶¶ 9–10, Ex. B.) Mother is contemporaneously filing a Notice of Appeal and will request expedition in the Ninth Circuit.

## III. GOVERNING STANDARD.

Federal Rule of Appellate Procedure 8(a)(1)(A) requires a party ordinarily to seek a stay first in the district court. Rule 62(d) authorizes this Court, while an appeal is pending from a judgment granting injunctive relief, to suspend or modify that relief on appropriate terms.

The Supreme Court has addressed stays of Hague return orders directly. "Courts should apply the four traditional stay factors in considering whether to stay a return order": (1) whether the applicant has made a strong

showing that she is likely to succeed; (2) whether she will be irreparably injured absent a stay; (3) whether a stay will substantially injure the other parties; and (4) the public interest. *Chafin v. Chafin*, 568 U.S. 165, 179 (2013) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). The first two factors are the most critical. *Nken*, 556 U.S. at 434.

The Ninth Circuit applies a sliding scale. Once probable irreparable harm is shown, a stay may issue upon either "a strong likelihood of success on the merits" with the public interest not weighing heavily against relief, or "a substantial case on the merits" with the balance of hardships tipping sharply toward the movant. *Leiva-Perez v. Holder*, 640 F.3d 962, 966–70 (9th Cir. 2011) (per curiam). "Serious legal questions," a "substantial case on the merits," and a showing that success is "more likely than not" are not identical thresholds; the first two do not require proof that victory is probable. *Id.* at 967–68. Irreparable harm, however, must be probable and case-specific. *Id.* at 968–70.

*Chafin* cautions against routine stays based merely on possible mootness, because a child's return does not moot the appeal. 568 U.S. at 178–79. But it equally recognizes that courts can protect the Convention's interests by "expediting proceedings and granting stays where appropriate." *Id.* at 179–80.

## IV. THE STAY FACTORS FAVOR RELIEF.

### A. The Appeal Presents Serious Legal Questions.

#### *1. The Article 13(b) Inquiry Is Prospective.*

Article 13(b) asks whether return "would expose" the child to grave physical or psychological harm or otherwise place the child in an intolerable situation. The inquiry is prospective. The Supreme Court has explained that "[o]ther physical or psychological abuse, serious neglect, and domestic violence in the home may also constitute an obvious grave risk to the child's

safety that could not readily be ameliorated." *Golan v. Saada*, 596 U.S. 666, 680 (2022). The Ninth Circuit reviews factual findings for clear error but reviews the application of the Convention to those facts de novo. *Radu v. Shon*, 62 F.4th 1165, 1171 (9th Cir. 2023).

The Sixth Circuit confronted materially similar reasoning involving a younger sibling who had not yet suffered the injuries experienced by older children. It held: "Although S. Simcox, presumably due to her young age, appears to have largely escaped the physical and psychological injuries suffered by her older siblings, nothing in the Convention requires that a child must first be traumatized by abuse before the Article 13b exception applies." *Simcox v. Simcox*, 511 F.3d 594, 609 (6th Cir. 2007). *Simcox* is persuasive rather than controlling, but it squarely demonstrates that the absence of prior direct injury cannot substitute for the required assessment of future risk.

The Eleventh Circuit likewise treated the inquiry as present and prospective rather than requiring proof that the predicted injury had already occurred. *Silva v. Dos Santos*, 68 F.4th 1247, 1255, 1260 (11th Cir. 2023) (examining the "present grave risk" and holding that the district court "was not required to find [the child] had previously been physically or psychologically harmed" before finding grave risk).

Here, the Order emphasized that Father had not already hit S.A.N. and that no physical abuse of S.A.N. was alleged during her two-month summer 2026 visit. Those facts are relevant. They do not resolve the forward-looking question in light of the Court's other findings: Father repeatedly used objects to punish K.E.N.; concealed the resulting injuries; directed silence; avoided mandated reporters; created an environment of secrecy; and gave materially incomplete sworn testimony. (Dkt. at 12–13, 16, 22.) The appeal therefore presents a substantial question whether the Order gave dispositive weight to

the absence of prior direct victimization rather than assessing the risk created by return to the same parent and household system.

***2. The Order Does Not Reconcile Its Child-Protection Findings.***

The Court expressly found that "[s]chool, therapist, or guardian reporting cannot sufficiently protect the children" because Father had already defeated those safeguards through concealment and suppression of reporting. (Dkt. at 22 (emphasis added).) It also found that "[e]ven S.A.N was unwilling to answer questions about the disciplinary actions her father took against K.E.N" and that Father admitted creating "an environment of secrecy around the hitting of K.E.N." (*Id.* at 13.)

The Order does not explain what mechanism would protect S.A.N. in the same household when the identified reporting systems were found insufficient for "the children." Nor does it explain why the absence of an allegation of physical abuse during the summer visit is materially reassuring when the Court simultaneously found an environment designed to inhibit disclosure and found that S.A.N. herself would not discuss Father's treatment of her sister. That unresolved tension presents a serious question concerning both Article 13(b) and the adequacy of the child-specific findings.

***3. The Order Does Not Address the "Intolerable Situation" Clause.***

Article 13(b) is not limited to direct physical or psychological injury; its text also asks whether return would "otherwise place the child in an intolerable situation." The Order concluded that S.A.N. had different experiences but did not separately address whether returning a seven-year-old, without her mother or sister, to reside with a parent whom the Court found engaged in physical abuse, concealment, and suppression of reporting would place her in an intolerable situation. Mother does not contend that separation or discomfort alone satisfies Article 13(b). She contends that the

treaty's full text required consideration of those circumstances together with the independently established household risks.

### *4. The Order Does Not Address International Sibling Separation.*

Mother does not contend that sibling separation, standing alone, establishes grave risk. *See England v. England*, 234 F.3d 268, 271–72 (5th Cir. 2000). But sibling separation may be legally relevant when combined with independently established risks. In *Ermini v. Vittori*, the Second Circuit relied on both the children's close relationship and the established abuse in holding that it was not error to decline to separate them. 758 F.3d 153, 167 (2d Cir. 2014). *Ermini* does not compel the same result here because the Order made no express finding concerning the sisters' relationship. Its relevance is narrower: the sibling relationship and the consequences of separation are proper considerations when assessed together with independently established abuse and household risk.

A recent district court likewise declined to return a younger child alone where affirmative defenses applied independently to the older child and the evidence established a sibling bond. *Dominguez Ochoa v. Ochoa Perez*, No. 7:24-cv-04736-NSR, ECF No. 59, at 20–21 (S.D.N.Y. July 31, 2025). Here, the Judgment divides the sisters between different parents and different countries, yet it contains no findings concerning their relationship, the effect of separation on either child, or the means by which they will maintain contact. The existing risk is not separation alone: S.A.N. would also return to the household in which the Court found physical abuse, concealment, suppression of reporting, and ineffective safeguards. *Ermini* and *Dominguez Ochoa* therefore show, at minimum, that the combined effect of sibling separation and independently established abuse presented an issue requiring analysis before the sisters were divided internationally.

### *5. The Child-Specific Findings Present a Substantial Rule 52 Issue.*

The Court wrote that there was "no evidence that Father ever hit S.A.N" and then stated that, during the in-camera interview, S.A.N. "did not express that Father had never hit her." (Dkt. at 13.) Read literally, the second statement does not support the first. The intended finding may have been that S.A.N. did not say Father had ever hit her, but the Judgment does not say that. Because this ambiguity bears directly on the child-specific distinction, appellate review requires clarification.

Rule 52 requires findings "explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision." *Colchester v. Lazaro*, 16 F.4th 712, 727 (9th Cir. 2021). When "a full understanding of the issues can[not] be reached without the aid of findings," the absence of findings precludes effective review and requires vacatur and remand. *Id.* at 727–29. The double negative, the unaddressed tension concerning secrecy, and the absence of findings on sibling separation together present a substantial Rule 52 issue.

### *6. The Remedy Requires Clarification Before Transfer.*

The Court stated that it would not determine custody but ordered S.A.N. returned "to reside with Father." (Dkt. at 2, 14, 23.) The Judgment does not specify a return date, escort, passport procedure, interim custody terms, transition plan, notification to child-protection authorities, protective conditions, or continuing contact between the sisters.

In *Radu*, the Ninth Circuit retained jurisdiction and ordered a limited remand directing clarification of the grave-risk finding and practical terms including airfare, housing, interim custody, the consequences if the mother could not remain in the country, and possible notice to child-protection

authorities. 62 F.4th at 1170–71. *Radu* ultimately affirmed return after those matters were clarified; it does not create a general requirement that every return order contain identical provisions. Its narrower relevance here is that unresolved findings and safety-related implementation terms should be clarified before, not after, an international transfer. That supports preserving the status quo while the Court and the Ninth Circuit consider the issue.

**B. Irreparable Harm Is Probable Without a Stay.**

The threatened transfer is concrete and imminent. Father directed Mother to return S.A.N. within days, proposed that airline personnel escort her, and invoked the prospect of the District Attorney taking custody. (J. Na Decl. ¶ 5, Ex. 1 at 119; Quinn Decl. ¶¶ 4, 6.) Father's own word for a District Attorney pickup was "traumatized": "Please do this before the DA picks her up. I don't [want] her to get traumatized." (J. Na Decl. Ex. 1 at 119.) The deadline Father demanded has passed, but he has not withdrawn the demand, no agreement preserves the status quo, and the District Attorney's informal statement that the transfer would not occur that week is not a judicial stay and does not bind Father. (Quinn Decl. ¶¶ 7, 9, 12.) Unless the Court acts, the very event under appellate review may occur before the stay motion can be resolved.

Mother does not contend that return would legally moot the appeal. *Chafin* holds otherwise. 568 U.S. at 178–79. But *Chafin* also recognizes that "shuttling children back and forth between parents and across international borders may be detrimental" and identifies appropriate stays and expedited proceedings as the tools for protecting children while preserving the Convention's goals. *Id.* at 178–80. A later re-return order cannot undo the period during which the sisters were separated, the disruption of S.A.N.'s school and newly commenced therapy, or the emotional consequences of one or more international transfers.

The harm is individualized, not the ordinary disruption present in every Hague case. S.A.N. would be separated from Mother and K.E.N. and sent to reside in the same household in which the Court found physical abuse, deliberate concealment, suppression of disclosure, and inadequate reporting safeguards. The Judgment provides no transition or sibling-contact plan. S.A.N. has begun therapy in California, and on September 10 Mother took her to school, where she became extremely upset, cried, and could not separate from Mother. (J. Na Decl. ¶¶ 6–7.) These concrete circumstances make irreparable harm probable during the appellate period. *See Leiva-Perez*, 640 F.3d at 969–70 (recognizing that "other important irreparable harm factors include separation from family members, medical needs, and potential economic hardship" (citation omitted)).

**C. A Conditioned Stay Will Not Substantially Injure Father.**

Father has a legitimate interest in prompt implementation of the Judgment and in resuming in-person parenting of S.A.N. Mother does not minimize that interest. The urgency Father has asserted, though, rests on school enrollment, and Father himself twice told Mother that "Korean school starts in March." (J. Na Decl. Ex. 1 at 115–16.) The requested stay, however, is temporary, conditioned, and paired with expedited appellate review. It delays implementation; it does not decide permanent custody or erase the Judgment.

During the stay, Father can continue direct electronic contact with both children. The Guardian ad Litem has confirmed that each child has her own device, can call Father whenever she wishes, and regularly messages him. (Quinn Decl. ¶ 8, Ex. A.) Mother will accept reasonable conditions, including no international travel, continued school and therapy, continued direct communication with Father, secure nonuse and neutral retention of every

passport and travel document for S.A.N. in either party's possession, custody, or control, and diligent pursuit of an expedited appeal. (J. Na Decl. ¶¶ 9–11.)

The requested pause is also consistent with Father's own stated concern before judgment, when he wrote on August 25, 2026: "Judge Carter still wants to give us a chance to keep the kids together… . Please let's not split the kids up." (J. Na Decl. ¶ 5, Ex. 1 at 116; Quinn Decl. ¶ 5.) A conditioned stay preserves the sisters' present placement while the appellate court considers the legal questions, and any prejudice from delay can be reduced through an expedited schedule.

The surrounding professionals likewise identified the need for an orderly process. The Senior Deputy District Attorney asked whether mediation could avoid separating the children and recommended prompt state-court consideration of therapy, passports, and related implementation issues. The Guardian ad Litem stated that settlement would be best and that a plan was needed for the sisters to see one another. (Quinn Decl. ¶¶ 7–8, Ex. A.) Those statements do not decide the federal stay motion, but they confirm that a short pause for judicial review and planning is workable rather than prejudicial.

**D. The Public Interest Favors a Stay and Expedited Review.**

The Convention's interest in prompt return is substantial, and Chafin cautions against stays granted as a matter of course. 568 U.S. at 178–79. This is not a routine request based on the mere existence of an appeal. It rests on the Court's own grave-risk findings, the unresolved child-specific and Rule 52 issues, the immediate threat of transfer, and the absence of any protective or implementation protocol.

The public interest also includes child safety and confidence that an international transfer will occur only after individualized judicial review. This Court itself recognized that "the safety of children is paramount." (Dkt.

at 11.) *Golan* confirms that domestic violence and other abuse in the home may constitute an "obvious grave risk" to a child's safety. 596 U.S. at 680. *Chafin* instructs that courts can honor both safety and expedition through appropriate stays and expedited proceedings. 568 U.S. at 179–80. Mother will promptly seek expedited briefing and disposition in the Ninth Circuit. A narrow stay therefore serves both the Convention's return objective and its protection of children.

**E. Alternatively, Grant a Seven-Day Bridge Stay.**

If the Court is not inclined to stay the S.A.N. return provision for the duration of the appeal, it should continue the administrative stay for seven calendar days after entry of any denial. That limited period will permit Mother to seek emergency relief under Federal Rule of Appellate Procedure 8(a)(2) without allowing travel logistics, rather than the appellate court, to determine whether the status quo is preserved. Seven days is short enough to respect the Convention's emphasis on expedition and sufficient for a focused emergency application based on the record already assembled here.

## V. CONCLUSION.

The Court should stay the portions of Dkt. 69 directing S.A.N.'s return to Korea and placement with Father until issuance of the Ninth Circuit's mandate or further order. The Court may condition the stay on no international travel, secure nonuse and neutral retention of every passport and travel document for S.A.N. in either party's possession, custody, or control, continued school attendance and therapy or assessment, subject to provider availability and clinical recommendations, reasonable electronic contact with Father, and diligent prosecution of an expedited appeal. Because the Judgment is nonmonetary and the proposed conditions protect Father's interests, no bond is necessary. If the Court denies a full stay, it should

maintain the administrative stay for seven calendar days to permit an application to the Ninth Circuit.

Dated: September 15, 2026

**QUINN & DWORAKOWSKI, LLP**

/s/ Stephane Quinn
STEPHANE QUINN CFLS
*Attorneys for Respondent*
JASMINE PEARL NA

## Certificate Of Compliance

The undersigned, counsel of record for Respondent Jasmine Pearl Na, certifies that this memorandum contains 3,578 words and complies with the applicable word limit of Local Rule 11-6.1.

Dated: September 15, 2026

/s/ Stephane Quinn
STEPHANE QUINN CFLS

STEPHANE QUINN CFLS (SBN: 278188)
DAVID DWORAKOWSKI CFLS, CALS (SBN: 135285)
**QUINN & DWORAKOWSKI, LLP**
IRVINE CONCOURSE
2050 Main Street, 6th Floor, Suite 600
Irvine, California 92614
Telephone: (949) 660-1400
E-Mail: quinn@orangecountyfamilylaw.com
E-Mail: david@orangecountyfamilylaw.com

Attorneys for Respondent JASMINE PEARL NA

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

| | |
|---|---|
| JUNG WOOK NA,<br>*Petitioner*,<br><br>vs.<br><br>JASMINE PEARL NA,<br>*Respondent*. | **CASE NO.: 8:25-CV-02479-DOC-ADS**<br><br>**RESPONDENT'S EX PARTE APPLICATION FOR IMMEDIATE ADMINISTRATIVE STAY AND ORDER SHORTENING TIME ON MOTION FOR STAY PENDING APPEAL AS TO MINOR CHILD S.A.N.; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Ex Parte Application: Decision on Papers Requested<br>Underlying Motion Hearing: October 19, 2026, 8:30 a.m.<br>Courtroom: 10A |

**TO THE HONORABLE DAVID O. CARTER, UNITED STATES DISTRICT JUDGE, PETITIONER JUNG WOOK NA, AND HIS COUNSEL OF RECORD:**

Respondent Jasmine Pearl Na ("Mother") applies ex parte under Federal Rule of Civil Procedure 62(d), Federal Rule of Appellate Procedure

8(a)(1)(A), and Local Rules 6-1 and 7-19 for an immediate administrative stay of the portion of the September 4, 2026, Order and Judgment (Dkt. 69) directing the return of S.A.N. to the Republic of Korea, and for an order shortening time on Mother's concurrently filed Motion for Stay Pending Appeal. Mother also requests that, if the Court denies the full stay, the administrative stay remain in effect for seven calendar days so she may seek relief from the Ninth Circuit under Rule 8(a)(2).

Mother is contemporaneously filing a Notice of Appeal from Dkt. 69. (Quinn Decl. ¶ 11.) She does not ask the Court to decide the appeal ex parte. She asks only that the status quo be preserved while the fully briefed stay motion is considered.

