**REDACTED PUBLIC VERSION**

**Nos. 26-6105 and 26-6374**

Oral Argument January 12, 2027, at 9:00 a.m., Pasadena

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**JUNG WOOK NA,**
Petitioner-Appellee and Cross-Appellant,

v.

**JASMINE PEARL NA,**
Respondent-Appellant and Cross-Appellee.

Appeals from the United States District Court
for the Central District of California
No. 8:25-cv-02479-DOC-ADS
Hon. David O. Carter, District Judge

# FIRST BRIEF ON CROSS-APPEAL OF JASMINE PEARL NA

STEPHANE QUINN, CFLS (SBN 278188)
DAVID DWORAKOWSKI, CFLS, CALS (SBN 135285)
**QUINN & DWORAKOWSKI, LLP**
2050 Main Street, Sixth Floor, Suite 600
Irvine, California 92614
(949) 660-1400
quinn@orangecountyfamilylaw.com
david@orangecountyfamilylaw.com

Attorneys for Jasmine Pearl Na

# TABLE OF CONTENTS

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 4

ISSUES PRESENTED FOR REVIEW ........ 5

PERTINENT PROVISIONS ........ 6

STATEMENT OF THE CASE ........ 8

A. The Petition and The Proceedings Below ........ 8
B. The Court Found Repeated Abuse and Deliberate Concealment ........ 9
C. The Court Credited Evidence of Violence Against Mother ........ 13
D. Testimony Addressed Both Girls' Fear and Family Relationships ........ 14
E. The Summer Stay Occurred Under a Temporary Travel Order. 16
F. The Final Judgment Denies Return of K.E.N. But Sends S.A.N. To Live with Father ........ 17

SUMMARY OF ARGUMENT ........ 19

PRESERVATION AND STANDARDS OF REVIEW ........ 21

ARGUMENT ........ 24

I. THE DISTRICT COURT MISAPPLIED ARTICLE 13(b) TO S.A.N.'S PROSPECTIVE RISK ........ 24
  A. Article 13(b) Protects A Child Before the Abuse Reaches Her ........ 24
  B. Recurring Discipline and Impaired Disclosure Establish S.A.N.'s Own Risk ........ 27
  C. Family Violence and Concealment Reinforce the Prospective Danger ........ 31
  D. The Temporary Summer Stay Does Not Resolve Prospective Risk ........ 34

II. ONCE GRAVE RISK IS ESTABLISHED, THE REJECTED MEASURES DO NOT SUPPORT RETURN ........ 36
  A. Golan Requires a Decision Grounded in the Child's Actual Safety ........ 36

# TABLE OF CONTENTS (CONTINUED)

B. The Proposed Services Do Not Supply an Operating Protective Arrangement....38
C. Gaudin and Radu Do Not Justify an Unsupported Assumption of Safe Interim Care....41

III. THE SPLIT RETURN CREATES AN INTOLERABLE SITUATION BY REDUCING ACCESS TO PROTECTION....43
A. Separation Increases Vulnerability to Concealed Abuse....43
B. Mother's Care of K.E.N. Limits Her Availability in Korea....47

IV. THE COURT SHOULD REVERSE WITH DIRECTIONS TO DENY RETURN AS TO S.A.N....49
A. The Accepted Findings Support Denial Without New Factfinding....49
B. Any Remand Must Resolve S.A.N.'s Risk and Access to Protection....51

CONCLUSION....55

CERTIFICATE OF COMPLIANCE....56

STATEMENT OF RELATED CASES....57

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Acosta*
725 F.3d 868 (8th Cir. 2013)....................25–26, 38–39

*Baran v. Beaty*
526 F.3d 1340 (11th Cir. 2008)....................25

*Chafin v. Chafin*
568 U.S. 165 (2013)....................53–54

*Colchester v. Lazaro*
16 F.4th 712 (9th Cir. 2021)....................31, 51–52

*Cuellar v. Joyce*
596 F.3d 505 (9th Cir. 2010)....................23, 29–30, 42, 44

*Elyashiv v. Elyashiv*
353 F. Supp. 2d 394 (E.D.N.Y. 2005)....................24–25, 44–45

*Ermini v. Vittori*
758 F.3d 153 (2d Cir. 2014)....................31, 44

*Gaudin v. Remis*
415 F.3d 1028 (9th Cir. 2005)....................41–42

*Golan v. Saada*
596 U.S. 666 (2022)....................20, 23, 36–37, 41–42, 50–51, 53

*Gomez v. Fuenmayor*
812 F.3d 1005 (11th Cir. 2016)....................25–26, 31–32

*In re E.R. Fegert, Inc.*
887 F.2d 955 (9th Cir. 1989)....................22–23

*Kelly v. Turner*
2026 WL 1230531 (9th Cir. May 5, 2026) (unpublished)....................41

*Khan v. Fatima*
680 F.3d 781 (7th Cir. 2012)....................31–32

*Monasky v. Taglieri*
589 U.S. 68 (2020)....................42

# TABLE OF AUTHORITIES (CONTINUED)

*Pullman-Standard v. Swint*
456 U.S. 273 (1982)........51

*Radu v. Shon*
62 F.4th 1165 (9th Cir. 2023)........20, 38, 41–43

*Silva v. Ferreira dos Santos*
68 F.4th 1247 (11th Cir. 2023)........31–32

*Simcox v. Simcox*
511 F.3d 594 (6th Cir. 2007)........24–25, 37–38

*Souratgar v. Fair*
720 F.3d 96 (2d Cir. 2013)........30

*Urquia Dominguez v. Hernandez Vasquez*
No. 8:25-cv-02411-PX, 2026 U.S. Dist. LEXIS 201782 (D. Md. Sept. 8, 2026)........45–46

*Van De Sande v. Van De Sande*
431 F.3d 567 (7th Cir. 2005)........27, 39

*Walsh v. Walsh*
221 F.3d 204 (1st Cir. 2000)........31, 39, 48, 50

**Treaty and Statutes**

Hague Convention, art. 13(b)........1, 5–9, 19, 22–26, 42–43, 51
Hague Convention, art. 19........6–7, 42
22 U.S.C. § 9001(b)(4)........7
22 U.S.C. § 9003........4, 7, 24
28 U.S.C. § 1291........4

**Rules**

Fed. R. App. P. 4(a)(1)(A)........5
Fed. R. Civ. P. 52(a)(1)........52

# INTRODUCTION

The district court found that Father kept the parties' older daughter, K.E.N., out of school so her teachers would not see the injuries he had inflicted. 1-ER-17. The sisters were living together in South Korea when their mother, Jasmine Pearl Na (Mother), brought them to California in July 2025. Father petitioned under the Hague Convention for the return of both girls, and Mother opposed return on grave-risk grounds. The court heard evidence and interviewed both girls. In September 2026, the court denied K.E.N.'s return, leaving her with Mother in California, but ordered her seven-year-old sister, S.A.N., back to South Korea "to reside with Father." 1-ER-15, 1-ER-24. Mother appeals only S.A.N.'s return order. The court relied on the sisters' different past experiences without addressing how its own findings of repeated injurious discipline and deliberate concealment bore on the question Article 13(b) requires it to decide: whether there is a grave risk that return would expose S.A.N. to physical or psychological harm.