## I. RELIEF REQUESTED.

Mother requests an order: (1) immediately staying the portion of Dkt. 69 directing S.A.N.'s return and placement with Father; (2) prohibiting the parties and persons acting at their direction from facilitating international travel for S.A.N. while the administrative stay is in effect; (3) requiring secure nonuse and neutral retention of every passport or travel document for S.A.N. in either party's possession, custody, or control; (4) shortening time for opposition, reply, and determination of the Motion for Stay Pending Appeal; and (5) continuing the administrative stay for seven calendar days after any denial of the full stay so Mother may seek emergency relief from the Ninth Circuit.

## II. EX PARTE RELIEF IS NECESSARY.

Ex parte relief is appropriate where the moving party will suffer irreparable prejudice if required to proceed on the regular motion calendar and did not create the emergency through a lack of diligence. *Mission Power Engineering Co. v. Continental Casualty Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995). Both requirements are met.

The Court filed Dkt. 69 on September 4, 2026, and the CM/ECF notice issued on September 8. On September 8 and 9, Father directed Mother to send S.A.N. to Korea "asap" and "by this Saturday," proposed that Asiana personnel escort the seven-year-old child if Mother would not accompany her, and told Mother to act before "the DA picks her up." (Declaration of Jasmine Pearl Na ("J. Na Decl.") ¶ 5, Ex. 1 at 119; Declaration of Stephane Quinn ("Quinn Decl.") ¶¶ 4–5.) Father's own word for a District Attorney pickup was "traumatized." (J. Na Decl. Ex. 1 at 119.) Father's counsel separately asked the Orange County District Attorney's Child Abduction Unit to assist with the return, demanded turnover of a passport, and stated that Father could purchase tickets immediately. (Quinn Decl. ¶ 6, Ex. A.)

The Judgment supplies no return date and no procedure for passports, an escort, interim placement, school transition, therapy continuity, protective conditions, or contact between the sisters. (Dkt. 69 at 14, 23.) Although the Senior Deputy District Attorney stated that the transfer would not occur that day or that week, that statement is not a judicial stay and does not bind Father. (Quinn Decl. ¶ 7, Ex. A.) The Saturday Father demanded has passed, but he has not withdrawn the demand, and no agreement preserves the status quo. (Quinn Decl. ¶¶ 9, 12, Ex. B.) Father's demands establish a concrete risk that the transfer will occur before an ordinary twenty-eight-day motion schedule could be completed.

Mother did not create the emergency. She received electronic notice on September 8, sought a short voluntary standstill beginning September 10, pursued Petitioner's position in writing, and on September 14 provided oral ex parte notice and attempted the Local Rule 7-3 conference. Petitioner confirmed his opposition to a stay and no agreement preserved the status quo. (Quinn Decl. ¶¶ 9–11, Ex. B.) Local Rule 6-1 permits the Court to order

shorter notice. Without an administrative stay, the very act under appellate review may occur before the Court can consider the full motion.

## III. The Motion Presents Serious Questions And The Equities Favor Preserving The Status Quo.

The Court found that Father struck K.E.N. with a stick, caused bruising, concealed the injuries, directed the child not to disclose the abuse, kept her from mandated reporters, and created an environment of secrecy. It further found that school, therapist, or guardian reporting could not sufficiently protect "the children." (Dkt. 69 at 12–13, 15–17, 22–23.) Yet the Order directed S.A.N. to return because Father had not previously hit her and her experiences differed from K.E.N.'s. (*Id.* at 13.)

The appeal raises focused questions concerning whether Article 13(b)'s prospective inquiry was fully applied to S.A.N.; whether the Order reconciled its finding that reporting could not protect "the children" (Dkt. 69 at 22) with the return of the younger child to the same household; whether the "intolerable situation" clause and the consequences of international sibling separation were addressed; whether the material double negative concerning S.A.N.'s in-camera statement requires Rule 52 clarification; and whether safety-related implementation terms should be clarified before transfer. Those issues are developed in the concurrently filed motion.

The threatened injury is individualized and immediate. S.A.N. would be separated from Mother and K.E.N., moved internationally, and placed in Father's care before appellate review, without a transition or sibling-contact plan. (Dkt. 69 at 14, 23; J. Na Decl. ¶¶ 5, 7–8.) On September 10, Mother attempted to take S.A.N. to school; the child became extremely upset, cried, and could not separate from Mother. (J. Na Decl. ¶ 6.) *Chafin v. Chafin* recognizes that courts should apply the traditional stay factors to Hague

return orders and may protect children through appropriate stays and expedited proceedings. 568 U.S. 165, 179–80 (2013).

A short administrative stay imposes limited prejudice. Father can continue frequent electronic contact. (J. Na Decl. ¶ 9; Quinn Decl. ¶ 8, Ex. A.) Mother will accept reasonable conditions, including no international travel, retention of all available passports by counsel, continued school and therapy, continued communication with Father, and expedited prosecution of the appeal. (J. Na Decl. ¶¶ 9–13.) The administrative stay preserves the existing placement; it does not decide custody or the ultimate appeal.

## IV. NOTICE AND CONFERENCE OF COUNSEL.

Opposing counsel is Merritt McKeon, Esq., 24001 Calle de la Magdalena #2845, Laguna Hills, California 92653; telephone: (949) 584-1281; email: merrittmck@hotmail.com.

On September 14, 2026, at 4:22 p.m., Mother's counsel telephoned Ms. McKeon and orally advised her of the date and substance of this ex parte application, the requested administrative stay, the Motion for Stay Pending Appeal, the proposed interim conditions, the request for an expedited schedule, and the requested seven-day bridge stay. Ms. McKeon confirmed that Petitioner opposes a stay. Counsel also advised that any opposition must be filed within twenty-four hours of electronic or hand service, consistent with Judge Carter's published procedures. (Quinn Decl. ¶ 10.)

During the same telephone call, Mother's counsel attempted to confer under Local Rule 7-3 regarding the stay motion and possible resolution. Alexandra Sandoval of counsel's office was present. Ms. McKeon stated that she did not understand why counsel was asking for Petitioner's position, argued the merits and disputed factual allegations, and terminated the call before the conference could be completed. She did not state Petitioner's position on the request to shorten time, the alternative seven-day bridge stay,

the proposed interim passport and travel restrictions, or mediation. At 4:42 p.m., Mother's counsel memorialized the call in writing. At 4:46 p.m., Ms. McKeon again stated in writing that Petitioner opposed a stay and would not agree to refrain from taking implementation steps absent a court order. The parties did not resolve or narrow the dispute. The seven-day interval in Local Rule 7-3 could not be observed because Father demanded transfer within days of electronic notice of the Judgment. Mother respectfully requests that the Court excuse or shorten that interval. (Quinn Decl. ¶¶ 9–10, 12, Ex. B.)

## V. CONCLUSION

Mother respectfully requests an immediate administrative stay and an order shortening time for consideration of the concurrently filed Motion for Stay Pending Appeal. After expedited consideration, Mother requests a stay pending appeal. If the Court denies the full stay, Mother requests a seven-day bridge stay to seek relief under Federal Rule of Appellate Procedure 8(a)(2).

Dated: September 15, 2026

**QUINN & DWORAKOWSKI, LLP**

/s/ Stephane Quinn
STEPHANE QUINN, CFLS
Attorneys for Respondent
JASMINE PEARL NA

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Respondent Jasmine Pearl Na, certifies that this memorandum contains 1,408 words, which complies with the word limit of Local Rule 11-6.1.

Dated: September 15, 2026

/s/ Stephane Quinn,
STEPHANE QUINN, CFLS

STEPHANE QUINN CFLS (SBN: 278188)
DAVID DWORAKOWSKI CFLS, CALS (SBN: 135285)
**QUINN & DWORAKOWSKI, LLP**
IRVINE CONCOURSE
2050 Main Street, 6th Floor, Suite 600
Irvine, California 92614
Telephone: (949) 660-1400
E-Mail: quinn@orangecountyfamilylaw.com
E-Mail: david@orangecountyfamilylaw.com

Attorneys for Respondent JASMINE PEARL NA

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

| | |
|---|---|
| JUNG WOOK NA,<br>*Petitioner*,<br><br>vs.<br><br>JASMINE PEARL NA,<br>*Respondent*. | **CASE NO.: 8:25-CV-02479-DOC-ADS**<br><br>**DECLARATION OF STEPHANE QUINN IN SUPPORT OF RESPONDENT'S EX PARTE APPLICATION AND MOTION FOR STAY PENDING APPEAL**<br><br>Underlying Motion Hearing: October 19, 2026, 8:30 a.m.<br>Ex Parte Application: Decision on Papers Requested<br>Courtroom: 10A |

I, Stephane Quinn, declare:

1. I am an attorney licensed to practice before this Court and counsel of record for Respondent Jasmine Pearl Na. I have personal knowledge of the matters stated in this declaration and, if called, could testify competently to them.

2. On September 4, 2026, the Court filed its Order and Judgment Granting Petition in Part; Findings of Fact and Conclusions of Law. (Dkt. 69.) The Court ordered that S.A.N. be returned to the Republic of Korea to

reside with Petitioner and that K.E.N. remain in the United States. The CM/ECF notice of Dkt. 69 was transmitted on September 8, 2026.

3. Dkt. 69 does not state a return date or establish a procedure concerning passports, airline travel, an escort, a power of attorney, transition, schooling, therapy, protective conditions, or continuing contact between the sisters.

4. Respondent has provided me with, and I have reviewed, messages that Petitioner sent directly to her through TalkingParents on September 8 and 9, 2026. In those messages Petitioner wrote, "Please send [S.A.N.] back asap . . . ," instructed Respondent to act "before the DA picks her up" so that the child would not "get traumatized," directed her to "send her back by this Saturday," proposed that Asiana personnel escort the child if Respondent would not accompany her, and specified that the child should be placed on an evening flight because it had Wi-Fi. (J. Na Decl., Ex. 1 at 119.)

5. Shortly before judgment, on August 25, 2026, Petitioner had written through the same platform, "Judge Carter still wants to give us a chance to keep the kids together. . . . Please let's not split the kids up." (J. Na Decl., Ex. 1 at 116.) The authenticated TalkingParents excerpts containing the statements described in paragraphs 4 and 5 are attached as Exhibit 1 to Respondent's declaration.

6. On September 9, 2026, Petitioner's counsel, Merritt McKeon, emailed the Orange County District Attorney's Child Abduction Unit and requested its assistance in returning S.A.N. to Korea. She requested turnover of S.A.N.'s passport, stated that Petitioner's father could travel to pick up the child, stated that Petitioner could purchase tickets, and urged that "we need to get something moving asap." A true and correct copy of the relevant email chain, which I sent or received in the course of this representation, is attached to this declaration as Exhibit A.

7. In the same email chain, Senior Deputy District Attorney Tammy Jacobs stated that the return would not occur that day or that week, asked whether there was room for mediation or whether the parties intended to separate the children, and suggested placing implementation issues, including therapy and passports, before Department L65.

8. Guardian ad Litem Loni Klein stated in the same chain that settlement would be the best option and that there needed to be a plan for the girls to see one another. Ms. Klein later reported that each child had her own electronic device, that each could call Father whenever she wished, and that they regularly messaged him.

9. On September 10, 2026, I sent Petitioner's counsel a written request that Petitioner agree, without prejudice, that no steps be taken to implement S.A.N.'s return until this Court ruled on a stay request and for seventy-two hours after any denial so Respondent could seek relief from the Ninth Circuit. On September 14, after additional written requests for Petitioner's position, Ms. McKeon stated that Petitioner opposed a stay and did not agree to refrain from taking steps to implement the return absent a court order. True and correct copies of that correspondence are attached as Exhibit B.

10. On September 14, 2026, at 4:22 p.m., I called Ms. McKeon. Alexandra Sandoval of my office was present throughout the call. I orally advised Ms. McKeon that Respondent would request an immediate administrative stay, an order shortening time, a stay pending appeal, reasonable interim passport and travel conditions, and an alternative seven-day bridge stay if the full stay were denied. I also advised her that Judge Carter's procedures require any opposition to the ex parte application to be filed within twenty-four hours of electronic or hand service. Ms. McKeon confirmed that Petitioner opposes a stay. When I attempted to obtain

Petitioner's position on the remaining requested relief and discuss whether the dispute could be resolved or narrowed, Ms. McKeon stated that she did not understand why I was asking those questions, argued the merits and the parties' disputed factual allegations, and terminated the call before the conference could be completed. She did not state Petitioner's position on the request to shorten time, the alternative seven-day bridge stay, the proposed interim passport and travel restrictions, or mediation. At 4:42 p.m., I memorialized the call in writing. At 4:46 p.m., Ms. McKeon again stated in writing that Petitioner did not agree to a stay and would not agree to refrain from taking implementation steps absent a stay order. The parties did not resolve or narrow the dispute. The conference occurred fewer than seven days before filing because electronic notice of judgment issued September 8 and Petitioner sought implementation within days.

11. Respondent is contemporaneously filing a Notice of Appeal from Dkt. 69 and intends to seek expedited appellate review.

12. As of the execution of this declaration, no written agreement or court order prevents the parties from taking steps to implement S.A.N.'s return while the stay request is pending. Petitioner has expressly opposed a stay and has not agreed to the requested interim passport and travel restrictions or bridge stay.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 15, 2026, at Irvine, California.

/s/ Stephane Quinn
STEPHANE QUINN, CFLS

STEPHANE QUINN CFLS (SBN: 278188)
DAVID DWORAKOWSKI CFLS, CALS (SBN: 135285)
**QUINN & DWORAKOWSKI, LLP**
IRVINE CONCOURSE
2050 Main Street, 6th Floor, Suite 600
Irvine, California 92614
Telephone: (949) 660-1400
E-Mail: quinn@orangecountyfamilylaw.com
E-Mail: david@orangecountyfamilylaw.com

Attorneys for Respondent JASMINE PEARL NA

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

| | |
|---|---|
| JUNG WOOK NA,<br>*Petitioner*,<br><br>vs.<br><br>JASMINE PEARL NA,<br>*Respondent*. | **CASE NO.: 8:25-CV-02479-DOC-ADS**<br><br>**DECLARATION OF JASMINE PEARL NA IN SUPPORT OF RESPONDENT'S MOTION FOR STAY PENDING APPEAL**<br><br>Underlying Motion Hearing: October 19, 2026, 8:30 a.m.<br>Ex Parte Application: Decision on Papers Requested<br>Courtroom: 10A |

I, Jasmine Pearl Na, declare:

1. I am Respondent and the mother of K.E.N. and S.A.N. I make this declaration from personal knowledge and could testify competently to the facts stated here.

2. I understand that the Court ordered S.A.N. returned to Korea and ordered that K.E.N. remain in the United States. I am not asking to ignore the Court's order. I am asking for a stay so that the

return provision can be reviewed before the sisters are separated and S.A.N. is sent abroad.

3. Both children presently live with me in California. They have lived together here since July 31, 2025, except for S.A.N.'s court-ordered summer 2026 visit to Korea.

4. Since S.A.N. returned from the court-ordered summer visit to Korea, the sisters have again lived together in the same home and resumed their shared daily family routine. They spend their non-school time in the same household and are currently participating in therapy through the same provider. I am concerned that abruptly separating them between different parents and countries, without any contact plan, will cause both children emotional harm.

5. After the judgment was electronically noticed, Father sent me messages demanding that I return S.A.N. "asap" and "by this Saturday." He proposed that airline staff escort her if I did not accompany her and told me to send her before "the DA picks her up" so that she would not "get traumatized." (Ex. 1 at 119.) Shortly before judgment, on August 25, 2026, he had written, "Judge Carter still wants to give us a chance to keep the kids together… . Please let's not split the kids up." (Ex. 1 at 116.) No one has provided me with a transition plan, a confirmed escort protocol, a therapy-continuity plan, or a schedule for the sisters to see each other after a return. Attached as Exhibit 1 is a true and correct excerpt (pages 114 through 125) of the authenticated TalkingParents record containing those communications and my September 10 school update. In that record I appear as "Jasmine Jace" and Father appears as "Daniel Na." All times shown in the record are Eastern Time, and page references in this declaration are to the page numbers printed on the record.

6. On September 10, 2026, I took S.A.N. to school because I wanted to preserve her routine. At school, she became extremely upset, cried, and would not leave my side. I ultimately brought her home and advised Father of what occurred through TalkingParents. (Ex. 1, at 122.) I also told Father that I planned to speak with the school so it could be aware of the situation and provide appropriate support. (*Id.*)

7. K.E.N. began therapy at Child Guidance Center on August 26, 2026. S.A.N. attended her initial intake and assessment session on September 2, 2026. K.E.N.'s regular sessions are scheduled for Wednesday evenings at 6:00 p.m. S.A.N.'s continuing schedule is being determined after completion of her assessment.

8. K.E.N. missed school time on two days, August 26 and September 2, 2026, for the initial therapy appointments because no appointments outside school hours were available. The household became ill on September 3. On Friday, September 4, a half day, I kept both girls home because S.A.N. had vomited and had chills and K.E.N. and I were also unwell. On September 7, I advised Father through TalkingParents. (Ex. A at 119.) Monday, September 7 was Labor Day. K.E.N. returned to school on September 9 and has attended regularly since. S.A.N. remained ill for several days, and I arranged a pediatric appointment for September 10, 2026, the earliest available that did not interfere with school hours. Before the appointment, I provided Father the physician's name, office address, telephone number, and appointment time; afterward, I reported the physician's assessment and the symptoms that would require follow-up. (Ex. A at 120, 122.) After the September 10 school incident described above, S.A.N. attended half days on September 11 and September 14 and agreed to attempt full days beginning September 15. (Ex. A at 123.) I have been in contact

with her teacher and the front office, and the school has agreed to support her. I have not withheld either child from school to obstruct Father or the Court's order.