The court relied on the absence of evidence that Father had struck S.A.N. while she lived with him. 1-ER-14. But Father began striking K.E.N. with objects when she was much younger and struck her again

after promising to stop. He linked the beating that left bruises to homework and room cleaning, ordinary occasions for discipline that were not unique to K.E.N. He concealed the injuries and told K.E.N. not to tell anyone. 1-ER-17; 2-ER-102–03. The court also found that S.A.N. was unwilling to discuss her sister's punishment. 1-ER-14. The children's guardian ad litem reported that S.A.N.'s principal concern was being with Mother. 3-ER-521. S.A.N.'s prospective danger arises from return to the same disciplinary authority, with concealment and inhibited disclosure impairing access to protection.

No physical abuse was alleged during S.A.N.'s summer stay with Father. The order governing that stay, however, provided for her return to the United States on or about August 16 and required contact with Mother at least four times a week. 1-ER-14; 6-ER-926–27. The final judgment sends S.A.N. to live with Father pending Korean custody proceedings, with no comparable provision for her return to Mother and K.E.N. 1-ER-14–15, 1-ER-24. The summer stay bears on the likelihood of harm, but it does not show that the barriers to detecting and reporting abuse had changed.

In denying K.E.N.'s return, the court rejected Father's proposed safeguards in part because he had kept her out of school and told her not to tell anyone. The court found that school, therapist, or guardian reporting "cannot sufficiently protect the children." 1-ER-23. Returning S.A.N. alone does not make those safeguards more reliable. During the proceedings, the court remarked that siblings are "support for each other." 4-ER-640, 4-ER-644. Yet the final judgment leaves K.E.N. with Mother in California and sends S.A.N. back to Father without explaining how losing her sister's day-to-day support would affect her ability to speak up or get help. That omission matters because the court found that S.A.N. was already unwilling to discuss her sister's punishment and that Father had deliberately concealed abuse. 1-ER-14, 1-ER-17, 1-ER-24.

Mother asks this Court to reverse with instructions to deny S.A.N.'s return. Mother submits that the district court's existing findings establish a grave risk to S.A.N. and explain why Father's proposed safeguards would not adequately address it. If further findings or an exercise of discretion specific to S.A.N. are necessary, this Court

should vacate her return order and remand for an expedited determination, with return stayed during remand.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 22 U.S.C. § 9003(a), which gives state courts and United States district courts "concurrent original jurisdiction of actions arising under the Convention." Father sought return of both children under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act (ICARA). 1-ER-3–6.

This Court has jurisdiction over the district court's "final decisions" under 28 U.S.C. § 1291. The September 4, 2026, Order and Judgment Granting Petition in Part resolved the petition for both children and was entered on September 8, 2026. 1-ER-15, 1-ER-24; 6-ER-963 (district docket sheet, entry 69). Mother filed her notice of appeal on September 15, 2026. 6-ER-956 (Dkt. 70). Father filed an initial notice on September 28 and refiled it under the corrected appellate event on September 29, 2026; the cross-appeal is No. 26-6374. 6-ER-955, 6-ER-964–65 (Dkt. 85; district docket sheet, entries 79, 84–

85, 87). The notices were filed "within 30 days after entry of the judgment or order appealed from." Fed. R. App. P. 4(a)(1)(A).

This first brief challenges the portion of the judgment ordering S.A.N.'s return. 1-ER-15, 1-ER-24; 6-ER-956 (Dkt. 70). Father's cross-appeal challenges the denial of return as to K.E.N. 6-ER-955, 6-ER-965 (Dkt. 85; district docket sheet, entry 87). Mother will answer that cross-appeal in the third brief on cross-appeal.

## Issues Presented for Review

1. Whether the district court misapplied Article 13(b) by relying on the absence of reported physical injury to S.A.N. and temporary summer stay without reconciling its findings of recurring disciplinary violence, deliberate concealment, and impaired disclosure with her prospective risk in Father's care.
2. Whether those accepted findings establish grave risk and support denial under the measures presented, and whether the split return compounds that danger by separating S.A.N. from Mother and K.E.N. while leaving unreliable access to protection.

3. Whether any necessary further findings or exercise of discretion require vacatur and a focused, expedited remand addressing S.A.N.'s risk and actual return arrangements, with protection against return during remand.

## PERTINENT PROVISIONS

- **Hague Convention on the Civil Aspects of International Child Abduction** – Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89
    - **Article 13 (pertinent portion)**

Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that –

. . .

b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

- - **Article 19**

A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.

- **22 U.S.C. § 9003 (pertinent portions)**

**(a) Jurisdiction of courts**

The courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention.

**(e) Burdens of proof**

(2) In the case of an action for the return of a child, a respondent who opposes the return of the child has the burden of establishing—

(A) by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies; and

- **22 U.S.C. § 9001(b)(4)**

The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims.

## Statement of the Case

### A. The Petition and The Proceedings Below.

Jasmine Pearl Na and Jung Wook Na are the parents of K.E.N. and S.A.N. Mother moved back to the United States around May 2021. After a period with her in California, S.A.N. returned to Korea in December 2021 and K.E.N. in June 2022 to reside with Father. Mother thereafter visited the children abroad. 1-ER-3. On July 31, 2025, she brought them to California. Father petitioned for return in Orange County Superior Court, and Mother removed the proceeding to federal court and opposed return under Article 13(b). 1-ER-3–6. The district court appointed Loni Klein as guardian ad litem for both children. It heard evidence in nonconsecutive sessions and, on March 11, 2026, interviewed both children. 1-ER-4, 1-ER-17; 7-ER-972–76. Judge Carter called the federal matter on the record at the joint interview, and Judge Kreber-Varipapa stated that the transcript could be used in both proceedings and would be forwarded to the federal court. 7-ER-972–75.

Interim orders also governed the children's placement and Mother's contact. In March 2026, the court ordered that the children temporarily reside with their maternal grandparents instead of family

friends, while remaining in their paternal grandfather's custody. The maternal grandparents replaced the professional monitor for Mother's ten hours of weekly parenting time. 6-ER-929–30 (Dkt. 47 at 1–2 ¶¶ 1, 4). In June, by further stipulation, the court lifted the restrictions on Mother's parenting time with both children, including monitoring. 6-ER-927 (Dkt. 55 at 4 ¶ 5).

The court found South Korea was the children's habitual residence immediately before removal and that the removal breached custody rights Father was exercising. 1-ER-9–12, 1-ER-16. Mother does not challenge those findings in this brief. Her appeal concerns the Article 13(b) defense and the terms of S.A.N.'s return.

## B. The Court Found Repeated Abuse and Deliberate Concealment.

In April 2024, Father made nine-year-old K.E.N. kneel and struck her with a stick. The blows left marks and bruises, which he covered with bandages. 1-ER-17. He told her not to tell anyone and did not inform Mother. 1-ER-17. The court credited Klein's testimony and K.E.N.'s disclosure that Father kept K.E.N. from school so teachers and other mandated reporters would not see her injuries. 1-ER-17, 1-ER-23. It also found that Father struck her with a wire hanger while forcing

her to kneel and struck her on the head with a metal leg brace in 2023. 1-ER-17, 1-ER-23.

Father linked the stick incident to homework and room cleaning. After other consequences failed, he warned K.E.N. it would hurt and struck her back. He initially denied bruising and bandaging. 2-ER-102–03. In later testimony, he described contact with the hanger and brace as tapping and disputed its force. 4-ER-572–74. The court resolved severity and concealment in its findings. 1-ER-13, 1-ER-17, 1-ER-23.