9. I have not restricted Father's communications with either child. S.A.N. FaceTimes with Father daily, often more than once. K.E.N. regularly messages him and also speaks with him by FaceTime. Each child has her own electronic device. During any stay, I will continue to permit and facilitate reasonable direct contact.

10. I currently possess S.A.N.'s Korean passport and a limited-validity emergency United States passport. Father possesses her regular United States passport. I will not use any passport for travel, release any passport for travel, seek a replacement, or apply for an additional passport or travel document for S.A.N. I will deposit every passport in my possession with my counsel or another neutral custodian designated by the Court.

11. I will not remove either child from the United States while a stay is in effect. I will maintain school attendance absent illness or another ordinary reason, continue existing therapy and assessment arrangements subject to provider availability and clinical recommendations, comply with reasonable conditions imposed by the Court, and cooperate in expedited appellate proceedings and mediation.

12. If S.A.N. is transferred before appellate review, she will be separated immediately from her mother and sister, moved internationally, and placed in Father's household without any transition or sibling-contact plan. Even if an appellate court later orders another return, the period of separation and the disruption of school and therapy will already have occurred.

13. I respectfully ask the Court to preserve the present placement long enough for the stay motion and appeal to be heard. I am willing to comply with conditions that protect Father's rights while review proceeds.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 14, 2026, at Irvine, California.

________________________________

JASMINE PEARL NA

Daniel Na viewed this subject on 8/21/2026 at 3:36:25 AM

Daniel Na on 8/21/2026 at 7:12:37 AM said:

I am picking up your dad and going together. Brigitte is going together as well.

Jasmine Jace viewed this subject on 8/21/2026 at 11:42:37 AM

Jasmine Jace on 8/21/2026 at 11:42:49 AM said:

Ok thank you

Daniel Na viewed this subject on 8/21/2026 at 5:30:20 PM

Daniel Na on 8/21/2026 at 7:44:15 PM said:

Any update from the doctors appointment? I remember last time you said it was postponed.

Daniel Na on 8/21/2026 at 8:09:49 PM said:

If you were, please give me the report from the doctor

Jasmine Jace viewed this subject on 8/21/2026 at 8:10:16 PM

Jasmine Jace on 8/21/2026 at 8:22:41 PM said:

We went today after school. Everything is fine and normal. The doctor recommended that she increase her overall calorie intake as she is growing. I was not provided with a separate report from today's visit. She will also need three additional vaccines before she turns 12.

Jasmine Jace on 8/21/2026 at 8:22:47 PM said:

Are you at the airport?

Daniel Na viewed this subject on 8/21/2026 at 8:22:51 PM

Daniel Na on 8/21/2026 at 8:23:39 PM said:

Can you give me a contact info so I can contact for report?

Daniel Na on 8/21/2026 at 8:23:51 PM said:

On the way

Jasmine Jace viewed this subject on 8/21/2026 at 8:23:52 PM

Jasmine Jace on 8/21/2026 at 8:26:32 PM said:

The doctor's contact information has previously been provided to you. It's the same one as before

Daniel Na viewed this subject on 8/21/2026 at 9:02:30 PM

User Printed User Printed User Printed

Daniel Na on 8/21/2026 at 9:54:30 PM said:

Am I registered as her father there?

Daniel Na on 8/22/2026 at 11:47:38 AM said:

Hello. Are you picking up S.A.N. ?

Jasmine Jace viewed this subject on 8/22/2026 at 1:29:53 PM

Jasmine Jace on 8/22/2026 at 2:56:50 PM said:

I assumed the information was already updated last year, but if not, I can take care of updating it.

Jasmine Jace on 8/22/2026 at 2:57:23 PM said:

Yes, me and K.E.N. went to pick up S.A.N. and my dad. We just got back if you want to FaceTime with the kids

Daniel Na viewed this subject on 8/22/2026 at 6:01:47 PM

Daniel Na on 8/24/2026 at 4:41:57 PM said:

Jasmine

Daniel Na on 8/24/2026 at 4:45:59 PM said:

you need to understand. One year here one year there isn't good for the children. As you know the Korean school starts in March. They will not be able to continue school if they miss 1/3 of school.

Daniel Na on 8/24/2026 at 4:46:12 PM said:

Please do what's best for the children.

Jasmine Jace viewed this subject on 8/24/2026 at 4:53:14 PM

Jasmine Jace on 8/24/2026 at 9:34:25 PM said:

Just letting you know, S.A.N. is currently napping. I just heard the FaceTime ring but didn't check who was calling. If that was you, she can return the call when she wakes up.

Daniel Na viewed this subject on 8/24/2026 at 9:34:47 PM

Daniel Na on 8/24/2026 at 9:34:59 PM said:

Let her sleep

Jasmine Jace viewed this subject on 8/24/2026 at 9:51:14 PM

Jasmine Jace on 8/24/2026 at 9:51:49 PM said:

Yes, I'm sure she is tired

User Printed User Printed User Printed

Jasmine Jace on 8/24/2026 at 9:51:54 PM said:

Also, I was able to switch the girls' therapy provider from Little Otter to Child Guidance Center because Child Guidance Center offers in-person sessions, rather than Zoom/telehealth sessions. I provided them with your contact information, so they may reach out to you this week.

K.E.N. s first session is scheduled for Wednesday, 8/26, and S.A.N. s first session is scheduled for 9/2. They are currently assigned to the same therapist. At this time, I have only been provided with her first name, Daniella.

I'll keep you updated as I receive additional information.

Daniel Na viewed this subject on 8/24/2026 at 9:52:20 PM

Daniel Na on 8/25/2026 at 5:17:54 AM said:

Jasmine

Daniel Na on 8/25/2026 at 5:23:01 AM said:

I'm not against you. We should be a team player. One year there one year here doesn't work for the children. You can have all summer and winter and any time when you visit. There's no warrant against you in Korea. I have never screwed you over. I want you to be in our lives. Like what you said before let's do this while we have the control of the outcome. Ross is gonna be another appeal. More instability for the children. More money. Please this isn't about winning. It's about doing what's best for our children. I know you know that I have been there for the children this whole time. And you have been too. Please think again before the judge makes his decision today.

Daniel Na on 8/25/2026 at 5:24:07 AM said:

Sorry typo. Ross = there's

Daniel Na on 8/25/2026 at 3:47:49 PM said:

Jasmine

Daniel Na on 8/25/2026 at 4:05:25 PM said:

You know how hard it is to get into KIS. They won't let her just go one year and one year off. They will need to go to Korean school and Korean school starts in March. If they miss 1/3 of school year they can't go to next grade.

Jasmine Jace viewed this subject on 8/25/2026 at 4:40:50 PM

Daniel Na on 8/25/2026 at 4:48:40 PM said:

Jasmine. Judge Carter still wants to give us a chance to keep the kids together. Please listen. Through this experience K.E.N. really got to learn that you care about her. When she thought that you didn't love her and told the school that she wasn't happy, the school told you to do scheduled call but you declined saying that you did not want to promise something you can keep. She was devastated. But now she knows how much we love her. I truly believe that you know that they are safe here. They have been safe under my care for the last 12 years. Please let's not split the kids up. You get to see them anytime you want. I don't have that luxury because of the visa problem. It's not about winning or losing.



User Printed User Printed User Printed

Daniel Na on 8/26/2026 at 3:40:08 AM said:

Under my care the kids would get everything they need. Good school, math tutor, piano lessons, Art, dance, piano, figure skating. You won't be able to do that with you working and driving them. Please stop this fight. Also when you we spoke 6 months ago you told me you wanted to take S.A.N. and not K.E.N. K.E.N. is at a point where education and right direction is really needed such as SAT schools and etc. You can't provide her with these. Please do what's best for the children.

Jasmine Jace viewed this subject on 8/26/2026 at 11:20:29 AM

Jasmine Jace on 8/26/2026 at 11:52:34 AM said:

I remain willing to come to an agreement, but reaching one requires mutual compromise and flexibility from both of us. My concerns regarding the children's safety and well-being and the incidents that brought us here remain unchanged.

Also, K.E.N. has her therapy appointment today at 10:00 a.m. I tried to schedule an appointment after school, but there were no other times available.

Child Guidance Center
600 West Santa Ana Boulevard, Suite 202
Santa Ana, CA 92701
714-953-4455

Daniel Na viewed this subject on 8/26/2026 at 12:06:16 PM

Jasmine Jace on 8/26/2026 at 3:16:22 PM said:

Therapy went well today. Daniella is very nice, and K.E.N. seemed comfortable with her. K.E.N. will have her second session on Wednesday, which will also be S.A.N. s first session.

Daniel Na viewed this subject on 8/26/2026 at 3:58:38 PM

Daniel Na on 8/26/2026 at 3:59:08 PM said:

Will it also be during school hours?

Jasmine Jace viewed this subject on 8/26/2026 at 11:39:37 PM

Jasmine Jace on 8/26/2026 at 11:40:07 PM said:

Only the first session and afterwards will be after school hours

Daniel Na viewed this subject on 8/27/2026 at 1:06:25 AM

Daniel Na on 8/27/2026 at 7:39:37 AM said:

The kids are safe here. If they are not safe you wouldn't send them here biannually or summer or winter. I promise nothing would happen to them. I can provide everything they need here. Please I ask you to do what's best for them. It will never happen again. I love them.

Jasmine Jace viewed this subject on 8/27/2026 at 6:59:42 PM

User Printed User Printed

Jasmine Jace on 8/27/2026 at 7:08:07 PM said:

That is not accurate. Since becoming aware of the circumstances that caused me serious concerns about the children's safety, I have not voluntarily sent them to Korea for summer or winter visits, so I am not sure what you are referring to. S.A.N. s travel to Korea was pursuant to a court order, and K.E.N. was not sent to Korea. My compliance with a court order should not be characterized as my agreement that the children are safe living in Korea.

Daniel Na viewed this subject on 8/27/2026 at 7:51:11 PM

Daniel Na on 8/28/2026 at 3:24:19 AM said:

I promise it will never happen again.

Daniel Na on 8/29/2026 at 7:23:51 AM said:

Jasmine we can still be family and all live together for our kids. That's the best. I have always gave you this option and we have been waiting for you. This is what the children wants the most.

Jasmine Jace viewed this subject on 8/29/2026 at 5:09:36 PM

Jasmine Jace on 8/29/2026 at 5:11:01 PM said:

K.E.N. signed up for the Fall Volleyball League with her friend Vicky yesterday. Today is her first session from 2:00–4:00 p.m., and it will be every Saturday for two months.

Here is the website for the program:
https://socalelite.org

Daniel Na viewed this subject on 8/29/2026 at 10:15:00 PM

Daniel Na on 8/29/2026 at 10:16:07 PM said:

That's wonderful. Do you think you can set up a time for me to call her? I haven't been able to FaceTime with her for months now.

Jasmine Jace viewed this subject on 8/30/2026 at 4:40:06 PM

Jasmine Jace on 8/30/2026 at 4:41:00 PM said:

She is home all the time. Maybe she is sleeping or on the phone with her friends. I will let her know

Daniel Na viewed this subject on 8/30/2026 at 4:41:34 PM

Daniel Na on 9/5/2026 at 8:59:00 AM said:

Jasmine. How come they keep missing school?

Daniel Na on 9/5/2026 at 8:59:27 AM said:

Once last week and once this week

User Printed User Printed

Daniel Na on 9/5/2026 at 9:00:46 AM said:

How was the therapy for the children? What did they say?

Jasmine Jace viewed this subject on 9/6/2026 at 12:28:17 AM

Jasmine Jace on 9/7/2026 at 12:42:43 AM said:

Therapy went well. They are still completing assessments for both kids. K.E.N. s session was conducted individually. S.A.N. threw up and had some shivers, and K.E.N. and I were also not feeling well. Since Friday was a half day, I kept the girls home so they could rest and recover.

Daniel Na viewed this subject on 9/7/2026 at 12:51:36 AM

Daniel Na on 9/8/2026 at 7:30:18 PM said:

Jasmine. Have you read the order? Please send S.A.N. back asap so we can enroll her into school and get her medical treatment that has been delayed.

Daniel Na on 9/9/2026 at 2:40:54 AM said:

Please do this before the DA picks her up. I don’t her to get traumatized

Daniel Na on 9/9/2026 at 9:24:28 AM said:

Please send her back by this Saturday

Daniel Na on 9/9/2026 at 9:26:27 AM said:

If you can’t bring her I can have Asiana staff escort her like what we did with K.E.N. before. Please let me know.

Daniel Na on 9/9/2026 at 9:27:09 AM said:

Make sure it’s the evening flight because it has WiFi

Jasmine Jace viewed this subject on 9/10/2026 at 1:05:44 PM

Jasmine Jace on 9/10/2026 at 1:13:21 PM said:

I am currently awaiting further guidance regarding S.A.N. s situation and will proceed accordingly.

Daniel Na viewed this subject on 9/10/2026 at 1:13:29 PM

Daniel Na on 9/10/2026 at 1:13:55 PM said:

Guidance from who?

Jasmine Jace viewed this subject on 9/10/2026 at 1:14:23 PM

Jasmine Jace on 9/10/2026 at 1:14:23 PM said:

Since things have been a bit hectic this week, I may have forgotten to let you know that K.E.N. had a routine dental checkup and cleaning yesterday, Wednesday, after school at the same dental office she

User Printed User Printed

previously attended.

Dental office information:

Irvine Orthodontics and Irvine Dentistry
4482 Barranca Parkway, Suite 102
Irvine, CA 92604
Phone: 949-786-7800
Dr. Sean Woo, DMD

Everything went well with her checkup. She has one baby tooth that has not fallen out yet, and the dentist suggested that it may need to be extracted. We have not made a decision or scheduled anything regarding the extraction yet, particularly given everything going on this week. I will keep you updated if any further dental treatment is scheduled.

Daniel Na viewed this subject on 9/10/2026 at 1:14:48 PM

Daniel Na on 9/10/2026 at 1:14:50 PM said:

Please let's get her settled in with school asap. KIS isn't going to wait any longer

Daniel Na on 9/10/2026 at 1:16:11 PM said:

You need to start communicating with me better Jasmine.

Daniel Na on 9/10/2026 at 1:16:23 PM said:

Not answering me days or months later

Jasmine Jace viewed this subject on 9/10/2026 at 1:19:50 PM

Jasmine Jace on 9/10/2026 at 1:19:52 PM said:

Since you brought up S.A.N. s medical treatment, I did want to ask you about something related to her health. S.A.N. was with you for approximately two months over the summer and only recently returned.

She currently has a deep, wet cough and has been coughing extensively throughout the night. She told me that the cough began while she was in Korea and has been ongoing for some time, but has recently gotten significantly worse.

Was S.A.N. evaluated by a doctor in Korea for this cough? If so, please provide the relevant information regarding the visit, including any diagnosis, medication, or treatment she received.

S.A.N. has an appointment today at her regular pediatrician's office. Her regular pediatrician, Dr. Julie Cheng, was not available, so she will be seeing Dr. Catherine Su today at 4:30 p.m. This was the earliest available appointment that did not interfere with her school hours.

Pediatrician's office:

Coastal Kids Pediatric Care – Laguna Hills
24422 Avenida De La Carlota, Suite 180
Laguna Hills, CA 92653
Phone: (949) 951-1376

I will provide an update after her appointment.



User Printed User Printed User Printed

Daniel Na viewed this subject on 9/10/2026 at 1:20:00 PM

Daniel Na on 9/10/2026 at 1:20:49 PM said:

No she didn't have the cough when she was here.

Daniel Na on 9/10/2026 at 1:20:59 PM said:

Are you planning to follow court order?

Daniel Na on 9/10/2026 at 1:23:43 PM said:

Please provide me with the doctors assessment of K.E.N. s doctor about her weight

Jasmine Jace viewed this subject on 9/10/2026 at 1:24:07 PM

Jasmine Jace on 9/10/2026 at 1:24:08 PM said:

K.E.N. s regular Wednesday therapy appointments will resume next week. She was unable to attend yesterday's session due to everything going on that day, including her meeting with minor's counsel.

I attempted to schedule a make-up session for Thursday or Friday, but the only available appointment times were during her school hours, so I did not schedule one.

Daniel Na viewed this subject on 9/10/2026 at 1:24:08 PM

Daniel Na on 9/10/2026 at 1:25:13 PM said:

What did the therapist say? Can you please share it with me?

Daniel Na on 9/10/2026 at 1:25:27 PM said:

And please answer all my questions from above.

Jasmine Jace viewed this subject on 9/10/2026 at 1:32:47 PM

Jasmine Jace on 9/10/2026 at 1:33:08 PM said:

Thank you for clarifying. S.A.N. has told me that her cough began while she was in Korea and has been ongoing for some time. I understand that your recollection is different. I will have her evaluated by the pediatrician today and will provide an update afterward.

I can request the records today if they are available. I also ask that you please provide me with copies of the medical records from Korea for both children, as I have not previously received copies of those records.

Jasmine Jace on 9/10/2026 at 1:34:05 PM said:

I believe I have already answered the question you asked. If there is a different specific question you would like me to address, please let me know.