Father's February 2 declaration acknowledged "hitting our daughter K.E.N. with a stick, and telling her not to tell anyone about it," bruising, and nondisclosure to Mother. 6-ER-932 (Dkt. 34-1 at 2 ¶¶ 3, 7). He explained, "I did fear Korean law," including reporting duties, loss of custody, and prosecution. 6-ER-933 (Dkt. 34-1 at 3 ¶ 8). After initially declining the untested declaration and reopening the evidence, the court received it by agreement on February 12. Father affirmed its truth under penalty of perjury. 3-ER-550–51, 4-ER-562–63, 4-ER-566.

Father's proposed findings acknowledged keeping K.E.N. from school and bandaging the marks. 6-ER-890 (Dkt. 66-1 at 4 ¶ 10). They called his account "roughly consistent with K.E.N.'s testimony," while

distinguishing his description of tapping from her recollection of being hit. 6-ER-896 (Dkt. 66-1 at 10 ¶ 32). These were Father's characterizations of the evidence.

In July 2025 Father wrote, "I did discipline [K.E.N.] physically twice, once when she was little and once last year," expressed regret, and promised to stop. 6-ER-947 (Joint Ex. 124 at L-002). In Respondent's Exhibit K, K.E.N. described bruises and scars and refused to return because he would hit her again; Father apologized. 6-ER-944–45 (Resp. Ex. K at K-002–003). At trial, he authenticated the messages and acknowledged not denying the hitting in that exchange. 2-ER-157–59.

The court credited Klein's account of K.E.N.'s disclosures of hitting, bruising, instructed silence, and concealment from school. 3-ER-472; 1-ER-13, 1-ER-17, 1-ER-23.

The court's own interview added the history of repetition. The court summarized K.E.N.'s account of punishment with objects when she was "much younger, maybe in Kindergarten." 1-ER-17. Father had promised never to do it again, so the 2024 beating caused her to distrust him. 1-ER-17. She remained afraid he would hit her if she did

something wrong. 7-ER-1002. [redacted] The court was "deeply alarmed by the pattern of physical harm" and concealment. 1-ER-13, 1-ER-17.

[redacted]

[redacted]

[redacted]

### C. The Court Credited Evidence of Violence Against Mother.

During a 2017 altercation, Father broke a nightstand and pushed Mother out of the room. 1-ER-12; 2-ER-212. Mother alleged that he pushed her to the ground and dragged or forced her into the balcony area of their twelfth-floor residence. 1-ER-18. Father disputed dragging her. He testified: “I grabbed her and I took her outside, I pushed her outside, yes, because she wouldn’t stop hitting me.” 2-ER-212. He agreed the balcony was twelve stories above ground and placed K.E.N. in the master bedroom during the altercation. 2-ER-212, 2-ER-218. S.A.N. was not yet born. 1-ER-3.

Father’s contemporaneous text that he “can’t believe [he] let it go that far” corroborated the incident’s seriousness. 1-ER-18; 6-ER-948–54 (Joint Ex. 101 at exported pp. 367–373). The thread also contains Mother’s hostile and threatening language. The court found her insulting messages inappropriate but distinguished them from physical

violence toward children, concealment, and evasion of child-protection systems. 6-ER-948–54; 1-ER-18.

After a 2023 argument, Mother sought emergency medical care. She alleged Father punched her in the chest; he attributed her injury to a tussle over a phone. 1-ER-12–13, 1-ER-18. The court did not resolve the precise mechanics of either incident. It recorded Dr. Leslie Dobson's assessment that Mother showed signs of "extreme abuse," credited her testimony that Mother was "clearly fearful of Father," and found that "at least one of the children may have been present" to witness his actions. 1-ER-13.

### D. Testimony Addressed Both Girls' Fear and Family Relationships.

Mother acknowledged that she personally observed no injuries on either child during her July 2025 visit. 3-ER-307. Asked whether either child expressed fear of being alone with Father, she answered, "Not alone per se," but said they feared that he would regard disclosure or a wish to live with her in America as disobedience. She testified that, if they lived with him again, they feared "he was going to physically punish them." 3-ER-307. This was Mother's account of what the children expressed to her.

Dobson testified that absence of reporting did not establish absence of abuse and that return would psychologically harm "those two little girls." 3-ER-399. The court credited her testimony for the limited purposes of concealment, trauma-based silence, and the operation of protective measures. 1-ER-14, 1-ER-18.

Klein's February 3 update addressed S.A.N.'s own circumstances. After speaking privately with her, Klein reported that S.A.N. wanted to remain in Mother's care in California and that "[h]er biggest focus was being with her mom." 3-ER-521. She initially preferred not to visit Korea for summer but agreed she could do so after Klein encouraged contact with Father. 3-ER-521–22.

[redacted]

[redacted]

## E. The Summer Stay Occurred Under a Temporary Travel Order.

At the June 9 interim hearing, the court stated it had not heard "any violence or any issue concerning the younger child." Mother's counsel answered, "That is correct, Your Honor." 4-ER-768. The court later said, "I can't find a danger to that younger child," while considering the summer trip and an August review. 4-ER-798–99. Both parties stipulated to the interim arrangement. 4-ER-801.

The entered June 22 order authorized temporary travel with S.A.N.'s maternal grandfather and placed her in Father's custody

during the stay. It required her return to her grandfather for transportation to the United States on or about August 16. 6-ER-926 (Dkt. 55 at 3 ¶¶ 1–2). It lifted restrictions on Mother's parenting time and required telephone or video contact at least four times each week. 6-ER-927 (Dkt. 55 at 4 ¶ 5). It also provided that K.E.N. "shall not be removed from the State of California until further order of the Court." 6-ER-927 (Dkt. 55 at 4 ¶ 6). S.A.N. spent two months in Korea and returned to the United States; the court identified no allegation of physical abuse during that stay. 1-ER-4, 1-ER-14.

At the June hearing, Father reported eight counseling sessions and fourteen sessions of a fifty-two-session batterer program. Mother presented completed anger-management and parenting courses and ongoing therapy. 4-ER-778–82. By closing, the court found Father had consistently attended twenty-five weeks and undertaken parenting classes and personal therapy. 1-ER-14, 1-ER-18.

### F. The Final Judgment Denies Return of K.E.N. But Sends S.A.N. To Live with Father.

Before final argument on August 25, the court said it was tentatively prepared to return S.A.N. and keep K.E.N. in the United States. 5-ER-843, 5-ER-845–47. The court ultimately found Mother

established grave risk by clear and convincing evidence as to K.E.N. It relied on the repeated abuse, concealment, knowledge of reporting duties, and fear of recurrence. 1-ER-14, 1-ER-23. For S.A.N., it cited the absence of evidence Father had hit her, the absence of allegations of summer physical abuse, and her "differing experiences." 1-ER-14. It ordered S.A.N. returned "to reside with Father" and K.E.N. to remain in the United States with Mother. 1-ER-15, 1-ER-24.

For K.E.N., the court considered Father's proposed promises, treatment, parenting classes, school reporting, child therapy, a Korean guardian ad litem, transmission of the order to professionals, housing for Mother, and holiday travel. It rejected the proposals. 1-ER-14–15, 1-ER-18, 1-ER-23–24. Promises were inadequate because Father concealed abuse and gave "materially incomplete sworn testimony." 1-ER-23. Treatment did not eliminate risk because it began "only after litigation exposure" and durable change was not assured. 1-ER-23. Reporting "cannot sufficiently protect the children" because Father kept K.E.N. from school and directed her not to report. 1-ER-23. He already knew Korean law and concealed abuse because he feared its consequences. The court concluded that the proposed measures would

not sufficiently mitigate the risk "before and after a violation." 1-ER-23 –24.