User Printed User Printed User Printed

Jasmine Jace on 9/10/2026 at 1:46:49 PM said:

I also wanted to let you know that I brought S.A.N. to school today because I want to maintain as much consistency and routine as possible during this transition period. However, she became very upset and was crying at school and did not want to leave my side. I ultimately brought her home. I plan to speak with the school tomorrow so that they are aware of the situation and can provide appropriate support as needed.

K.E.N. appears to be doing well and has resumed attending school regularly following her recent illness.

Jasmine Jace on 9/10/2026 at 1:47:08 PM said:

I will continue to keep you updated

Daniel Na viewed this subject on 9/10/2026 at 5:30:28 PM

Daniel Na on 9/10/2026 at 6:34:59 PM said:

I sent all hospital record through your email just right now.

Jasmine Jace viewed this subject on 9/10/2026 at 9:19:50 PM

Jasmine Jace on 9/10/2026 at 9:19:50 PM said:

We went to the doctor, and everything was fine. The doctor said there is a virus going around right now. She said that if S.A.N. develops a fever or if her cough lasts longer than three weeks, she should come back.

She said no medication is necessary, but to help ease S.A.N. s cough at night, she can take allergy medicine.

S.A.N. was fussy and crying, and the office was closing, so I didn't get a chance to ask about the medical records. I can request them, but if you need them sooner, you should be able to request them directly from the doctor's office. I gave you the contact info.

Daniel Na viewed this subject on 9/10/2026 at 9:22:42 PM

Jasmine Jace on 9/10/2026 at 9:37:28 PM said:

I would also like to briefly clarify some inaccurate statements you made earlier. I respond to necessary child-related communications in a timely manner and have never gone "months" without responding. You also have regular communication with the girls, including FaceTime, and I will continue to encourage their communication with you.

Moving forward, I ask that we both keep our communication factual and focused on the children. Thank you.

Daniel Na viewed this subject on 9/10/2026 at 9:37:51 PM

Daniel Na on 9/10/2026 at 9:39:53 PM said:

You didn't answer me from June 11 to August 11

User Printed

Daniel Na on 9/10/2026 at 9:40:52 PM said:

Please set up a time for me to FaceTime with K.E.N. I haven't FaceTimed with her ever since a week after she went under your care.

Jasmine Jace viewed this subject on 9/11/2026 at 7:46:14 PM

Jasmine Jace on 9/11/2026 at 8:02:50 PM said:

I reviewed the June 13 messages you are referring to. As I have explained before, when I perceive the tone of our communication as becoming contentious, I prefer to wait until things have calmed down before responding so that the conversation does not escalate.

In any event, the questions you raised were addressed, and I took care of everything that needed to be handled for the children, including the lice treatment.

Daniel Na viewed this subject on 9/11/2026 at 8:03:06 PM

Jasmine Jace on 9/11/2026 at 8:09:15 PM said:

Regarding contact with the children, I was sitting at the dinner table with K.E.N. and S.A.N. when you FaceTimed with K.E.N. a few days ago. Our TalkingParents messages also reflect that when K.E.N. and I picked S.A.N. up from the airport two weeks ago, I let you know when we arrived home and that the children were available to FaceTime.

I regularly encourage K.E.N. to FaceTime you. When I ask her about calling you, she often tells me, "I'm talking to him right now." I asked her again today, and she told me that she spoke with you yesterday.

In any event, I will continue to encourage regular communication, and we can also set up a specific time for K.E.N. to FaceTime with you if that would be helpful.

Daniel Na viewed this subject on 9/11/2026 at 8:11:23 PM

Daniel Na on 9/11/2026 at 8:12:40 PM said:

I did not see K.E.N. s face ever since she went under your care. I'm not lying. Can you please set up a regular FaceTime call with K.E.N. for me?

Jasmine Jace viewed this subject on 9/11/2026 at 8:15:19 PM

Jasmine Jace on 9/11/2026 at 8:16:02 PM said:

As for S.A.N. I already let you know about the backpack incident yesterday and how upset she became. We talked about it afterward, and she agreed to try a half day of school today, which she did. She was a little clingier than usual at drop-off but otherwise did better.

I also checked in with the front office regarding how she has been doing, and they were supportive. For now, I am continuing to support her and take things day by day.

Daniel Na viewed this subject on 9/11/2026 at 8:16:25 PM

Jasmine Jace on 9/11/2026 at 8:19:14 PM said:

I'm not sure how that could be the case, as I saw you on FaceTime with K.E.N. at the dinner table a few days ago while she was sitting next to me. If she turned her camera off at some point, I was not aware of that, but the FaceTime did occur.



User Printed

In any event, I believe I have already answered these questions and offered my assistance. Our TalkingParents messages also reflect instances where I have let you know the children were available to FaceTime, and I continue to encourage K.E.N. to FaceTime you.

I don't think continuing to go back and forth on this is productive, so I am going to step away from this conversation for now.

Daniel Na viewed this subject on 9/11/2026 at 8:33:28 PM

Daniel Na on 9/11/2026 at 8:34:57 PM said:

Her FaceTime was on but not at her face but the background of your kitchen.
I just want regular FaceTime with her please.

Daniel Na on 9/12/2026 at 10:55:57 AM said:

I will ask again Jasmine, I need all medical records showing S.A.N. has been seen by a doctor or hospitalized. You have those records. Don't make me ask my lawyer to get them, it is a waste of money.

Jasmine Jace viewed this subject on 9/12/2026 at 10:45:18 PM

Jasmine Jace on 9/12/2026 at 10:46:36 PM said:

I'm not in control of how she chooses to FaceTime or how she positions the camera during the call.

Jasmine Jace on 9/12/2026 at 10:47:11 PM said:

I told her to FaceTime you and she said she will after she eats

Jasmine Jace on 9/12/2026 at 10:52:03 PM said:

I also explained the situation regarding S.A.N. s last visit and that she was fussy. I do not personally have copies of those medical records and will need to request them. I explained to you that I can request them, but I will need to obtain them from the provider next week just as you would. If you need them sooner, you can contact the provider directly. I previously provided you with the information, but here it is again:

Coastal Kids – Laguna Hills
949-951-1376

Daniel Na viewed this subject on 9/13/2026 at 12:39:39 AM

Jasmine Jace on 9/13/2026 at 2:07:41 PM said:

K.E.N. mentioned that she was confused about why I keep reminding her to FaceTime you because she says she communicates with you regularly. She told me that she FaceTimed you yesterday morning and that you two talked about Demon Slayer, and she showed me her recent call log. I told her that was great and encouraged her to continue communicating with you, since I know you miss her.

Daniel Na viewed this subject on 9/13/2026 at 3:22:06 PM



User Printed User Printed User Printed

Daniel Na on 9/13/2026 at 3:23:44 PM said:

Jasmine, I would do the same for you. Please set up a call for me that is scheduled. I have not seen her face or heard her voice.

Jasmine Jace viewed this subject on 9/14/2026 at 1:06:34 PM

Jasmine Jace on 9/14/2026 at 1:23:43 PM said:

I may have misunderstood what you meant when you said you haven't seen her or heard her voice. I only ask because I've happened to see and hear you and K.E.N. talking on FaceTime on several occasions, and she has also mentioned that she FaceTimes with you regularly. Maybe you meant that you haven't been able to talk with her as much as you would like.

I do encourage her to FaceTime you, but she seemed confused and got a little upset with me because she said she talks to you on FaceTime often and didn't understand why I kept reminding her. I'm sure there may just be a misunderstanding somewhere, so I wanted to clarify.

At any rate, what time works best for you?

Daniel Na viewed this subject on 9/14/2026 at 1:25:05 PM

User Printed User Printed User Printed

Merritt McKeon, Esq. (SBN: 187983)
Reel Fathers Rights APC
18881 Von Karman Ave. Ste. 1600
Irvine, CA 92612
Phone: (951) 460-2003
TeamMerritt@reelfathersrights.com

Attorney for Petitioner, Jung Wook Na

SUPERIOR COURT OF THE STATE OF CALIFORNIA

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| JUNG WOOK NA,<br>Petitioner,<br>vs.<br>JASMINE NA,<br>Respondent. | Case No.: 8:25-CV-02479-DOC-ADS<br><br>**PETITIONER'S OPPOSITION TO RESPONDENT'S EX PARTE APPLICATION FOR IMMEDIATE ADMINISTRATIVE STAY AND ORDER SHORTENING TIME**<br><br>Ex Parte Application: Decision on Papers Requested<br>Underlying Motion Hearing: October 19, 2026, 8:30 a.m.<br>Courtroom: 10A<br>Judge: Hon. David O. Carter |

**I. INTRODUCTION**

Respondent asks the Court to suspend immediately the return provision of its September 4, 2026 Order and Judgment, which directs S.A.N.'s return to the Republic of Korea to reside with Petitioner. The request should be denied. A stay pending appeal is extraordinary relief, not a consequence of filing a notice of appeal. Respondent bears the burden to establish both a substantial merits showing and probable, case-specific irreparable injury. She has not done so.

The Court entered its judgment after an eleven-day evidentiary hearing. It found that South Korea was the children's habitual residence, that Respondent wrongfully removed them in breach of Petitioner's custody rights, and that the evidence did not establish a grave-risk defense as to S.A.N. The Court accordingly ordered S.A.N.'s return. Respondent's ex parte application

reel fathers rights

does not identify new evidence or a changed circumstance that calls those determinations into question. It instead repackages issues decided in the judgment for immediate reconsideration under the rubric of an administrative stay.

Respondent also does not establish a concrete emergency that justifies ex parte suspension of a final return order. The order does not impose an immediate transfer deadline, and the correspondence on which Respondent relies confirms that the Orange County District Attorney's Office stated that a return would not occur that day or that week. Petitioner has sought implementation of the Court's order, not unilateral extra-judicial removal. A request for assistance in implementing a final judgment does not establish the imminent, irreparable harm required to displace that judgment without full briefing.

The Convention and ICARA require expeditious return of children wrongfully removed or retained, while leaving custody merits to the courts of the habitual-residence country. A stay would prolong the separation caused by the wrongful removal, delay S.A.N.'s return to her established home in Korea, and undermine the Court's child-specific judgment. The Court should deny the requested administrative stay and allow the return order to be implemented. If the Court elects to shorten time on Respondent's noticed motion, Petitioner requests a schedule that permits a prompt, fair opposition and a decision on the merits without an interim stay.

**II. RELEVANT BACKGROUND**

On September 4, 2026, following an eleven-day evidentiary hearing, the Court entered its Order and Judgment Granting Petition in Part. The Court found that South Korea was the habitual residence of both children at the time of Respondent's removal, that Respondent's removal breached Petitioner's custody rights under Korean law, and that Petitioner was exercising those rights. The Court ordered S.A.N. returned to South Korea to reside with Petitioner, while ordering K.E.N. to remain in the United States based on the grave-risk finding specific to K.E.N.

The judgment made separate findings concerning S.A.N. The Court found no evidence that Petitioner had ever hit S.A.N. and no allegation of physical abuse of S.A.N. during her two-

month summer 2026 visit to Korea. On that child-specific record, the Court held that S.A.N., unlike K.E.N., should be returned to South Korea.

Respondent's application rests principally on post-judgment communications concerning implementation. Petitioner asked Respondent to comply with the return order, including by arranging S.A.N.'s travel. Petitioner's counsel also asked the Orange County District Attorney's Child Abduction Unit to assist in implementing the order. In response, the assigned Senior Deputy District Attorney stated that the return would not occur that day or that week and suggested that implementation details be addressed in the family-court matter. Petitioner has not agreed to an extra-judicial transfer or taken action outside available legal processes.

**III. GOVERNING STANDARD**

Federal Rule of Appellate Procedure 8(a)(1)(A) requires a party ordinarily to seek a stay first in the district court. Fed. R. App. P. 8. Rule 62(d) authorizes a district court to suspend or modify injunctive relief during an appeal on terms that secure the opposing party's rights. Fed. R. Civ. P. 62.

A stay is not a matter of right. The applicant bears the burden to justify that extraordinary relief under the circumstances of the case. The Court considers: (1) a strong showing of likely success on appeal; (2) probable irreparable injury absent a stay; (3) substantial injury to other interested parties from a stay; and (4) the public interest. The first two factors are the most critical. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

The Supreme Court applies those same traditional factors to Hague return orders. It recognizes that stays may be appropriate in a particular case, but rejects stays granted as a matter of course because routine delay conflicts with the Convention's prompt-return objective. *Chafin v. Chafin*, 568 U.S. 165, 178-80 (2013). In the Ninth Circuit, a stay applicant must establish that irreparable injury is probable, not merely possible, and must show either a strong likelihood of success with a public interest that does not weigh heavily against a stay, or a substantial merits case with hardships tipping sharply in the applicant's favor. *Leiva-Perez v. Holder*, 640 F.3d 962, 966-70 (9th Cir. 2011) (per curiam).

//

reel fathers rights

## IV. ARGUMENT

**A. Respondent Has Not Made the Required Merits Showing.**

Respondent has not identified a substantial likelihood that the Ninth Circuit will reverse the return order as to S.A.N. The Court conducted an eleven-day evidentiary hearing and made individualized findings. It distinguished S.A.N. from K.E.N. based on the record before it: no evidence that Petitioner had ever hit S.A.N. and no allegation that Petitioner physically abused S.A.N. during the court-ordered summer visit to Korea. The Court then applied the Convention's grave-risk standard to each child and ordered return only as to S.A.N.

The application's asserted appellate issues do not establish a basis for administrative relief. The claimed tension between the Court's findings as to K.E.N. and its separate determination as to S.A.N. is an argument against the judgment, not a showing that the judgment is likely erroneous. The Court expressly made the child-specific distinction that Respondent now challenges. A stay motion is not the occasion to retry the evidentiary hearing or to treat an adverse finding as an unresolved legal question.

Nor does Respondent identify a presently material defect in the return directive. The Court ordered S.A.N. returned to Korea to reside with Petitioner. The fact that the judgment does not prescribe every travel, passport, or transition detail does not alter the final ruling or justify suspending it. Implementation details can be addressed through counsel and, if necessary, appropriate proceedings, without postponing the return judgment pending appeal.

**B. Respondent Has Not Shown Probable, Case-Specific Irreparable Harm.**

Respondent's claimed injury is speculative. Her application assumes an immediate, uncontrolled international transfer, but identifies no set travel date, issued ticket, transfer order, or directive from Petitioner authorizing anyone to remove S.A.N. outside lawful process. The District Attorney's Office advised the parties that implementation would not occur that day or that week. Petitioner's communications seeking compliance and lawful assistance do not establish that Respondent faces irreparable harm before the noticed stay motion can be heard.

The claimed harms also arise from the relief the Court already ordered after considering the Convention defenses. Separation from Respondent and K.E.N., disruption from a return to

reel fathers rights

reel fathers rights

Korea, and adjustment to a new school setting are foreseeable consequences of any Hague return order. They cannot alone establish the individualized, probable irreparable harm required for a stay. To hold otherwise would convert the filing of a notice of appeal in a Hague case into an effective automatic stay.

Respondent's reliance on S.A.N.'s reaction during a September 10 school drop-off does not change the analysis. The record describes one school incident during a period of post-judgment uncertainty. It does not provide an expert opinion, clinical finding, or other competent evidence that compliance with the return order will cause probable irreparable harm. Likewise, the record confirms that S.A.N. has an existing relationship with Petitioner and recently completed a two-month court-ordered summer visit in Korea without any allegation of physical abuse by Petitioner.

**C. A Stay Would Substantially Injure Petitioner and Frustrate the Convention's Purpose.**

Petitioner has a compelling interest in prompt implementation of a final order returning S.A.N. to her habitual residence after a wrongful removal. The Court found that South Korea was S.A.N.'s habitual residence and that Respondent's removal violated Petitioner's custody rights. Further delay perpetuates the displacement that the Convention and ICARA are designed to remedy.

The public interest likewise weighs against a stay. The Supreme Court has emphasized that <u>routine stays of Hague return orders can cost children precious months of readjustment in their country of habitual residence and conflict with the Convention's prompt-return objective.</u> *Chafin*, 568 U.S. at 179-80. Respondent's proposed conditions do not cure this prejudice. Electronic contact is not a substitute for implementation of the Court's return judgment, and passport restraints would reinforce a delay that Respondent has not justified under the governing standard.

**D. The Requested Seven-Day Bridge Stay Should Also Be Denied.**

Respondent has not made the threshold showing for an administrative stay, and therefore shows no basis for a further seven-day bridge stay. Federal Rule of Appellate Procedure 8

permits Respondent to seek appropriate relief in the Ninth Circuit after the district court rules. Fed. R. App. P. 8(a)(2). A prospective bridge stay would merely extend relief that Respondent has not earned and would impose additional delay on a final Hague return order.

**V. CONCLUSION**

The Court should deny Respondent's Ex Parte Application for Immediate Administrative Stay. The Court should also deny the requested order shortening time to the extent it seeks to impose an interim stay or to curtail Petitioner's opportunity to respond to the noticed motion. If the Court shortens time, it should set a prompt schedule that permits Petitioner a meaningful written opposition and leaves the September 4, 2026 return order in effect pending resolution of the motion.