The court also found S.A.N. unwilling to discuss her sister's punishment and Father's admitted "environment of secrecy." 1-ER-14. Its return order assigns no independent supervisory role addressing those failures for S.A.N. 1-ER-15, 1-ER-23–24.

## Summary Of Argument

Article 13(b) requires application of the accepted facts to S.A.N.'s prospective risk. The district court relied on her different reported experiences, favorable relationship with Father, and summer stay without reported physical abuse. The affirmative showing is a recurring method of injurious discipline beginning in early childhood, followed by concealment that defeated detection and intervention. The court's findings connect that method to this child's age, exposure to Father's disciplinary authority, and inhibited disclosure. No prior injury to S.A.N. is required to recognize that danger.

The dispute concerns the legal effect of those findings. Mother does not ask this Court to find an unreported assault or to infer why S.A.N. declined to discuss her sister's punishment. Nor does she claim

S.A.N. witnessed the 2017 incident, which preceded her birth. The case rests on established conduct and protection failures. Additional testimony concerning fear is identified as testimony; any necessary new credibility determination belongs on remand.

The summer stay tested a temporary arrangement with a defined return to the United States and frequent contact with Mother. That experience does not establish that Father's concealment or suppression of disclosure had changed. The prospective inquiry must address the danger during the actual placement pending Korean custody proceedings.

Grave risk and protective measures are separate questions. Once risk to S.A.N. is established, the findings rejecting promises, treatment, and reporting explain why the same proposals do not support her return. Their defects concern Father's conduct and compliance. *Golan* leaves consideration of measures discretionary; *Radu* does not permit a finding of safe interim care to be assumed.

The split disposition also places S.A.N. in Father's care while Mother remains responsible for K.E.N. in California. The separation claim concerns the resulting access to detection and intervention,

assessed with the proven disciplinary environment. It does not depend on ordinary sadness or a diagnosis the court never made. The physical-risk ground stands independently.

The Court should direct denial because the accepted findings establish recurring danger and defeat the protections presented. If a material factual issue or child-specific exercise of discretion remains, it should vacate the return order and require a focused, expedited decision, with protection against return during remand.

## Preservation And Standards Of Review

Mother expressly argued that returning either child to Father's care would create grave risk or an intolerable situation. 6-ER-915, 6-ER-919–20 (Dkt. 65-1 at 9 ¶ 35, 13–14 § E). The district court decided the defense for both children, and the placement and separation issues arise from the judgment's operative terms. 1-ER-12–15, 1-ER-22–24.

Mother acknowledges the June stipulation and counsel's agreement that there had been no violence toward S.A.N. 4-ER-768, 4-ER-801. At the August 25 closing, the court asked what actions Father had taken against S.A.N. and why she should not be returned after her summer visit. 5-ER-861. Counsel acknowledged that Father had "yet to

abuse the younger one" and referred to his acts against the older child. 5-ER-861. Asked whether abuse occurred during the preceding two months, counsel answered, "Not to my knowledge, Your Honor." 5-ER-861. Mother does not seek a finding of prior assault on S.A.N. or shift the burden to Father. Her clear-and-convincing showing rests on recurring disciplinary violence and concealment. At closing, Mother requested denial and findings that "no ameliorative measures are sufficiently in place to ensure the safety of these children." 5-ER-877–78. Her August 31 proposed findings sought denial for both children, arguing that S.A.N. "need not first be struck with an object before Article 13(b) protects her." 6-ER-915, 6-ER-919–20 (Dkt. 65-1 at 9 ¶ 35, 13–14 § E). The entered summer order separately required return to the United States. 6-ER-926–28 (Dkt. 55 at 3–5).

The sequence confirms preservation of the prospective defense. The June travel colloquy and August 25 exchange preceded Mother's August 31 written request to deny return of both children and the September judgment deciding that defense on the merits. 5-ER-861, 4-ER-768; 6-ER-915, 6-ER-919–20; 1-ER-14–15, 1-ER-23–24. An argument is properly raised when it is "raised sufficiently for the trial

court to rule on it." *In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir. 1989). Mother's express written submission met that standard, and the court actually ruled. This appeal seeks review of that final legal determination, not withdrawal of the concessions about S.A.N.'s lack of reported injury or revival of an abandoned defense.

Counsel also agreed in January that the court could fashion provisional custody conditions for a hypothetical summer-return arrangement. 3-ER-476–77. Mother accepts the authority to arrange a provisional return. The challenge concerns whether the placement actually ordered is consistent with Article 13(b). 1-ER-15, 1-ER-24.

"We review the district court's factual findings for clear error, but determine de novo whether those facts establish a grave risk of harm." *Cuellar v. Joyce*, 596 F.3d 505, 509 (9th Cir. 2010). Mother accepts the historical findings and challenges their legal effect for S.A.N. Any essential new factfinding belongs on remand.

After grave risk, return and measures receive "an ordinary abuse-of-discretion standard." *Golan v. Saada*, 596 U.S. 666, 682 (2022). Mother seeks a risk determination followed by review of the proposed protections under the accepted findings.

# ARGUMENT

## I. THE DISTRICT COURT MISAPPLIED ARTICLE 13(b) TO S.A.N.'S PROSPECTIVE RISK.

### A. Article 13(b) Protects A Child Before the Abuse Reaches Her.

Article 13(b) addresses a grave risk that return "would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b). Its inquiry is prospective. Mother bears the burden of proving the exception "by clear and convincing evidence." 22 U.S.C. § 9003(e)(2)(A). That burden requires persuasive evidence of S.A.N.'s own risk. It does not require a completed injury to her before the court can act.

*Simcox* squarely addresses the distinction. The youngest sibling had largely escaped the physical and psychological injuries suffered by the older children. The Sixth Circuit held that the record established grave risk, explaining that "nothing in the Convention requires that a child must first be traumatized by abuse before the Article 13b exception applies." *Simcox v. Simcox*, 511 F.3d 594, 609 (6th Cir. 2007). It cited *Elyashiv*, which found an uninjured younger child "not insulated from the likelihood of future abuse" given the father's pattern,

inability to control his temper, and threats. *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 409 (E.D.N.Y. 2005). Both decisions assessed the younger child's future exposure to the abusive parent.

*Baran* applies the same principle. The Eleventh Circuit held that the court was "not required to find Samuel had previously been physically or psychologically harmed." *Baran v. Beaty*, 526 F.3d 1340, 1346 (11th Cir. 2008). The question was whether return would expose him to "a present grave risk of physical or psychological harm." *Id.* at 1346. That record included threats and actual endangerment of an infant, including irresponsible handling while drunk, even though no intentional injury was established. The court affirmed denial of return. The material principle here is that prior injury is not a prerequisite; the particular facts must establish the future danger.

*Gomez* makes the distinction explicit: "the inquiry under the Convention is not whether the child had previously been harmed. Rather, the question is whether returning the child to Venezuela would expose her to a grave risk of harm going forward." *Gomez v. Fuenmayor*, 812 F.3d 1005, 1015 (11th Cir. 2016). *Acosta* likewise held that little evidence of past physical abuse did not make Article 13(b)

inapplicable; the proper focus was whether return would expose the children to grave risk. *Acosta v. Acosta*, 725 F.3d 868, 876 (8th Cir. 2013). These cases require evidence of the particular child's prospective danger. They reject a prerequisite that the danger already have produced an injury.