Respectfully Submitted,

Dated: September 16, 2026 **REEL FATHERS RIGHTS, APC**

Date: ______________________________CRC 2.257(b)
Merritt McKeon, Esq.
Attorneys for Petitioner **JUNG WOOK NA**

reel fathers rights

## PROOF OF SERVICE

I am employed in the County of Orange, State of California. I am over the age of eighteen and not a party to this action. On September 16, 2026 I served the foregoing:

**PETITIONER'S OPPOSITION TO RESPONDENT'S EX PARTE APPLICATION FOR IMMEDIATE ADMINISTRATIVE STAY AND ORDER SHORTENING TIME** on all counsel of record through the Court's CM/ECF system.

Also sent directly via email to Stephane Quinn, Quinn & Dworakowski
Email address:
Quinn@orangecountyfamilylaw.com
And
Loni Klien, Esq. GAL for the minor children
Loni@centerforchildren.com
And the Orange County District Attorney's Child Abduction Unit,
Tamara "Tammy" Jacobs:
Tammy.Jacobs@ocdistrictattorney.gov

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on September 16, 2026, at Laguna Hills, California.

**REEL FATHERS RIGHTS, APC**

Date: ______________________________ CRC 2.257(b)
Merritt McKeon, Esq.
Attorney for Petitioner

Merritt McKeon, Esq. (SBN: 187983)
Reel Fathers Rights APC
18881 Von Karman Ave. Ste. 1600
Irvine, CA 92612
Phone: (951) 460-2003
TeamMerritt@reelfathersrights.com

Attorney for Petitioner, Jung Wook Na

SUPERIOR COURT OF THE STATE OF CALIFORNIA

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| JUNG WOOK NA,<br>Petitioner,<br>vs.<br>JASMINE NA,<br>Respondent. | Case No.: 8:25-CV-02479-DOC-ADS<br><br>**DECLARATION OF JUNG WOOK NA IN SUPPORT OF PETITIONER'S OPPOSITION TO RESPONDENT'S EX PARTE APPLICATION FOR ADMINISTRATIVE STAY AND MOTION FOR STAY PENDING APPEAL**<br><br>Ex Parte Application: Decision on Papers Requested<br>Underlying Motion Hearing: October 19, 2026, 8:30 a.m.<br>Courtroom: 10A<br>Judge: Hon. David O. Carter |

I, Jung Wook Na, declare:

1. I am the Petitioner in this action and the father of S.A.N. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could and would testify competently to them.

**Passport Custody Order**

2. The Orange County Superior Court ordered that S.A.N.'s passports be held by the Orange County District Attorney's Child Abduction Unit, in October of 2025.
3. The passports were temporarily released in June 2026, so that S.A.N. could travel to the Republic of Korea.

4. After S.A.N. returned from that visit to Korea in August 2026, Jasmine Na did not return S.A.N.'s passports to the Orange County District Attorney's Child Abduction Unit as the Orange County Superior Court had ordered.

5. Jasmine Na presently possesses S.A.N.'s passports. I do not possess all of S.A.N.'s passports. I have requested she turn them over through my attorney contacting the Orange County District Attorney and Jasmine's lawyers.

6. A true and correct copy of the Orange County Superior Court order concerning custody of S.A.N.'s passports is attached as Exhibit A and incorporated by reference.

**School Attendance and Medical Information**

7. Since S.A.N. returned from Korea, I have been concerned about her school attendance. I understand that she has been kept out of school on multiple days. On September 5, 2026, I asked Jasmine Na why S.A.N. continued to miss school.

8. Jasmine Na stated that S.A.N. was sick. I asked for information and records showing the medical basis for S.A.N.'s absences, including the name and contact information for S.A.N.'s medical provider and the records or report from any appointment addressing the asserted illness.

9. Jasmine Na had not provided me the requested medical records substantiating that S.A.N. was sick until 5:00 am this morning, September 16, 2026. I first asked for the children's records on August 21, 2026 when K.E.N. told me she is underweight and recently on September 11, 2026 when I found out both our daughters are missing school.

10. Without those records, I could not verify the reason for S.A.N.'s repeated absences or confirm that she received the medical care asserted by Jasmine. All she sent me was a single screen shot. I request she provide full medical record information.

11. A true and correct copy of the pertinent communications concerning S.A.N.'s school attendance, asserted illness, and my requests for medical information is attached as Exhibit B and incorporated by reference.

//

//

reel fathers rights

**Risk of Removal**

11. I am concerned that S.A.N. is again at risk of being removed from California without my consent or authorization. My concern is based on the prior removal that led to this Hague Convention proceeding, the temporary release of S.A.N.'s passports for the Korea visit, Jasmine Na's failure to return the passports to the Orange County District Attorney's Child Abduction Unit after S.A.N.'s return, and the lack of information concerning S.A.N.'s current school attendance and medical care.

12. I understand that Respondent seeks an administrative stay and a stay pending appeal of the September 4, 2026 Order and Judgment directing S.A.N.'s return to the Republic of Korea. The requested stay should not displace the existing Orange County Superior Court passport-custody order or permit the use, transfer, concealment, or release of S.A.N.'s passports except as authorized by the Orange County District Attorney's Child Abduction Unit or further order of the appropriate court.

**Requested Relief**

13. I respectfully request that the Court deny Respondent's requested stay. I further request that any order concerning the stay preserve the Orange County Superior Court's existing directive that S.A.N.'s passports be held by the Orange County District Attorney's Child Abduction Unit, unless and until released under a further court order or as otherwise authorized by that unit.

14. I affirm I have followed the stipulations and orders in this case, and have consistently followed the orders even if they mean returning S.A.N. while this matter was pending. I am deeply concerned that S.A.N. will again be detained in the United States, after she has expressed to me that she wants to stay in Korea and that everyone in her home, K.E.N., her mother Jasmine, and her maternal grandparents, are "always angry."

//

//

//

//



reel fathers rights

15. S.A.N. needs more dental work in Korea. She had to undergo a root canal here due to Jasmine's neglect. Korea will follow international law, and I will follow the law. There is no reason to suspect I will disobey a re-return order if the Court of Appeal changes the decision this honorable Court has made.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 16, 2026, at Seoul, Korea.

JUNG WOOK NA, Petitioner

reel fathers rights

reel fathers rights

**PROOF OF SERVICE**

I am employed in the County of Orange, State of California. I am over the age of eighteen and not a party to this action. On September 16, 2026 I served the foregoing:

**DECLARATION OF JUNG WOOK NA IN SUPPORT OF PETITIONER'S OPPOSITION TO RESPONDENT'S EX PARTE APPLICATION FOR ADMINISTRATIVE STAY AND MOTION FOR STAY PENDING APPEAL**
on all counsel of record through the Court's CM/ECF system.

Also sent directly via email to Stephane Quinn, Quinn & Dworakowski
Email address:
Quinn@orangecountyfamilylaw.com
And
Loni Klien, Esq. GAL for the minor children
Loni@centerforchildren.com
And the Orange County District Attorney's Child Abduction Unit,
Tamara "Tammy" Jacobs:
Tammy.Jacobs@ocdistrictattorney.gov

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on September 16, 2026, at Laguna Hills, California.

**REEL FATHERS RIGHTS, APC**

Date: 09/16/2026

Merritt McKeon CRC 2.257(b)
Merritt McKeon, Esq.
Attorney for Petitioner

# EXHIBIT A

**SUPERIOR COURT OF CALIFORNIA**
**FOR THE COUNTY OF ORANGE**
**MINUTE ORDER**
10/29/2025

**Judge / Commissioner:** MARY KREBER-VARIPAPA

**Dept.:** L65 at 8:30 AM

**Clerk:** C. MARIN

**Bailiff:** E. PETERSON

**Reporter:** K. CHRISTOPHER 11188

**Case Type:** OTHER

**Case Number:** 25FL001112

**Case Name:** JUNG NA VS JASMINE NA

**Appearances:**
JASMINE PEARL NA, RESPONDENT
JUNG WOOK NA, PETITIONER
**Attorney for PET / PLTF**
MERITT MCKEON
**Attorney for RESP / DEF**
STEPHANE QUINN
**Other Parties and Their Attorneys**
TAMARA JACOBS, DEPUTY DISTRICT ATTORNEY

---

**RFO - OTHER**
By PETITIONER

Filed on 10/13/2025
JUNG WOOK NA

*This hearing is being conducted via remote video appearance pursuant to CA Civil Code of Procedures 367.75. Photographing, recording, filming and/or broadcasting of these courtroom proceedings is not permitted pursuant to California Rules of Court 1.150 and Orange County Superior Court Rule 180.*

10:15 AM On the record, appearances as indicated above. Petitioner/Applicant appears via Zoom, all others are personally present.

*CART interpreter present via Zoom.*

Attorney Stephane Quinn specially appears.

Matter is before the Court for Petitioner/Applicant's request under the Hague Petition.

Court hears from Deputy District Attorney as to updates and requests, as fully stated on the record.

Court notes that counsel for Respondent has filed a Notice of Special Appearance and Intent to Remove Action to Federal Court this date.

10:20 AM Court briefly trails matter at the request of the Deputy District Attorney.

Deputy District Attorney serves counsel for Petitioner and counsel for Respondent in open court.

10:26 AM Back on the record, appearances as before.

Court hears further updates from Deputy District Attorney, as fully stated on the record.

Pursuant to the request of Deputy District Attorney, Exhibit 23, entire case file of related Orange County Superior Court case 25V001816, is filed this date.

Court hears from Deputy District attorney as to requests, as fully stated on the record.

Court hears from counsel for Petitioner as to requests, as fully stated on the record.

Parties hear from the Court as to indicated temporary emergency orders, pending the filing of this matter with federal court.

Court finds good cause to trail this matter to allow for counsel for Respondent to file their request in federal court.

**Continuance**
**The Court orders this matter continued to November 12, 2025 at 8:30 AM in Department L65 for updates as to the case being filed in federal court.**

Respondent is ordered to return to this department on 11/12/2025 at 8:30 AM.

If federal court accepts jurisdiction of this case, counsels are ordered to notify this department's clerk immediately (657-622-5565 or L65@occourts.org).

Matter set on November 12, 2025 shall go off calendar should federal court accept jurisdiction on this case.

Court shall request a CART interpreter be present at each future hearing in this matter in this department.

Court hears from counsel for Respondent as to temporary emergency orders.

**Passports – Children's US and Respondent's US**
Counsel for Respondent gives both minor children's United States Passports and Respondent/Mother's United States Passport to Deputy District Attorney in open court.

10:52 AM Court trails matter to allow for the appearance of the Korean interpreter for paternal grandfather.

11:06 AM Back on the record, appearances as before.

Court finds good cause to swear in paternal grandfather for the limited purpose of temporary emergency orders, noting testimony will not be utilized for the Hague Petition proceeding, without objection from counsels.

**Court Interpreter**
Nicole Jo (357818) is a certified court interpreter who will be interpreting the Korean language for witness, paternal grandfather, Chun Jang Na. Interpreter's identification has been verified, and there is an interpreter's oath on file with the court.

Interpreter is conducting Video Remote Interpreting and will be interpreting remotely. Interpreter confirms audio and video is functioning for paternal grandfather and interpreter.

Paternal grandfather, Chun Jang Na, is sworn to testify on the limited issue of temporary emergency orders and temporary placement of the minor children.

Court finds good cause to trail matter for the lunch hour.

The minor children are to spend the lunch time with paternal grandfather within the Lamoreaux Justice Center.

**Child Communication Orders**
Court orders no discussion of this case or the ongoing custody and visitation issues with the minor children.

11:29 AM Court declares the lunch recess. All parties are to return at 1:30 PM in this department.

*Interpreter, Nicole Jo, now personally present, assisting the paternal grandfather.*

1:36 PM Back on the record, appearances as before.

Court hears from Deputy District Attorney as to further requests and updates, as fully stated on the record.

Court hears from counsel for Respondent as to temporary orders, as fully stated on the record.

Court hears from counsel for Petitioner, as fully stated on the record.

Discussion ensues.

Matter is submitted to the Court for the limited purpose of temporary emergency orders.

Court makes the following temporary emergency orders, pending further order of this Court or of federal court:

The Court has reviewed the CLETS (California Law Enforcement Telecommunications Tracking System) report regarding the criminal history of the Petitioner.

Court notes the possible flight risk of releasing the children to Respondent/Mother, including the possibility of multiple passports and connections to non-Hague countries.

**Child Communication Orders**
Court orders that neither party is to discuss this case with, or within earshot of, the minor children, nor allow any third parties to do so.

**Children to Remain in Orange County**
Court orders that the minor children are not to be removed from Orange County, California, without further order of this Court or federal court.

**Passport Relinquishment**
Court orders that all passports are to be given to the District Attorney until further order of this Court or federal court. Passports to be relinquished include: both minor children, Respondent/Mother, maternal grandmother, maternal grandfather, paternal grandfather, paternal cousin(s), Randy Hoang and Crystal Hoang.

**Temporary Placement**
Court orders that the minor children be released to paternal grandfather, Chun Jang Na. The minor children are to remain in the custody of paternal grandfather and will be temporarily live with family friends, Randy Hoang and Crystal Hoang, pending further order of this Court or federal court.

**School**
Paternal grandfather, Chun Jang Na, shall be responsible for transporting the minor children to and from school. Mr. and Mrs. Hoang may assist with transportation.

Paternal grandfather, Chun Jang Na, and Randy and Crystal Hoang are to immediately be placed on the minor children's school safe pick up list.

The minor children may not be released to Respondent/Mother or maternal grandparents.

Respondent/Mother and maternal family members are not to be present at the minor children's school.

**Temporary Parenting Time – Respondent/Mother**
Respondent/Mother shall have temporary professionally monitored parenting time with the minor children for up to ten (10) hours per week. Parenting time shall not interrupt the children's school schedule. Time of parenting time shall be as coordinated with the professional monitor, paternal grandfather and Mr. and Mrs. Hoang.

Respondent/Mother shall bear the entire cost of the professional monitor.

Respondent/Mother may select any professional monitor off the court-approved list, which is given in open court this date.

Maternal relatives may be present during Respondent/Mother's parenting time.

**Parenting Time Provisions**
Communication during parenting time may be in English only. Professional monitor is to immediately cease parenting time if conversations occur in any language other than English.

Court reiterates that the children are not to be communicated with regarding this case. Professional monitor is to immediately cease parenting time if there is discussion of this case with the minor children during parenting time.

Parties are to request a written report from the professional monitor as to the visits.

**Temporary Parenting Time – Petitioner/Father**
Petitioner/Father shall have no limitations on telephonic/video contact with the minor children while in the care of paternal grandfather. Court notes Petitioner/Father may not discuss this case with the minor children.

**Talking Parents**
Parties agree that Respondent/Mother and maternal grandparents may have unlimited text message communication with the minor, Karissa, via Talking Parents application. Parties may not delete any messages on Talking Parents.

Paternal grandfather may contact Respondent/Mother via call or text in the event of an emergency.

Court notes that if federal court does not accept jurisdiction on this case, this court is inclined to appoint minor's counsel for the minor children.

Court notes for the record paternal grandfather is on a 90-day visa.

Court hereby orders the immediate release of the minor children to paternal grandfather, Chun Jang Na.

Court notes all orders made this date are subject to modification by federal court.

This Minute Order shall constitute the formal order of the Court.

**IT IS SO ORDERED:**

Date: October 29, 2025

Judge Mary Kreber Varipapa

*quinn@orangecountyfamilylaw.com; merrittmck@hotmail.com; tammy.jacobs@ocdapa.org*
**Certificate of Electronic Service**
Clerk's certificate of electronic service - I certify that I am not a party to this cause, that I am over the age of 18, and that this certificate of electronic service was transmitted in accordance with rule 2.251 of the California Rules of Court from an Orange County Superior Court email address. I certify that a copy of this document was electronically served as addressed above. The electronic service and this certificate occurred at Orange, California, on October 30, 2025. David H. Yamasaki, Executive Officer/Clerk, by C. Marin Deputy Clerk.

# EXHIBIT B

Jasmine Jace viewed this subject on 10/31/2025 at 5:23:10 PM

Jasmine Jace on 10/31/2025 at 5:23:10 PM said:

Document as far as her trying to reach out to you

Daniel Na viewed this subject on 10/31/2025 at 5:23:10 PM

Daniel Na on 10/31/2025 at 5:23:55 PM said:

I did reply everything as soon as I see it. For the record, I reached out to Beata first to get the paperwork moving.

Jasmine Jace viewed this subject on 10/31/2025 at 5:24:39 PM

Jasmine Jace on 10/31/2025 at 5:24:40 PM said:

I already requested I do not want to discuss anything besides children visitation hours. Thank you

Daniel Na viewed this subject on 10/31/2025 at 5:24:42 PM

Daniel Na on 11/1/2025 at 6:27:55 AM said:

Jasmine I need the medical insurance information for the children and the contact information for their doctors and dentists and therapists. Please send me this information asap.

Also I need the passcodes to the children's phone and iPad. And their phone numbers.

Daniel Na on 11/1/2025 at 6:35:40 AM said:

I have sole legal and physical custody and I am entitled to this.

Jasmine Jace viewed this subject on 11/1/2025 at 7:00:24 AM

Jasmine Jace on 11/1/2025 at 7:01:10 AM said:

I don't know their passcodes to their iPads and phones. You can ask them. Medical insurance I will give to Randy

Daniel Na viewed this subject on 11/1/2025 at 7:01:18 AM

Daniel Na on 11/1/2025 at 7:02:26 AM said:

Okay please provide the other informations that requested above to me as well along with the insurance.