The order recites the prospective standard but distinguishes S.A.N. by the absence of reported injury, the absence of a summer allegation, and her "differing experiences." 1-ER-12, 1-ER-14–15, 1-ER-22. Those distinctions concern the reported past. The legal question is whether they answer the danger shown by the onset, recurrence, and concealment of Father's injurious discipline. Treating prior injury as a prerequisite would misstate Article 13(b); treating it as evidence still requires applying the whole established pattern to this child.

The judgment directs return to Father's daily care. 1-ER-15, 1-ER-24. The relevant exposure is therefore to his method of discipline during the interim before Korean custody adjudication. Mother must establish that danger affirmatively; the absence of an independent supervisor alone does not establish grave risk.

### B. Recurring Discipline and Impaired Disclosure Establish S.A.N.'s Own Risk.

The analysis concerns both "the probability of harm" and "the magnitude of the harm if the probability materializes." *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005). That court remanded for an evidentiary hearing. Here, the completed trial produced findings identifying the conduct, its recurrence, its consequences, and its concealment.

The district court emphasized that no physical abuse of S.A.N. had been reported during her years in Father's care. 1-ER-3, 1-ER-14. [redacted] But the evidence of future danger is not simply that Father abused her sister. He began striking K.E.N. with objects when she was much younger and did it again after promising to stop. 1-ER-17. Father linked the beating that left bruises to homework and room cleaning. 1-ER-17, 1-ER-23; 2-ER-102–03. Mother submits that those ordinary occasions for discipline are not circumstances unique to K.E.N. The court's separate findings about concealment and S.A.N.'s reluctance to discuss her sister's punishment explain why the absence of a report,

though relevant, cannot resolve the risk posed by the placement now ordered. 1-ER-14, 1-ER-17, 1-ER-23.

First, the pattern began in early childhood. [redacted] This history is material to seven-year-old S.A.N.'s exposure to the same disciplinary authority.

Because that pattern began in early childhood, the danger is not confined to conflict with an adolescent. The prospective inference concerns S.A.N.'s exposure to the same disciplinary response as she grows.

The consequences were serious: forced kneeling, blows with objects, bruises, and marks concealed by bandages and absence from school. 1-ER-17, 1-ER-23. The absence of reported physical injury to S.A.N. bears on likelihood. It does not diminish the magnitude of harm if Father uses that established method against her.

The findings also address this child's access to protection. The court found S.A.N. unwilling to discuss her sister's punishment alongside Father's admitted "environment of secrecy." 1-ER-14. It found

that reporting "cannot sufficiently protect the children" because he kept K.E.N. from school and instructed silence. 1-ER-23. Those barriers lie in Father's conduct and the operation of reporting; they are not a protection unique to one daughter. Read with the recurring disciplinary violence, they establish why S.A.N.'s favorable treatment does not supply dependable protection from its consequences. The court's ultimate grave-risk conclusion was limited to K.E.N., but the legal effect of its underlying findings must also be assessed for S.A.N.

Mother also testified that both girls feared physical punishment if Father treated disclosure or a wish to live with her as disobedience. 3-ER-307. The court did not expressly resolve that account for S.A.N. It is additional testimony, not a necessary new finding underlying the requested directed disposition.

*Cuellar*'s demanding standard does not erase the distinction between the records. Its evidence of inadequate conditions, asserted neglect, and an accidental fall fell far short of "serious abuse" that is "a great deal more than minimal." *Cuellar*, 596 F.3d at 510. Here, the court found repeated intentional injury and deliberate concealment. The

question is the application of that established pattern to S.A.N.'s own circumstances.

Nor does Mother rely on a better American home o*r* on having "grown accustomed to her new home." *Id.* at 511. The claim concerns Father's adjudicated conduct and the placement the judgment orders.

*Souratgar* affirmed return despite spousal abuse, which "is not dispositive in these fact-intensive cases," *a*nd relied on "contrary credited evidence of a loving father-son relationship." *Souratgar v. Fair*, 720 F.3d 96, 104, 106 (2d Cir. 2013). S.A.N.'s favorable relationship likewise matters. Here, the findings also include recurring child-directed injury beginning in early childhood, concealment, and this child's inhibited disclosure. 1-ER-14, 1-ER-17, 1-ER-23.

*Souratgar* declined to require "past parental abuse of the child, past parental threats to the child or the child's fear of a parent." 720 F.3d at 105. Mother's showing therefore turns on the disciplinary pattern and S.A.N.'s circumstances, without a presumption from spousal or sibling abuse.

### C. Family Violence and Concealment Reinforce the Prospective Danger.

Binding circuit law requires consideration of family violence beyond a prior blow to the particular child. *Colchester* adopts the rule that spousal violence may "establish a grave risk of harm to the child, particularly when it occurs in the presence of the child." *Colchester v. Lazaro*, 16 F.4th 712, 718 (9th Cir. 2021) (quoting *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014)). *Walsh* found significant that a father's "violence knows not the bonds between parent and child," considering severe spousal and older-child abuse, exposure of the younger children, and repeated violations of court orders. *Walsh v. Walsh*, 221 F.3d 204, 220 (1st Cir. 2000).

The other circuits apply the same child-focused analysis. *Gomez* holds that "sufficiently serious threats and violence directed against a parent can nonetheless pose a grave risk of harm to a child as well." 812 F.3d at 1010. *Silva* adopted its reasoning that "serious, violent domestic abuse repeatedly directed at a parent can easily be turned against a child." *Silva v. Ferreira dos Santos*, 68 F.4th 1247, 1255 (11th Cir. 2023) (quoting *Gomez*). *Khan* recognized that repeated abuse of a mother in a young child's presence can create psychological danger, while leaving

whether that danger was grave to be determined on remand. *Khan v. Fatima*, 680 F.3d 781, 787–88 (7th Cir. 2012). The rule is not that every marital conflict establishes the defense. The court must evaluate the child's exposure to the serious violence actually proved.

The credited history includes physical force against Mother, the broken nightstand, contemporaneous corroboration of the 2017 incident, emergency treatment after the 2023 dispute, and fear. 1-ER-12–13, 1-ER-18; 2-ER-212, 2-ER-218; 6-ER-948–54. The court did not resolve every act or identify which child may have witnessed violence. 1-ER-13, 1-ER-18. S.A.N. could not have witnessed the 2017 incident, which preceded her birth. 1-ER-3. This history corroborates Father's use of force within the family; the primary showing remains the established child-directed pattern.

Father's declaration explains the concealment: he knew the reporting duties, feared custody loss and prosecution, and nevertheless injured K.E.N. and instructed silence. 6-ER-932–33 (Dkt. 34-1 at 2–3 ¶¶ 3, 7–8). The court found he avoided teachers who could see the injuries. 1-ER-17, 1-ER-23. The resulting obstacle was deliberate suppression of information, not an absence of Korean law.

His initial denials of secrecy and concealment, his later acknowledgment of the text about emotional scarring from "hitting her and telling her not to tell," and counsel's closing acknowledgment supported the finding of incomplete sworn testimony. 2-ER-149–50, 4-ER-594–95, 5-ER-878; 1-ER-23. Mother relies on the court's credibility finding.