Jasmine Jace viewed this subject on 11/1/2025 at 7:02:30 AM

Jasmine Jace on 11/1/2025 at 7:02:49 AM said:

What is the other information?

Jasmine Jace on 11/1/2025 at 7:03:00 AM said:

Medical I will give to Randy and you can get it from him

User Printed User Printed

Daniel Na on 11/22/2025 at 2:04:58 AM said:

can you give it to me as well?

Daniel Na on 11/23/2025 at 3:12:23 PM said:

Jasmine I want to talk about the visiting schedule.

Daniel Na on 11/23/2025 at 7:54:02 PM said:

Jasmine,I am not going to discuss our visitation and custody schedule with Beata. You are the mother. I am the father. I told you my proposal. Beata is not our therapist she is the monitor.

I suggest get a monitor who lives in Irvine or south Orange County so she can drive easily. She can't tell me my dad, who as you know needs an operation and does not drive, can drive. This is about what the schedule is for your visits. You need to talk to me on Talking Parents the judge was very clear about this.

maybe we can do 3 visits a week and increase the hours, and ask the judge to approve.

If you agree to increase time from 10 to 12 hours, we can ask the judge to change the order.

But only if visits are 3 times a week.

With twice a week pick ups from school.

Daniel Na on 11/28/2025 at 6:01:02 AM said:

Jasmine, I am surprised you had Beata give me the information that you wanted to take the girls to the dentist.

Talking Parents was ordered for us to communicate. The judge was very clear we are to communicate through the app.

Instead you are choosing to use your lawyer to send me insurance cards and the name of the children's medical doctor. And Beata to ask about my dad and why he isn't driving, and now, to get permission to take the girls to and from the dentist on your visit.

I demand the name, address and contact information for the dentist. Also get the records of the visits and any X-rays or treatment plans, to me right away.

I also demand the names and contact information for any therapists the girls have seen one the past 3 years in the US when they have visited.

I have asked for these things for over a month. There is no reason to expose our children's medical information and privacy to the monitor. You can ask me about these things on Talking Parents. This is what the judge ordered.

Daniel Na on 11/30/2025 at 5:46:14 PM said:

Jasmine one last try here.

I need their Apple accounts and passwords that you made in the US. It does not allow me to go through information on your phone as your attorney claimed. Please give it to me so I can access their phones.



User Printed User Printed User Printed

Case: 26-6195, 09/23/2026, DktEntry: 5.1, Page 121 of 155

Jasmine Jace on 1/14/2026 at 10:26:16 AM said:

Please contact the school for details.

Daniel Na viewed this subject on 1/14/2026 at 11:10:56 AM

Daniel Na on 1/29/2026 at 8:38:23 PM said:

Jasmine

Daniel Na on 1/29/2026 at 8:38:49 PM said:

Would you like to hang out with the kids tomorrow?

Daniel Na on 1/29/2026 at 8:39:36 PM said:

K.E.N. wants to play with her friend on Saturday

Jasmine Jace viewed this subject on 1/30/2026 at 2:26:08 PM

Jasmine Jace on 1/30/2026 at 2:27:05 PM said:

Hello, I think it might be too short of notice to schedule so perhaps I can see them 3x next week

Daniel Na viewed this subject on 1/30/2026 at 4:03:09 PM

Daniel Na on 1/30/2026 at 4:03:26 PM said:

Ok

Jasmine Jace viewed this subject on 1/30/2026 at 4:23:26 PM

Daniel Na on 2/2/2026 at 4:53:01 PM said:

K.E.N. asked if you can take her shopping tomorrow~

Jasmine Jace viewed this subject on 2/2/2026 at 4:55:19 PM

Jasmine Jace on 2/2/2026 at 4:56:07 PM said:

I think Wednesday is more likely. We can go after her school.

Daniel Na viewed this subject on 2/2/2026 at 4:56:15 PM

Daniel Na on 2/2/2026 at 4:56:38 PM said:

Okay I will let her know. She just cut her bangs so she would like to show you

Jasmine Jace viewed this subject on 2/2/2026 at 4:56:49 PM

Jasmine Jace on 2/2/2026 at 4:56:59 PM said:

Ok

User Printed User Printed User Printed

Case: 26-6195, 09/23/2026, DktEntry: 5.1, Page 122 of 155

Daniel Na viewed this subject on 8/21/2026 at 12:36:25 AM

Daniel Na on 8/21/2026 at 4:12:37 AM said:

I am picking up your dad and going together. Brigitte is going together as well.

Jasmine Jace viewed this subject on 8/21/2026 at 8:42:37 AM

Jasmine Jace on 8/21/2026 at 8:42:49 AM said:

Ok thank you

Daniel Na viewed this subject on 8/21/2026 at 2:30:20 PM

Daniel Na on 8/21/2026 at 4:44:15 PM said:

Any update from the doctors appointment? I remember last time you said it was postponed.

Daniel Na on 8/21/2026 at 5:09:49 PM said:

If you were, please give me the report from the doctor

Jasmine Jace viewed this subject on 8/21/2026 at 5:10:16 PM

Jasmine Jace on 8/21/2026 at 5:22:41 PM said:

We went today after school. Everything is fine and normal. The doctor recommended that she increase her overall calorie intake as she is growing. I was not provided with a separate report from today's visit. She will also need three additional vaccines before she turns 12.

Jasmine Jace on 8/21/2026 at 5:22:47 PM said:

Are you at the airport?

Daniel Na viewed this subject on 8/21/2026 at 5:22:51 PM

Daniel Na on 8/21/2026 at 5:23:39 PM said:

Can you give me a contact info so I can contact for report?

Daniel Na on 8/21/2026 at 5:23:51 PM said:

On the way

Jasmine Jace viewed this subject on 8/21/2026 at 5:23:52 PM

Jasmine Jace on 8/21/2026 at 5:26:32 PM said:

The doctor's contact information has previously been provided to you. It's the same one as before

Daniel Na viewed this subject on 8/21/2026 at 6:02:30 PM

User Printed User Printed User Printed

Daniel Na on 9/5/2026 at 6:00:46 AM said:

How was the therapy for the children? What did they say?

Jasmine Jace viewed this subject on 9/5/2026 at 9:28:17 PM

Jasmine Jace on 9/6/2026 at 9:42:43 PM said:

Therapy went well. They are still completing assessments for both kids. K.E.N. s session was conducted individually. S.A.N. threw up and had some shivers, and K.E.N. and I were also not feeling well. Since Friday was a half day, I kept the girls home so they could rest and recover.

Daniel Na viewed this subject on 9/6/2026 at 9:51:36 PM

Daniel Na on 9/8/2026 at 4:30:18 PM said:

Jasmine. Have you read the order? Please send S.A.N. back asap so we can enroll her into school and get her medical treatment that has been delayed.

Daniel Na on 9/8/2026 at 11:40:54 PM said:

Please do this before the DA picks her up. I don’t her to get traumatized

Daniel Na on 9/9/2026 at 6:24:28 AM said:

Please send her back by this Saturday

Daniel Na on 9/9/2026 at 6:26:27 AM said:

If you can’t bring her I can have Asiana staff escort her like what we did with K.E.N. before. Please let me know.

Daniel Na on 9/9/2026 at 6:27:09 AM said:

Make sure it’s the evening flight because it has WiFi

Jasmine Jace viewed this subject on 9/10/2026 at 10:05:44 AM

Jasmine Jace on 9/10/2026 at 10:13:21 AM said:

I am currently awaiting further guidance regarding S.A.N. s situation and will proceed accordingly.

Daniel Na viewed this subject on 9/10/2026 at 10:13:29 AM

Daniel Na on 9/10/2026 at 10:13:55 AM said:

Guidance from who?

Jasmine Jace viewed this subject on 9/10/2026 at 10:14:23 AM

Jasmine Jace on 9/10/2026 at 10:14:23 AM said:

Since things have been a bit hectic this week, I may have forgotten to let you know that K.E.N. had a routine dental checkup and cleaning yesterday, Wednesday, after school at the same dental office she

User Printed User Printed

Jasmine Jace on 9/10/2026 at 10:46:49 AM said:

I also wanted to let you know that I brought S.A.N. to school today because I want to maintain as much consistency and routine as possible during this transition period. However, she became very upset and was crying at school and did not want to leave my side. I ultimately brought her home. I plan to speak with the school tomorrow so that they are aware of the situation and can provide appropriate support as needed.

K.E.N. appears to be doing well and has resumed attending school regularly following her recent illness.

Jasmine Jace on 9/10/2026 at 10:47:08 AM said:

I will continue to keep you updated

Daniel Na viewed this subject on 9/10/2026 at 2:30:28 PM

Daniel Na on 9/10/2026 at 3:34:59 PM said:

I sent all hospital record through your email just right now.

Jasmine Jace viewed this subject on 9/10/2026 at 6:19:50 PM

Jasmine Jace on 9/10/2026 at 6:19:50 PM said:

We went to the doctor, and everything was fine. The doctor said there is a virus going around right now. She said that if S.A.N. develops a fever or if her cough lasts longer than three weeks, she should come back.

She said no medication is necessary, but to help ease S.A.N. s cough at night, she can take allergy medicine.

S.A.N. was fussy and crying, and the office was closing, so I didn't get a chance to ask about the medical records. I can request them, but if you need them sooner, you should be able to request them directly from the doctor's office. I gave you the contact info.

Daniel Na viewed this subject on 9/10/2026 at 6:22:42 PM

Jasmine Jace on 9/10/2026 at 6:37:28 PM said:

I would also like to briefly clarify some inaccurate statements you made earlier. I respond to necessary child-related communications in a timely manner and have never gone "months" without responding. You also have regular communication with the girls, including FaceTime, and I will continue to encourage their communication with you.

Moving forward, I ask that we both keep our communication factual and focused on the children. Thank you.

Daniel Na viewed this subject on 9/10/2026 at 6:37:51 PM

Daniel Na on 9/10/2026 at 6:39:53 PM said:

You didn't answer me from June 11 to August 11

User Printed

**2026-2027** Loma Ridge Elementary **9/9/2026**

| StuID | Last Name | First Name | Middle Name | Gender | Grade | Prg | Track | Birthdate | Birthplace |
|---|---|---|---|---|---|---|---|---|---|
| **138250027** | **Na** | S.A.N. | **Aylie** | **Female** | **2** | | **A** | **04/15/2019** | |

| ENR | PR | EXC | UNEX | TRU | TRDY | SUSP | IN-SUSP |
|---|---|---|---|---|---|---|---|
| **16** | **7** | **5** | **4** | **4** | **0** | **0** | **0** |

**Daily Absences**

| Date | Code | Rsn for Abs |
|---|---|---|
| Wed 09/09/2026 | I | Illness |
| Tue 09/08/2026 | I | Illness |
| Fri 09/04/2026 | I | Illness |
| Thu 09/03/2026 | I | Illness |
| Wed 09/02/2026 | I | Illness |
| Fri 08/21/2026 | U | Unexcused |
| Thu 08/20/2026 | U | Unexcused |
| Wed 08/19/2026 | U | Unexcused |
| Tue 08/18/2026 | U | Unexcused |

**Enter/Leave/Program Changes**

| Date | Ent/Lv | Grd | Prg | AttPr1 | AttPr2 | Trk | Teacher #/Name |
|---|---|---|---|---|---|---|---|
| **08/18/2026** | **E** | **2** | | | | **A** | **0 Unassigned** |

**Total Absences**

| CD | Description | All |
|---|---|---|
| **I** | **Illness** | **5** |
| **U** | **Unexcused** | **4** |
| | ***TOTALS*** | |
| | **EXCUSED** | **5** |
| | **UNEXCUSED** | **4** |

Student Attendance 9:36:47 AM Wednesday, September 9, 2026

**2026-2027** Loma Ridge Elementary **9/9/2026**

| StuID | Last Name | First Name | Middle Name | Gender | Grade | Prg | Track | Birthdate | Birthplace |
|---|---|---|---|---|---|---|---|---|---|
| **138250028** | **Na** | K.E.N. | **Eve** | **Female** | **6** | | **A** | **12/22/2014** | |

| ENR | PR | EXC | UNEX | TRU | TRDY | SUSP | IN-SUSP |
|---|---|---|---|---|---|---|---|
| **16** | **11** | **5** | **0** | **0** | **0** | **0** | **0** |

**Daily Absences**

| Date | Code | Rsn for Abs |
|---|---|---|
| Tue 09/08/2026 | I | Illness |
| Fri 09/04/2026 | I | Illness |
| Thu 09/03/2026 | I | Illness |
| Wed 09/02/2026 | I | Illness |
| Wed 08/26/2026 | I | Illness |

**Enter/Leave/Program Changes**

| Date | Ent/Lv | Grd | Prg | AttPr1 | AttPr2 | Trk | Teacher #/Name |
|---|---|---|---|---|---|---|---|
| **08/18/2026** | **E** | **6** | | | | **A** | **0 Unassigned** |

**Total Absences**

| CD | Description | All |
|---|---|---|
| **I** | **Illness** | **5** |
| | ***TOTALS*** | |
| | **EXCUSED** | **5** |
| | **UNEXCUSED** | **0** |

Student Attendance 9:35:55 AM Wednesday, September 9, 2026

Sep 10, 2026 | 04:30 PM

**Catherine Su**

Coastal Kids - Laguna Hills

24422 AVENIDA DE LA CARLOTA STE 180,LAGUNA HILLS,CA,92653-3648

Reason
2. Sick Appointment or injury - cough/cold/fever/rash/stomach issue/pain
Appointments

Aug 18, 2025 | 02:30 PM

**Julie Cheng**

Coastal Kids - Laguna Hills

24422 AVENIDA DE LA CARLOTA STE 180,LAGUNA HILLS,CA,92653-3648

Reason
New Patient - 6 years
Appointments

STEPHANE QUINN CFLS (SBN: 278188)
DAVID DWORAKOWSKI CFLS, CALS (SBN: 135285)
**QUINN & DWORAKOWSKI, LLP**
IRVINE CONCOURSE
2050 Main Street, 6th Floor, Suite 600
Irvine, California 92614
Telephone: (949) 660-1400
E-Mail: david@orangecountyfamilylaw.com
E-Mail: quinn@orangecountyfamilylaw.com
*Attorneys for Respondent*
*JASMINE PEARL NA*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

| | |
|---|---|
| JUNG WOOK NA,<br>*Petitioner,*<br>vs.<br>JASMINE PEARL NA,<br>*Respondent.* | CASE NO.: 8:25-CV-02479-DOC-ADS<br><br>**RESPONDENT'S REPLY IN SUPPORT OF EX PARTE APPLICATION FOR IMMEDIATE ADMINISTRATIVE STAY AND ORDER SHORTENING TIME; REQUEST FOR LEAVE TO FILE REPLY** |

## I. REQUEST FOR LEAVE

Local Rule 7-19 does not prescribe a reply schedule for an ex parte application. Petitioner's Opposition (Dkt. 73), the Declaration of Jung Wook Na (Dkt. 73-1), and Petitioner's proposed order (Dkt. 73-2) introduce new factual assertions and proposed relief concerning

passports, school attendance, medical care, and an asserted risk of removal. Local Rule 7-10 expressly permits a moving party to submit a reply memorandum and rebuttal evidence. Mother therefore respectfully requests leave to file this limited reply addressing that new matter.

## II. PETITIONER'S PASSPORT ACCOUNT IS MATERIALLY INCOMPLETE AND DOES NOT ESTABLISH A PRESENT REMOVAL RISK

Petitioner states that Mother "did not return S.A.N.'s passports" after the summer visit and that he "do[es] not possess all of S.A.N.'s passports." (Dkt. 73-1 ¶¶ 4–5.) That carefully phrased account obscures the facts that matter. Petitioner admits that travel documents were temporarily released in June so S.A.N. could travel to Korea. (Id. ¶ 3.) When S.A.N. returned to California on August 22, Mother received the Korean passport and a limited-validity emergency United States passport. She did not receive or possess the regular United States passport. (Supplemental Declaration of Jasmine Pearl Na ("Supp. J. Na Decl.") ¶ 2.) Father's declaration does not identify the regular passport's location, status, or custodian.

The contemporaneous TalkingParents record establishes Father's knowledge of the distinction between the documents. While S.A.N. remained in Korea, Mother asked Father to complete Form DS-3053 and provide the documents needed for her to apply for a replacement regular United States passport after S.A.N. returned. Father said he wanted to wait until the court proceedings ended, then wrote, "She got her emergency passport." When Mother asked whether he did not want to reapply for the regular United States passport, Father answered, "Of

course I do and we will when this is over." He later stated, "I just think it's easier if I make their passports in Korea." Mother told him the emergency passport was "only valid for five days." (Supp. J. Na Decl. ¶¶ 3–4, Ex. A.) The passport itself confirms the point. It was issued August 21, 2026, expired August 26, 2026, and bears the endorsement: "THIS PASSPORT IS VALID ONLY FOR RETURN TO THE UNITED STATES BEFORE 26-AUG-2026. IT CANNOT BE EXTENDED." (Id. ¶¶ 4–6, Ex. B.)

Thus, Mother never possessed a regular United States passport after S.A.N.'s return. The only United States passport in her possession was a five-day, return-only emergency document that had expired weeks before Father filed his declaration. Mother also possessed the Korean passport. On September 17, 2026, at approximately 9:50 a.m., she delivered both the Korean passport and the expired emergency booklet to Nathan Ridlon of the Orange County District Attorney's Child Abduction Unit, who personally accepted them. No written receipt was provided. Mother no longer possesses either document or any other passport or travel document for S.A.N. (Supp. J. Na Decl. ¶¶ 6–8.)