The interview illustrates an actual failure of reporting. [redacted] The court independently found concealment from school. 1-ER-17, 1-ER-23. The risk analysis therefore concerns a mechanism that already failed despite an available mandated reporter.

[redacted] The court independently found her unwillingness and placed it beside Father's secrecy. 1-ER-14. Mother does not infer an undisclosed assault or a particular cause for the reluctance. The narrower point is that

reliance on this child to disclose danger requires assessment in that established environment.

Dobson's broader opinion that both girls would suffer psychological injury remained testimony, not an express finding for S.A.N. 3-ER-399; 1-ER-14, 1-ER-18. Her credited evidence concerning concealment and trauma-based silence informs the operation of safeguards. Any essential further finding about psychological consequences belongs on remand.

### D. The Temporary Summer Stay Does Not Resolve Prospective Risk.

The summer stay occurred under a temporary travel order. Mother stipulated to it, he had custody, and the court identified no allegation of physical abuse. 4-ER-801; 6-ER-926–28; 1-ER-14. The court had also stated it could not find danger to S.A.N. 4-ER-798–99. The remaining question is what that bounded experience shows about the established disciplinary pattern during the placement the final judgment orders.

The June 22 order specified return to the maternal grandfather for transportation to the United States on or about August 16 and required contact with Mother at least four times weekly. 6-ER-926–27

(Dkt. 55 at 3–4 ¶¶ 2, 5). Those entered terms control the comparison despite earlier discussion removing a proposed fixed date. 4-ER-798–99. The final judgment instead sends S.A.N. to live with Father pending Korean custody adjudication, without a comparable return to Mother and K.E.N. 1-ER-15, 1-ER-24.

The court found that treatment begun "only after litigation exposure" did not establish durable change. 1-ER-23. The summer likewise occurred during litigation, with a defined return and frequent contact. 6-ER-926–27. An interval without reported injury does not itself show correction of the concealment and suppressed disclosure the court found. The favorable interval must be assessed with those continuing barriers.

Continued telephone rights do not answer that problem: the established concealment operated despite access to Mother, other adults, and school. 1-ER-17, 1-ER-23–24; 6-ER-927–28. The judgment does not reconcile the summer experience with the recurring conduct and inhibited disclosure under the actual return arrangement.

## II. ONCE GRAVE RISK IS ESTABLISHED, THE REJECTED MEASURES DO NOT SUPPORT RETURN.

### A. *Golan* Requires a Decision Grounded in The Child's Actual Safety.

After grave risk, *Golan* gives the court "the discretion to grant or deny return," guided by the child's physical and psychological safety. *Golan*, 596 U.S. at 676, 680. It permits rejection of measures expected to fail and recognizes risks "so unequivocal, or the potential harm so severe, that ameliorative measures would be inappropriate." *Id.* at 680, 682. Protection must address the identified danger in operation.

The sequence matters: "The question whether there is a grave risk, however, is separate from the question whether there are ameliorative measures that could mitigate that risk." *Id.* at 677. Part I supplies Mother's affirmative risk showing. Rejection of measures for K.E.N. does not itself prove risk to S.A.N.; it answers the second question once her risk is established.

The reasons for rejection concern the proposed mechanisms. The court rejected promises because of concealment and "materially incomplete sworn testimony" and reporting because Father kept an injured child from school and instructed silence. 1-ER-23. Its conclusion was that reporting "cannot sufficiently protect the children." 1-ER-23.

Nothing about returning S.A.N. alone changes those mechanisms. The ultimate determination was for K.E.N., but its reasons bear directly on whether the same proposals can protect S.A.N.

Father offered the proposals with both children at issue: a Korean guardian, therapy, housing for Mother, and a no-arrest provision even absent a grave-risk finding. 6-ER-894, 6-ER-903–05 (Dkt. 66-1 at 8 ¶¶ 21–22, 17–19). His central no-arrest proposal required Korean-court adoption, and the record identifies no operating arrangement adopted there. 4-ER-690–92; 6-ER-905. The court should not assume a new protective operation from the same proposals solely because no physical injury to that child was reported.

*Simcox* warns that return with "feckless undertakings is worse than not ordering it at all," yet remanded to determine which conditions, if any, would be efficacious. 511 F.3*d* at 608, 611. It therefore supports distinguishing the risk determination from the remaining measures decision. Here, Father presented his proposals and the court rejected their protective mechanisms. Mother seeks application of those reasons to S.A.N. under *Golan*.

*Simcox* and *Acosta* place the burden of establishing proposed undertakings' efficacy on the petitioner. 511 F.3d at 611; 725 F.3d at 877. Chief Judge Murguia urged that allocation but acknowledged the panel could not resolve it in *Radu.* 62 F.4th at 1176–77 (Murguia, C.J., concurring). Mother does not need a new burden rule: she relies on her affirmative risk showing and the findings about the actual proposals.

### B. The Proposed Services Do Not Supply an Operating Protective Arrangement.

The court credited Father's attendance at twenty-five weeks of treatment, parenting classes, and personal therapy, but found his efforts insufficient to eliminate the risk. 1-ER-14, 1-ER-18, 1-ER-23. Mother relies on that final assessment, not an assumption that treatment can never work.

The record included both progress and continuing denials. In February Father had not located the Korean program or sought a family-court referral. 4-ER-610–13. By August he reported about twenty-five sessions and an intention to finish, acknowledged two blows leaving marks on one occasion, but denied physically abusing Mother or striking K.E.N. with the hanger. 5-ER-834, 5-ER-837–41. The court nevertheless found durable change unestablished. 1-ER-23.

Korean law's adequacy is not disputed. *Van De Sande* requires protection "in fact, and not just in legal theory." 431 F.3d at 571. The district court found Father knew the prohibition and reporting duties and concealed abuse because he feared their consequences. 1-ER-17, 1-ER-23–24. That finding concerns protection in this family.

*Walsh* likewise distinguished sound protective law from dependable compliance: "We have no doubt that the Irish courts would issue appropriate protective orders. That is not the issue. The issue is John's history of violating orders issued by any court, Irish or American." 221 F.3d at 221. *Acosta* also rejected reliance on available services alone. 725 F.3d at 877. Father's concealment differs from *Walsh*'s order violations, but both bear on whether the proposed protections will operate.

Choi testified that Korean adoption of a United States decision was not automatic; Father's stipulation could make it more likely. 4-ER-690–92. Kim's private counseling facility lacked a court relationship or monitoring authority. 4-ER-705. At closing the Korean investigation remained incomplete, and the court declined to await a report. 5-

ER-847–48, 5-ER-879. These were possible services and future decisions, not an established protective arrangement at return.

The judgment assigns no Korean guardian, independent supervisor of Father's discipline, or separate caregiver for S.A.N. 1-ER-15, 1-ER-24. The grandparents' and nanny's presence is relevant, but their protective operation must be assessed against the established concealment. 1-ER-9, 1-ER-17, 1-ER-23; 6-ER-934–37.

[redacted] That supports an inference about the limits of their presence alone, not a finding that they could never protect either child. Any proposed changed protective role requires assessment.

Father requested a guardian, therapy, housing for Mother, and a no-arrest provision even without a grave-risk finding. 6-ER-894, 6-ER-905 (Dkt. 66-1 at 8, 19). He described arrest as likely to traumatize the children and required Korean adoption of the proposed protection. 6-ER-905. These requests did not concede grave risk; they identified

protections sought for return. The judgment sends S.A.N. to Father without imposing them. 1-ER-15, 1-ER-23–24.