Father's declaration omits that he knew the United States document in Mother's possession was an emergency, return-only passport; knew it expired after five days and could not be extended; and knew that obtaining a regular United States passport was a separate process. It also does not identify the location or custodian of the regular United States passport. Instead, the plural reference to Mother's possession of "passports" creates the misleading impression that she controlled multiple presently usable United States travel documents. She did not. An expired document valid only for return to the United

States could not facilitate removal from the United States, and the valid Korean passport is now in neutral custody. Mother has purchased no tickets, made no international travel arrangements, applied for no replacement document, and accepts an enforceable no-travel condition. (Id. ¶¶ 8–9.)

The appropriate response to passport concerns is reciprocal neutral custody, not denial of interim review. Father should be ordered to identify the precise location, status, and custodian of the regular United States passport, secure it against use, and, if it is within his possession, custody, or control, cause it to be delivered to the Child Abduction Unit or another neutral custodian. Neither party should be permitted to seek any replacement or additional passport or travel document without further order.

This incomplete presentation is especially significant because the Court previously found that Father gave "materially incomplete sworn testimony." (Dkt. 69 at 22.) Mother does not ask the Court to decide credibility by epithet. She asks the Court to compare Father's description with his own contemporaneous messages and the actual travel documents.

## III. FATHER'S FOREIGN DECLARATION IS FACIALLY DEFECTIVE AND ITS COLLATERAL ASSERTIONS DO NOT ANSWER THE STAY REQUEST

Father executed his declaration in Seoul. It states only, "I declare under penalty of perjury that the foregoing is true and correct." (Dkt. 73-1 at 4.) Section 1746(1) specifies that a declaration executed outside the United States be made under penalty of perjury "under the laws of the United States of America." 28 U.S.C. § 1746(1). Father's declaration

omits that language. Mother respectfully requests that the Court decline to rely on the declaration absent correction. At minimum, the defect warrants caution. Even if considered, the passport account remains materially incomplete for the reasons above.

Paragraph 14 also relays an uncorroborated statement allegedly made by a seven-year-old to the parent seeking her return. It does not establish that Mother interfered with contact, that S.A.N. faces harm in California, or that an international transfer should occur before the Court resolves the stay motion. The declaration's school, medical, and custody accusations likewise do not eliminate the appellate questions or the need for temporary preservation of the status quo.

**IV. PETITIONER'S OWN POSITION AND PROPOSED ORDER CONFIRM THE NEED FOR INTERIM RELIEF**

The Opposition says there is no ticket, no travel date, and no directive. (Dkt. 73 at 4.) But Father demanded return "by this Saturday," proposed an airline escort, and refused to agree to any standstill. His counsel stated that Father "does not agree that he should be stayed" from purchasing a ticket absent a court order. (Quinn Decl. ¶ 10, Ex. B.) The District Attorney's September 9 statement that implementation would not occur "today or even this week" was temporary, has expired by its terms, and never bound Father.

Petitioner's proposed order confirms the problem. Even if the Court shortens time, Petitioner asks that the September 4 Judgment "remain[] in effect pending further order" while the motion is briefed. (Dkt. 73-2 ¶ 3(c).) That would permit the transfer to occur before the Court decides whether the transfer should be stayed—the precise circumstance an administrative stay is intended to prevent. The

absence of a purchased ticket is not forbearance where Father has refused to refrain from purchasing one.

## V. THE OPPOSITION APPLIES A RECONSIDERATION STANDARD AND DOES NOT ANSWER THE IDENTIFIED APPELLATE QUESTIONS

The Opposition faults Mother for identifying no "new evidence or changed circumstance." (Dkt. 73 at 2.) That is not the governing standard. Mother is not seeking reconsideration under Local Rule 7-18. She seeks a stay under Federal Rule of Appellate Procedure 8 and Federal Rule of Civil Procedure 62. The question is whether the appeal presents a substantial merits case or serious legal questions, whether irreparable harm is probable, and how the remaining stay factors balance. *Leiva-Perez v. Holder*, 640 F.3d 962, 967–68 (9th Cir. 2011) (per curiam).

The Opposition does not engage the questions identified in the application: whether Article 13(b)'s prospective inquiry was fully applied to S.A.N.; how the finding that reporting cannot sufficiently protect "the children" is reconciled with returning one child to the same household; whether the "intolerable situation" language was addressed as to S.A.N.; whether international sibling separation was analyzed; and whether the child-specific findings and return conditions permit meaningful review. Calling those questions arguments "against the judgment" does not make them insubstantial. Appellate issues necessarily challenge the judgment under review.

## VI. THE UPDATED SCHOOL AND MEDICAL RECORD REBUTS PETITIONER'S COLLATERAL NARRATIVE

Father's own declaration admits that Mother provided medical documentation before he filed his opposition: "All she sent me was a single screen shot." (Dkt. 73-1 ¶¶ 9–10.) The authenticated TalkingParents record shows that Mother sent the pediatrician's visit summary on September 15, 2026, and Father downloaded it minutes later. (Supp. J. Na Decl. ¶ 11, Ex. D.) Father describes receipt at approximately 5:00 a.m. on September 16 because he was in Korea; Mother sent it during the afternoon of September 15 in California. The pediatrician's office told Mother that the summary was the document it ordinarily provides after a visit. Father's complaint concerns the amount of detail he preferred, not whether the September 10 appointment occurred.

The current school record is likewise concrete. S.A.N. attended a half day on September 14 and full days on September 15 and 16. On September 15, her teacher reported that the school counselor had met with her, that she had returned to class, that the school had provided preferred seating and frequent breaks, and that she was "doing really well." The counselor separately reported that she had met with S.A.N. and that the child "seemed to be doing well." Both parents signed the school-counseling consent on September 16; Mother sent the completed form to the school and forwarded the school communications to Father. On September 17, Mother reported that S.A.N. went to school happily, and Father responded, "Thank you." (Supp. J. Na Decl. ¶ 10, Exs. C–D.) Those facts rebut the implication that Mother continues to keep the child out of school. They also show an active school-based stabilization

plan that an immediate international transfer would interrupt. The Judgment still provides no transition plan, therapy-continuity plan, or provision for contact between the sisters.

## VII. PETITIONER'S EXHIBIT B SHOULD BE RE-FILED IN REDACTED FORM

Exhibit B to Father's declaration repeatedly displays both children's full names. (Dkt. 73-1 at 15–20.) Federal Rule of Civil Procedure 5.2(a)(3) requires use of a known minor's initials, and Local Rule 5.2-1 places responsibility for redaction on the filer. Mother requests that Petitioner be directed to re-file that exhibit in properly redacted form.

## VIII. CONCLUSION

Mother respectfully requests that the Court grant leave to file this reply, enter an immediate administrative stay, and shorten time on the noticed motion. Any interim order should provide that: (1) the Korean passport and expired emergency United States passport remain with the Child Abduction Unit; (2) Father identify the precise location and custodian of the regular United States passport within forty-eight hours and if within his possession, custody, or control, cause it to be delivered to the Unit or another neutral custodian within seven days; (3) neither party apply for or obtain any replacement or additional passport or travel document for S.A.N. absent further order; and (4) Petitioner re-file Dkt. 73-1, Exhibit B in redacted form. A revised proposed order is lodged herewith.

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Respondent, certifies that this reply contains 1,835 words, which complies with the word limit of Local Rule 11-6.1.

Dated: September 17, 2026

Respectfully submitted,

**QUINN & DWORAKOWSKI, LLP**

/s/ Stephane Quinn

STEPHANE QUINN, CFLS

Attorneys for Respondent

JASMINE PEARL NA

STEPHANE QUINN CFLS (SBN: 278188)
DAVID DWORAKOWSKI CFLS, CALS (SBN: 135285)
**QUINN & DWORAKOWSKI, LLP**
IRVINE CONCOURSE
2050 Main Street, 6th Floor, Suite 600
Irvine, California 92614
Telephone: (949) 660-1400
E-Mail: david@orangecountyfamilylaw.com
E-Mail: quinn@orangecountyfamilylaw.com
*Attorneys for Respondent*
*JASMINE PEARL NA*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

| | |
|---|---|
| JUNG WOOK NA,<br>*Petitioner,*<br>vs.<br>JASMINE PEARL NA,<br>*Respondent.* | CASE NO.: 8:25-CV-02479-DOC-ADS<br><br>**SUPPLEMENTAL DECLARATION OF JASMINE PEARL NA IN SUPPORT OF RESPONDENT'S REPLY IN SUPPORT OF EX PARTE APPLICATION** |

I, Jasmine Pearl Na, declare:

1. I am Respondent and the mother of K.E.N. and S.A.N. I submit this declaration solely to respond to new factual assertions in Father's September 16, 2026 declaration concerning passports, medical care, school attendance, and an alleged risk that I will remove

S.A.N. from the United States. I have personal knowledge of the facts stated below. Where I identify information given to me by another person, I identify the source.

2. S.A.N. has a Korean passport, a regular United States passport, and a limited-validity emergency United States passport. After S.A.N. returned to California on August 22, 2026, I possessed the Korean passport and the emergency United States passport. I did not receive or possess the regular United States passport.

3. On August 20, 2026, while S.A.N. was still in Korea, I asked Father through TalkingParents to complete Form DS-3053 and provide the documents needed for me to apply for a replacement regular United States passport after S.A.N. returned. Father responded that he wanted to wait until the court proceedings ended. He then wrote, "She got her emergency passport." When I asked whether he did not want to reapply for her regular United States passport, he answered, "Of course I do and we will when this is over." He later wrote, "I just think it's easier if I make their passports in Korea." Father did not send me the regular United States passport or the documents I requested. True and correct copies of those communications are attached as Exhibit A.

4. During the same exchange, I told Father, "[S.A.N.]'s emergency passport is only valid for five days." The passport itself states: "THIS PASSPORT IS VALID ONLY FOR RETURN TO THE UNITED STATES BEFORE 26-AUG-2026. IT CANNOT BE EXTENDED." Its data page shows that it was issued August 21, 2026, and expired August 26, 2026. True and correct copies of the relevant passport pages are attached as Exhibit B. The passport

number, photograph, full name, date and place of birth, and machine-readable information have been redacted.

5. I was in California and was not present at the United States Embassy in Seoul. I do not offer testimony about who physically attended the Embassy appointment or who physically possessed the regular United States passport in Korea. My testimony regarding Father's knowledge of the emergency passport and the separate regular-passport process is based on my direct TalkingParents communications with him and the passport itself.
6. The emergency United States passport was used for S.A.N.'s return flight from Seoul to Los Angeles on August 22, 2026. By its express terms, it was valid only for return to the United States before August 26, 2026, could not be extended, and expired on August 26. It therefore could not be used to remove S.A.N. from the United States when Father filed his September 16 declaration.
7. On September 17, 2026, at approximately 9:50 a.m., I personally delivered S.A.N.'s Korean passport and expired emergency United States passport to Nathan Ridlon of the Orange County District Attorney's Child Abduction Unit. Mr. Ridlon personally accepted both documents. I was not given a written receipt. I no longer possess either passport or any other passport or travel document for S.A.N.
8. Since S.A.N. returned to California, I have not purchased or reserved any airline ticket for myself or either child, made any international travel arrangement, applied for a replacement or additional passport, or taken any step to remove either child from California or the United States. I will not do so while the stay

request or appeal is pending. I am willing to be ordered not to apply for or obtain any new or replacement passport or travel document for S.A.N. without further order.

9. I am also willing to comply with any order requiring that the passports now held by the Child Abduction Unit remain there and requiring Father to identify the location, status, and custodian of the regular United States passport and, if it is within his possession, custody, or control, place it with the same Unit or another neutral custodian.

10. S.A.N. attended a half day of school on September 14, 2026, and full school days on September 15 and 16. On September 15, her teacher advised me that the school counselor had met with S.A.N., that the counselor returned with her to class, that S.A.N. had preferred seating and frequent breaks, and that she was "doing really well." The school counselor separately advised that she had met with S.A.N. and that S.A.N. "seemed to be doing well." Father and I both signed the school-counseling consent on September 16. I sent the completed form to the school and forwarded the relevant school communications to Father. On September 17, S.A.N. went to school happily. True and correct copies of the selected school communications are attached as Exhibit C. The authenticated TalkingParents record showing that I sent the medical and school information to Father, that he downloaded the materials, and that both parents completed the consent process is attached as Exhibit D.

11. On September 15, 2026, I sent Father through TalkingParents the visit summary from S.A.N.'s September 10 pediatric appointment.

Father downloaded the attached summary minutes later. Because Father was in Korea, it was approximately 5:00 a.m. on September 16 there; I did not send the document at 5:00 a.m. California time. The pediatrician's office told me that the summary was the document it ordinarily provides after a visit. Before the appointment, I had already given Father the office's name, address, telephone number, and appointment time; after the appointment, I told him the pediatrician's assessment and the symptoms that would require follow-up. Exhibit D contains the authenticated TalkingParents record of my transmission and Father's download.

12. I have not concealed S.A.N.'s location, school enrollment, medical care, or therapy. She remains enrolled in school, has resumed full-day attendance, and is continuing the therapy and assessment process described in my original declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 17, 2026, at Irvine, California.

______________________________

JASMINE PEARL NA

Daniel Na on 8/20/2026 at 7:50:50 PM said:

Did he answer you?

Jasmine Jace viewed this subject on 8/20/2026 at 7:50:51 PM

Daniel Na on 8/20/2026 at 7:50:58 PM said:

An hour ago

Jasmine Jace viewed this subject on 8/20/2026 at 7:51:02 PM

Jasmine Jace on 8/20/2026 at 7:51:07 PM said:

Yes he did

Jasmine Jace on 8/20/2026 at 7:51:19 PM said:

An hour ago

Daniel Na viewed this subject on 8/20/2026 at 7:51:22 PM

Daniel Na on 8/20/2026 at 7:51:23 PM said:

He said he was leaving at 7:15 yesterday. He should be here by now.

Jasmine Jace viewed this subject on 8/20/2026 at 7:51:29 PM

Jasmine Jace on 8/20/2026 at 7:51:37 PM said:

Maybe he's inside

Daniel Na viewed this subject on 8/20/2026 at 7:51:38 PM

Daniel Na on 8/20/2026 at 7:51:39 PM said:

Do you think he went in already?

Jasmine Jace viewed this subject on 8/20/2026 at 7:51:39 PM

Jasmine Jace on 8/20/2026 at 7:51:46 PM said:

Can you ask the front desk if Antony checked in already?

Daniel Na viewed this subject on 8/20/2026 at 7:51:52 PM

Jasmine Jace on 8/20/2026 at 8:01:37 PM said:

Did you ask?

Jasmine Jace on 8/20/2026 at 10:25:35 PM said:

Hi Daniel, could you please give my dad S.A.N. s original Korean birth certificate and her U.S. birth certificate (CRBA)?

User Printed User Printed

Could you also please complete Form DS-3053 and have it notarized, along with a color photocopy of the front and back of your government-issued ID that you present to the notary?

If you're able to get this done today after the embassy, I'd really appreciate it. That way, you could give everything to my dad so he can bring the documents back with him on his flight tomorrow. This will allow me to officially apply for a replacement U.S. passport for S.A.N. once she's back in the U.S.

Thank you for helping get everything in order.

Daniel Na viewed this subject on 8/20/2026 at 10:26:59 PM

Jasmine Jace on 8/20/2026 at 10:27:14 PM said:

You may also want to give my dad K.E.N. s original Korean birth certificate and U.S. birth certificate (CRBA) to bring back as well, just in case she ever has a passport issue similar to S.A.N. s. That way, we'll have the original documents available in the U.S. if they're needed.

Daniel Na viewed this subject on 8/20/2026 at 10:27:44 PM

Daniel Na on 8/20/2026 at 10:28:10 PM said:

I would like to wait until the court ends. I hope you understand

Jasmine Jace viewed this subject on 8/20/2026 at 10:28:21 PM

Daniel Na on 8/20/2026 at 10:29:02 PM said:

She got her emergency passport

Jasmine Jace viewed this subject on 8/20/2026 at 10:29:04 PM

Jasmine Jace on 8/20/2026 at 10:29:10 PM said:

Just to clarify, do you not want to reapply for her U.S. passport?

Daniel Na viewed this subject on 8/20/2026 at 10:29:15 PM

Daniel Na on 8/20/2026 at 10:29:37 PM said:

Of course I do and we will when this is over.

Jasmine Jace viewed this subject on 8/20/2026 at 10:29:41 PM

Daniel Na on 8/20/2026 at 10:30:11 PM said:

When you came to the embassy in Korea did you tell them you lost their passports?

Jasmine Jace viewed this subject on 8/20/2026 at 10:33:23 PM

Jasmine Jace on 8/20/2026 at 10:34:03 PM said:

I'm a little confused about why we need to wait until the court proceedings are over. S.A.N. s emergency passport is only valid for five days, so I'm referring to getting her regular U.S. passport replaced after she

User Printed

returns.

I believe the court hearing is a separate issue from making sure our child has a valid U.S. passport and is able to travel internationally when necessary. I'm only asking for the documents now because my dad is flying back tomorrow and can easily bring them with him.

You can have the original birth certificates back once the passport process is completed. I'm not asking to keep them permanently.

I hope we can handle this separately from the court proceedings and simply do what is best for S.A.N. by making sure she continues to have a valid U.S. passport.