*Kelly* affirmed rejection of protections where the district court found the father would not comply given his history of "disregard for judicial and other authority." *Kelly v. Turner*, No. 25-3638, 2026 WL 1230531, slip op. at 2–3 (9th Cir. May 5, 2026) (unpublished). That nonprecedential disposition illustrates the practical compliance inquiry.

### C. *Gaudin* And *Radu* Do Not Justify an Unsupported Assumption of Safe Interim Care.

*Gaudin* directs attention to danger "in the immediate future" pending a custody decision and discusses cumulative psychological harm "especially in the absence of physical abuse or extreme maltreatment." *Gaudin v. Remis*, 415 F.3d 1028, 1037 (9th Cir. 2005), abrogated in part by *Golan v. Saada*, 596 U.S. 666 (2022). Mother's claim concerns physical injury during ordinary discipline and concealment during that interim. It does not depend on years of residence or the eventual custody result.

*Golan* rejected a categorical duty to explore every alternative and identified *Gaudin* among the cases imposing it. 596 U.S. at 676 n.6, 678–79. The issue here is application of the existing findings to S.A.N.'s

actual placement. The alternative remand permits any necessary child-specific exercise of discretion.

Directing return "to reside with Father" identifies the placement; it does not itself adjudicate permanent custody. 1-ER-15, 1-ER-24. *Cuellar* itself ordered a transfer of custody. 596 F.3d at 512. Mother accepts provisional return authority, including counsel's January acknowledgment. 3-ER-476–77. The error claimed is the application of Article 13(b) to that placement's danger.

*Monasky* describes return as a "provisional" remedy that "fixes the forum for custody proceedings." *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020). Article 19 reserves custody merits, and *Golan* limits conditions "in time and scope to conditions that would permit safe return." 596 U.S. at 681. A provisional placement still requires assessment of interim physical and psychological danger.

*Radu* affirmed return under an arrangement providing interim joint custody and separate housing at the father's expense. The mother could accompany the children, and a German custody decision was expected within months. The court found temporary physical custody

safe "for the remaining time" before that decision. *Radu*, 62 F.4th at 1171, 1175.

That finding concerned cumulative psychological harm from years in sole custody. 62 F.4th at 1175. Here, the findings concern physical injury and concealment during discipline. 1-ER-17, 1-ER-23–24. Mother's risk claim concerns the interim itself, which a later custody proceeding does not answer.

Article 13(b) requires assessment of that interim danger, not an absolute guarantee. *Radu*'s supported finding of safe temporary care cannot be assumed here.

## III. THE SPLIT RETURN CREATES AN INTOLERABLE SITUATION BY REDUCING ACCESS TO PROTECTION.

### A. Separation Increases Vulnerability to Concealed Abuse.

The additional "intolerable situation" ground concerns the split disposition's effect on protection in the established disciplinary environment. Hague Convention art. 13(b). Ordinary separation distress alone is insufficient. Part I's physical-risk ground stands independently of Father's cross-appeal; this additional ground

addresses the judgment leaving K.E.N. with Mother while returning S.A.N. to Father.

*Cuellar* attributes return-related "pangs" to the abduction. 596 F.3d at 511. The sisters here lived together before removal and came to California together. 1-ER-3. The challenged separation results from the judgment keeping one with Mother because of established abuse while returning the other to Father. 1-ER-15, 1-ER-17, 1-ER-23–24. The claimed harm is that split disposition's combined effect on exposure, detection, and intervention, not attachment to a new American home.

*Ermini* upheld keeping siblings together "in light of the children's close relationship to each other, and, significantly, the conclusion we reached with respect to abuse." *Ermini v. Vittori*, 758 F.3d 153, 167 (2d Cir. 2014). The court had found grave risk from abuse of both children and an additional risk from interruption of one child's autism treatment. *Id.* at 163–67. Its reasoning supports evaluating separation together with the established abuse and the children's relationship.

*Elyashiv* likewise assessed the younger child's future physical danger together with family separation. She had not been physically abused and did not have PTSD, but faced future abuse and feared

separation from her mother and siblings. The court found no "viable arrangements" for her safe return. 353 F. Supp. 2d at 409. The absence of prior injury did not answer the danger of returning her without her family's protection.

*Urquia Dominguez* is a closer abuse-based comparison. The court denied return of a six-year-old boy who "has not suffered direct sexual abuse or physical violence," emphasizing: "But that does not end the analysis." *Urquia Dominguez v. Hernandez Vasquez*, No. 8:25-cv-02411-PX, 2026 U.S. Dist. LEXIS 201782, at *21, *27–28 (D. Md. Sept. 8, 2026). It found his exposure to a "pattern of hostility, emotional belittling, and verbal abuse" and the loss of his sister's presence and another protective family member significant. *Id.* at *21–22. Return without the sister would "visit the additive punishment of separation from his sole sibling," and "child victims of sexual and other abuse are not so easily separated, nor should they be." *Id.* at *22. The court denied return because of "grave risk associated with separation from his sister and mother, and with no protection once in Honduras." *Id.* at *23.

*Urquia Dominguez* is persuasive district-court authority addressing a younger child's exposure to abuse and loss of protection.

Its forensic evaluation covered both children, and neither party proposed ameliorative measures. *Id.* at *2–3, *12–15, *24. Here, the court considered the proposed measures and found that Father's concealment defeated reporting protection for "the children." 1-ER-23. The common point is the combination of established abuse, separation from family members, and ineffective access to protection. Those circumstances must be assessed together for S.A.N.

The sisters lived together for years and temporarily resided together under the March order. 1-ER-3; 6-ER-929. [redacted]

Klein separately reported that being with Mother was S.A.N.'s principal concern. 3-ER-521–22. Those relationships matter to the practical opportunities to recognize and communicate danger. They do not establish that K.E.N. physically shielded S.A.N. or would prevent an assault.

The court recognized the separation concern during the proceeding, stating, "I'm not splitting the children," and later describing siblings as "support for each other." 3-ER-477, 4-ER-640, 4-ER-644. Those exploratory remarks were not a ruling and included discussion of

a temporary split. The final judgment nevertheless orders separation without assessing its combined effect on protection in Father's care. 1-ER-14–15, 1-ER-23–24.

### B. Mother's Care of K.E.N. Limits Her Availability in Korea.

The operative judgment now places K.E.N. with her in the United States, and the June order prohibits K.E.N.'s removal from California without further order. 1-ER-15, 1-ER-24; 6-ER-927. Mother's theoretical ability to accompany S.A.N. must therefore be assessed with her simultaneous responsibility for K.E.N. The judgment supplies no arrangement reconciling those duties.

[redacted]

Father offered visiting housing, help with "easy entry," holiday travel, and video contact. 1-ER-14; 6-ER-936–39 (Dkt. 34-1 at 6–9 ¶¶ 22(j), 24). He proposed protection against arrest. 6-ER-894; 4-ER-635–

36. Those proposals prove neither pending charges nor an immigration bar. The issue is Mother's practical availability under the split arrangement. Father acknowledged that his ability to visit the United States was "highly uncertain." 6-ER-939 (Dkt. 34-1 at 9 ¶ 26).