Daniel Na viewed this subject on 8/20/2026 at 10:38:42 PM

Daniel Na on 8/20/2026 at 10:43:16 PM said:

I understand what you are saying. I just think it's easier if I make their passports in Korea. I need to make an appointment at the US embassy to get my consent notarized which needs much plan ahead. You can just go to a notary and sign it and send it over. Let's see how it goes on Monday. You still haven't answered my question about what you told the U.S. embassy about their passports when you visited them in July 2025.

Jasmine Jace viewed this subject on 8/20/2026 at 11:07:10 PM

Jasmine Jace on 8/20/2026 at 11:07:52 PM said:

No, I did not tell them that the passports were lost or stolen. I've answered this question, and I don't have anything further to add regarding that. Thank you

Jasmine Jace on 8/20/2026 at 11:09:07 PM said:

Please keep our conversations solely focused on matters concerning the children. Thank you.

Daniel Na viewed this subject on 8/20/2026 at 11:13:54 PM

Daniel Na on 8/20/2026 at 11:14:23 PM said:

It is about their passports

Jasmine Jace viewed this subject on 8/21/2026 at 1:14:17 AM

Jasmine Jace on 8/21/2026 at 2:08:53 AM said:

Please don't forget to go to the airport tomorrow Saturday 8/22/26, Incheon to LAX, Asiana flight OZ202, 12:40pm departure.

12:40pm departure so most likely need to be there 3 hours before at 9:30am.

If you can pick my dad up on the way that would be great.

Daniel Na viewed this subject on 8/21/2026 at 2:11:08 AM

Jasmine Jace on 8/21/2026 at 3:27:41 AM said:

If not, he can meet you there. Please don't be late. Thank you.



User Printed User Printed User Printed

## Emergency United States Passport - Redacted




**THIS PASSPORT IS VALID ONLY FOR RETURN TO THE UNITED STATES BEFORE 26-AUG-2026. IT CANNOT BE EXTENDED.**

Issue and expiration dates shown on data page:




**Date of issue: 21 AUG 2026**

**Date of expiration: 26 AUG 2026**

Hi Jasmine,

Thank you so much for our conversation earlier today. I really appreciate us working together to help S.A.N. feel comfortable staying for the full school day. I know our morning chat was a bit short, so I wanted to give you a quick update.

Our school counselor, Kerry Salkeld, met with S.A.N. during Music to talk through how she's been feeling. Afterward, they returned to class so Kerry could observe how she is doing in her regular environment. My plan for lunch today is to sit with S.A.N. and her friends, let her enjoy playtime, and then help her smoothly transition back into class for instruction.

Starting today, S.A.N. also has preferred seating. I am giving her frequent breaks and checking in with her throughout the day, and so far, she seems to be doing really well!

We know she may still cry in the mornings because she misses you, but we will continue to support her with "soft starts" and access to the calm corner tomorrow and throughout the rest of the week.

I will try to reach out again after lunch to share how the rest of her day is going. In the meantime, our counselor, Kerry (KerrySalkeld@iusd.org), will be getting in touch with you soon to discuss how we can best support S.A.N. this year and help ease her anxiety.

Warmly,

**Mrs. Bernice Pedroza**
*Second Grade*
*Loma Ridge Elementary School*

*"Loma Ridge is an inclusive community built on collaboration, empathy, positive impact, and joyful learning."*

---

**From:** Jasmine Jace <jasminepjace@gmail.com>
**Sent:** Monday, September 14, 2026 12:41 PM
**To:** Bernice Pedroza <BernicePedroza@iusd.org>
**Cc:** Priscilla Manriquez <PriscillaManriquez@iusd.org>; Nicola Cossio <NicolaCossio@iusd.org>
**Subject:** Re: [EXTERNAL] Re: Checking in on S.A.N.

My name is Kerry Salkeld, I am one of the Elementary Resource Counselors here at Loma Ridge. I meet with students both individually and in groups to provide support at school. I was able to meet with S.A.N. today and she seemed to be doing well. I told her I would check in with her after lunch.

I have attached a consent form, once I receive it back, I can start meeting her and supporting her as needed at school. Please return the signed consent form to Ms. Pedroza, the front office or email it to me at your earliest convenience.

Feel free to reach anytime.

Thank you,

**Kerry Salkeld, M.Ed., PPSC**
Elementary Resource Counselor
Loma Ridge Elementary
Irvine Unified School District

*Loma Ridge is an inclusive community built on collaboration, empathy, positive impact, and joyful learning.*

<image001.jpg>

*Out of Office Disclaimer: This email is not monitored after 4 pm Monday through Friday, on weekends, holidays, and non-student days. If you are experiencing a mental health emergency, please call the National Suicide Prevention Lifeline by dialing 988. For immediate assistance dial 911, or go to the nearest emergency room.

Confidentiality Notice: This e-mail communication and any attachments, including documents, files, or previous e-mail messages, constitute electronic communications within the scope of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. This e-mail communication may contain non-public, confidential or legally privileged information intended for the sole use of the designated recipient(s). The unauthorized and intentional interception, use, copy or disclosure of such information, or attempt to do so, is strictly prohibited and may be unlawful under applicable laws. 18 U.S.C. § 2511. If you have received this e-mail communication in error, please immediately notify the sender by return e-mail and delete the original e-mail from your system.

**Emergency Resources:**
Irvine Police Department: (949) 724-7000
National Suicide Prevention Lifeline: 988
Crisis Assessment Team (mobile county team): (866) 830-6011
California Youth Crisis Line: 1-800-843-5200
Crisis Text Line: text HOME to 741714

**Therapy Resources:**
OC Links: (855) 625-4657
Care Solace: (888) 515-0595
Hazel Health: (800)-764-2935

Daniel Na on 9/14/2026 at 3:28:37 PM said:

I am not included in any emails from school. Please give them a correct emails address.

Jasmine Jace viewed this subject on 9/14/2026 at 3:28:52 PM

Jasmine Jace on 9/14/2026 at 3:32:08 PM said:

I sent this email to the school on 8/28 to update your email

Attached File(s): IMG_0830.PNG (419.14 KB)

Jasmine Jace downloaded [IMG_0830.PNG] on 9/14/2026 at 3:32:11 PM

Jasmine Jace on 9/14/2026 at 3:39:14 PM said:

I just checked and saw her response—it must have gotten lost in my inbox. She stated that you will need to contact the school directly to make the update. In the meantime, I will forward you her email and the teacher emails.

Jasmine Jace on 9/14/2026 at 9:39:29 PM said:

I forwarded you the emails from the school regarding your email address and the correspondence with S.A.N. s teacher. I sent them to emaildanielna@gmail.com.

Daniel Na viewed this subject on 9/15/2026 at 5:56:51 AM

Daniel Na downloaded [IMG_0830.PNG] on 9/15/2026 at 5:57:11 AM

Jasmine Jace on 9/15/2026 at 3:56:23 PM said:

I contacted Coastal Kids regarding S.A.N. s medical records. They directed me to their website and provided the attached summary. They indicated they were not sure what additional information was being requested beyond the record they provided. I'm forwarding what they provided so you have the information available.

Jasmine Jace on 9/15/2026 at 3:57:43 PM said:

Here it is

Attached File(s): FullSizeRender.jpg (192.93 KB)

Jasmine Jace on 9/15/2026 at 4:09:32 PM said:

Regarding S.A.N. she was very upset this morning, but with support from her teacher and the school counselor, we encouraged her to try to stay at school. She has been doing better, and her teacher has been checking in with me throughout the day and letting me know that she is okay.

As we previously discussed, we believe having support from the school counselor will be helpful for S.A.N. I will forward you the two emails from her teacher and the counselor, Kerry. One of the emails includes a parent consent form. Please sign and return the form as soon as possible so S.A.N. can receive this support.

Thank you.

User Printed User Printed

Daniel Na viewed this subject on 9/15/2026 at 4:16:25 PM

Daniel Na downloaded [FullSizeRender.jpg] on 9/15/2026 at 4:16:47 PM

Daniel Na on 9/15/2026 at 4:17:52 PM said:

Thank you please send it to me

Jasmine Jace viewed this subject on 9/15/2026 at 4:20:57 PM

Jasmine Jace downloaded [FullSizeRender.jpg] on 9/15/2026 at 4:21:02 PM

Jasmine Jace on 9/15/2026 at 4:23:45 PM said:

Here is the consent form

Attached File(s): FINAL ERC Consent - Updated PPS.pdf (198.8 KB)

Jasmine Jace on 9/15/2026 at 4:24:09 PM said:

I also forwarded you the 2 new emails—one from S.A.N. s teacher and one from the school counselor, Kerry

Daniel Na viewed this subject on 9/16/2026 at 4:16:53 AM

Daniel Na downloaded [FINAL ERC Consent - Updated PPS.pdf] on 9/16/2026 at 4:17:05 AM

Daniel Na on 9/16/2026 at 4:20:09 AM said:

Okay please email me signed form so I can finalize it with my signature

Daniel Na on 9/16/2026 at 4:20:20 AM said:

The email you sent me also does not have any attachment

Jasmine Jace viewed this subject on 9/16/2026 at 2:03:41 PM

Jasmine Jace on 9/16/2026 at 2:04:06 PM said:

Ok

Jasmine Jace on 9/16/2026 at 2:06:31 PM said:

Yes, I’m aware there’s no attachment. It’s due to the settings of others included in the thread, which is why I sent it here.

Daniel Na viewed this subject on 9/16/2026 at 6:43:08 PM

Daniel Na on 9/16/2026 at 6:46:48 PM said:

I signed my part and sent it to you

Jasmine Jace viewed this subject on 9/16/2026 at 7:40:09 PM



User Printed User Printed User Printed

Jasmine Jace on 9/16/2026 at 7:40:39 PM said:

Ok thank you. I will sign and forward to school.

Jasmine Jace on 9/16/2026 at 7:40:50 PM said:

Would you like a copy of the it after I sign?

Jasmine Jace on 9/16/2026 at 7:41:04 PM said:

*it

Jasmine Jace on 9/16/2026 at 7:42:50 PM said:

K.E.N. wants to attend a science event at school today at 6:00 p.m., so I rescheduled this week's therapy session to tomorrow at 7:00 p.m. Starting next week, therapy will resume its regular Wednesday schedule at 6:00 p.m.

Daniel Na viewed this subject on 9/16/2026 at 9:48:50 PM

Daniel Na on 9/16/2026 at 9:49:39 PM said:

Yes I would like a copy of it. Also can you give me K.E.N. s report from the clinic?

Jasmine Jace viewed this subject on 9/17/2026 at 1:36:01 AM

Jasmine Jace on 9/17/2026 at 12:34:26 PM said:

I signed the form and forwarded it to the school. I noticed the date was missing next to your signature, so I added it. I hope that's okay. I did not make any other changes. I also forwarded you the email showing that I sent the completed form to the school at your Gmail address.

Jasmine Jace on 9/17/2026 at 12:35:19 PM said:

Here is the signed form

Attached File(s): IRVINE UNIFIED SCHOOL DISTRICT.pdf (10.61 MB)

Jasmine Jace on 9/17/2026 at 12:37:18 PM said:

S.A.N. has been doing better, and she went to school happy today. We will continue working closely with her teacher and counselor to support her at school.

Daniel Na viewed this subject on 9/17/2026 at 12:38:57 PM

Daniel Na on 9/17/2026 at 12:39:22 PM said:

Thank you

Jasmine Jace viewed this subject on 9/17/2026 at 1:10:48 PM



User Printed User Printed

Jasmine Jace on 9/17/2026 at 1:13:12 PM said:

You're welcome. Regarding FaceTime with K.E.N. I wanted to follow up since I haven't heard back regarding your preferred day and time. I asked K.E.N. what day she would prefer, and she said Sunday. I think Sunday afternoon our time would work well so the call isn't too late in the evening for her. Please let me know what time works best for you.

User Printed User Printed User Printed

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ELECTRONIC FILING

| | |
|---|---|
| **Transaction entry:** | September 21, 2026 at 8:51 a.m. PDT |
| **Filed date shown by CM/ECF:** | September 18, 2026 |
| **Case name:** | Jung Wook Na v. Jasmine Pearl Na |
| **District court case no.:** | 8:25-cv-02479-DOC-ADS |
| **Document no.:** | 75 |

**Docket text:**

Order Denying Respondent's Motion for Stay Pending Appeal and Ex Parte Application for Administrative Stay and Granting Respondent's Request for a Seven-Day Bridge Stay As To Minor Child S.A.N. by Judge David O. Carter. The portion of the September 4, 2026, Order and Judgment (Dkt. 69) directing that S.A.N. be returned to the Republic of Korea and reside with Petitioner is STAYED until September 25, 2026, pending the Respondent's filing to seek emergency relief from the Ninth Circuit.

**Notice electronically mailed to:**

David Anthony Dworakowski - david@orangecountyfamilylaw.com
Stephane Quinn - quinn@orangecountyfamilylaw.com
Merritt Lori McKeon - merrittmck@hotmail.com

Source: CM/ECF Notice of Electronic Filing received by counsel on September 21, 2026.

**Email from Petitioner's Counsel, September 22, 2026, 9:28 a.m. PDT**

From: Merritt McKeon <merrittmck@hotmail.com>
Sent: Tuesday, September 22, 2026, 9:28 a.m. PDT
To: Stephane Quinn; Loni Klein; Jacobs, Tammy
Cc: Alexandra Sandoval
Subject: Re: Na v. Na, Ninth Circuit No. 26-6105 — Notice of Emergency Motion Under Circuit Rule 27-3

---

My client opposes the stay.

He has informed me that his father, the children's paternal grandfather, has traveled to Orange County and would like to have time with his granddaughters.

Can this be arranged?

Please note my change of address which I am filing with the Federal Court, today.

Merritt McKeon, Esq. For Jung Wook Na

*[Text of email reproduced by Appellant's counsel; quoted history omitted. The email replied to counsel's 8:45 a.m. notice of this motion.]*

| | |
|---|---|
| **From:** | Jacobs, Tammy |
| **To:** | merritt mckeon; Stephane Quinn; David Dworakowski; Loni Klein |
| **Cc:** | Ridlon, Nathan; Robles, Cassandra |
| **Subject:** | RE: Activity in Case 8:25-cv-02479-DOC-ADS Jung Wook Na v. Jasmine Pearl Na Judgment |
| **Date:** | Wednesday, September 9, 2026 10:51:11 AM |
| **Attachments:** | image001.png |

I appreciate the urgency, however, this will not be done today or even this week. I need to review things, and Ms. Klein needs to meet with her clients. I suggest that one of the parties get this case on calendar as soon as possible in L65 to sort out some of these details, including therapy, passports etc.

Please start working on the power of attorney for the grandfather or whomever will be traveling with S.A.N.

*Tammy Jacobs*

Senior Deputy District Attorney

Child Abduction Unit

**From:** merritt mckeon <merrittmck@hotmail.com>
**Sent:** Wednesday, September 9, 2026 10:46 AM
**To:** Jacobs, Tammy <Tammy.Jacobs@ocdistrictattorney.gov>; Stephane Quinn <quinn@ORANGECOUNTYFAMILYLAW.COM>; David Dworakowski <david@orangecountyfamilylaw.com>; Loni Klein <loni@centerforchildren.com>
**Cc:** Ridlon, Nathan <Nathan.Ridlon@ocdistrictattorney.gov>; Robles, Cassandra <Cassandra.Robles@ocdistrictattorney.gov>
**Subject:** Re: Activity in Case 8:25-cv-02479-DOC-ADS Jung Wook Na v. Jasmine Pearl Na Judgment

**Attention:** This email originated from outside the Orange County District Attorney's Office. Use caution when opening attachments or links.

Mr. Na's father can travel to pick up S.A.N. We hope to hear from opposing counsel, or if Jasmine could respond to my client's Talking Parents, but we feel because the children

are kept out of school, and no information on K.E.N.'s therapy, we may need to get assistance. S.A.N.'s passport needs to be returned to your office and arrangements need to be made to get her back to Korea as school has already started there.
My client can get tickets but we need to get something moving asap.
Merritt

Get Outlook for iOS

---

**From:** Jacobs, Tammy <Tammy.Jacobs@ocdistrictattorney.gov>
**Sent:** Wednesday, 09 September 2026 10:40:05
**To:** merritt mckeon <merrittmck@hotmail.com>; Stephane Quinn <quinn@ORANGECOUNTYFAMILYLAW.COM>; David Dworakowski <david@orangecountyfamilylaw.com>; Loni Klein <loni@centerforchildren.com>
**Cc:** Ridlon, Nathan <Nathan.Ridlon@ocdistrictattorney.gov>; Robles, Cassandra <Cassandra.Robles@ocdistrictattorney.gov>
**Subject:** RE: Activity in Case 8:25-cv-02479-DOC-ADS Jung Wook Na v. Jasmine Pearl Na Judgment

Dear all
Thank you for the update.
I will review everything and see what our options are. I do have some preliminary questions if one or all of you can answer I would appreciate it.

1. Originally Mr. Na's father was present and had the power of attorney to travel with the children if a return was ordered. Is this still the plan?
2. Is there any room for mediation or is this the final decision of the court and all parties to separate the children?
3. Is there going to be a hearing set back in L65 for future custody arrangements pertaining to K.E.N.?

(I have added my investigators to this email thread)
Sincerely,

*Tammy Jacobs*
Senior Deputy District Attorney
Child Abduction Unit