The grandparents and nanny are possible sources of help, but the return order assigns no protective responsibility to them. 1-ER-9, 1-ER-15, 1-ER-24; 6-ER-934. Their presence must be considered with the specific disclosure failures discussed in Part II.B. The relevant question is whether those adults could detect harm and secure intervention despite the established barriers to disclosure.

*Walsh* identifies precisely that distinction: it "may pose a grave risk to send the child directly into the exclusive care of the other parent," although a return to the country may be safe if trustworthy undertakings lessen or eliminate the danger. 221 F.3d at 219 n.13. Here, the judgment specifies Father's care, while the court's findings reject the trustworthiness of the proposed protection. Separation from Mother and the older sister compounds that immediate exposure.

[redacted]

Mother does not relabel that attachment as a diagnosis. The

intolerable-situation claim combines the recurring violence, impaired disclosure, and the split arrangement's limits on familiar adults' availability to detect and report danger. 1-ER-14, 1-ER-17–18, 1-ER-23–24; 3-ER-521–22, 3-ER-307. Any necessary further psychological finding belongs on remand.

## IV. THE COURT SHOULD REVERSE WITH DIRECTIONS TO DENY RETURN AS TO S.A.N.

### A. The Accepted Findings Support Denial Without New Factfinding.

Directed denial requires two conclusions grounded in accepted findings. First, the court found recurring injurious discipline beginning with a much younger child and continuing after a promise to stop. 1-ER-17, 1-ER-23. Father's own testimony identified ordinary disciplinary conflicts. 2-ER-102–03. The judgment places seven-year-old S.A.N. under that same disciplinary authority, with inhibited disclosure in Father's "environment of secrecy." 1-ER-14–15. Applied prospectively, those facts establish her own grave risk without a new finding of past injury or a credibility choice about unresolved testimony.

Second, the proposals presented cannot sufficiently address that risk for the reasons the court already found: concealment, incomplete

sworn testimony, exclusion from school, and instructed silence. 1-ER-23–24. Those are defects in Father's compliance and the proposed reporting mechanisms, not a mechanism that functions differently for S.A.N. Father offered the suite with both children at issue. 6-ER-894, 6-ER-903–05. Once her risk is recognized, the rejected mechanisms supply no supported basis for return under the arrangements presented.

*Walsh* demonstrates that an unexercised discretion after grave risk does not invariably require remand for another return decision. It directed dismissal and explained that, even had return followed a grave-risk finding, "on these facts, such an order would have been an abuse of discretion." 221 F.3*d* at 221 n.17, 221–22. Its extraordinary order violations differ from Father's concealment. Mother relies on the same remedial principle: accepted facts may establish both the risk and why the proposed protections cannot support return.

*Golan* remanded because the district court had "never had the opportunity to engage in the discretionary inquiry" under the correct standard. 596 U.S. at 683. Judge Carter considered and rejected Father's actual proposals, although his ultimate determination

concerned K.E.N. 1-ER-14–15, 1-ER-23–24. Mother does not treat that as an exercise of discretion for S.A.N. She seeks directed denial because the accepted reasons for rejecting those mechanisms remain operative for her. If a material child-specific discretionary choice remains, the alternative remand preserves it.

*Pullman-Standard* supplies the limit: after legal error, "a remand is the proper course unless the record permits only one resolution of the factual issue." *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982). Mother seeks application of Article 13(b) to the established recurrence, severity, concealment, and inhibited disclosure, followed by review of the proposed mechanisms under the court's existing findings. She does not ask this Court to resolve the reason for S.A.N.'s reluctance, make a new psychological finding, or deem uncredited testimony true. If either requested determination requires an essential new factual finding or a permissible discretionary choice, vacatur and the focused remand below are the appropriate alternative.

### B. Any Remand Must Resolve S.A.N.'s Risk and Access to Protection.

If further determinations are essential, the Court should vacate the return order and require findings permitting review of S.A.N.'s risk

and actual return arrangement. Rule 52(a)(1) requires findings and separate legal conclusions, not discussion of every item of evidence. Fed. R. Civ. P. 52(a)(1); *Colchester*, 16 F.4th at 727–29.

*Colchester*'s combined evidentiary, procedural, and findings errors required a new trial. It explained that the Rule 52 error alone might require the court "to amplify its findings." *Id.* at 729 n.15. That narrower course would address any essential gap here.

The mandate should require the district court to: (1) assess prospective risk from Father's disciplinary pattern, considering S.A.N.'s different treatment and summer stay; (2) determine whether school, therapist, guardian, or household reporting can function despite the established concealment and S.A.N.'s inhibited disclosure; (3) identify the interim caregiving arrangement and explain the weight given the summer order's defined return and frequent contact; and (4) assess how separating S.A.N. from K.E.N. and returning her to Father while Mother remains in California caring for K.E.N. would affect S.A.N.'s ability to disclose harm or obtain help. The court should distinguish its adopted findings from unresolved testimony. 1-ER-14, 1-ER-17–18, 1-ER-23–24; 3-ER-521–22, 3-ER-307, 3-ER-399; 6-ER-926–28. [redacted]

[redacted]

The court should apply the prospective standard without requiring prior injury. If grave risk is established, it should exercise *Golan*'s discretion for S.A.N. and explain any finding that a proposal overcomes the existing protection failures. *Golan* permits declining measures that "risk overly prolonging return proceedings." 596 U.S. at 682. Remand should resolve the identified questions, with supplementation confined to necessary evidence, rather than reopen habitual residence, custody merits, or an unrestricted search for measures.

The mandate should expressly stay S.A.N.'s return pending the new decision and further implementation order. If a renewed return order issues, the district court should allow a reasonable opportunity to seek appellate review and a stay before execution. Those terms would preserve effective review while permitting focused proceedings.

Expedition serves the child as well as the treaty. *Chafin* explains that it "will help minimize the extent to which uncertainty adds to the challenges confronting both parents and child." *Chafin v. Chafin*, 568

U.S. 165, 180 (2013). That principle supports confining any remand to the findings and practical arrangements needed to decide S.A.N.'s safety, rather than prolonging the proceeding through speculative alternatives.

## CONCLUSION

Mother requests reversal with instructions to deny return as to S.A.N. The accepted findings establish recurring injurious discipline and concealment, connect that danger to her own circumstances, and defeat the protective mechanisms presented. Alternatively, the Court should vacate her return order and require a focused, expedited assessment of her prospective risk and actual protection, with return stayed during remand and an opportunity to seek review of any renewed return order before execution.

Dated: November 17, 2026 Respectfully submitted,

QUINN & DWORAKOWSKI, LLP

/s/ Stephane Quinn
STEPHANE QUINN
Counsel for Jasmine Pearl Na

# CERTIFICATE OF COMPLIANCE

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**
**Form 8. Certificate of Compliance for Briefs**
9th Cir. Case Number(s) 26-6105 and 26-6374

I am the attorney or self-represented party.

This brief contains 9,572 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

Dated: November 17, 2026

**QUINN & DWORAKOWSKI, LLP**

/s/ Stephane Quinn
STEPHANE QUINN
Counsel for Jasmine Pearl Na

## Statement of Related Cases

The companion case is Na v. Na, No. 26-6374. It is Father's cross-appeal from the same judgment in district court No. 8:25-cv-02479-DOC-ADS.

Dated: November 17, 2026

Respectfully submitted,

**Quinn & Dworakowski, LLP**

/s/ Stephane Quinn
STEPHANE QUINN
Counsel for Jasmine Pearl Na