**Nos. 26-6105 and 26-6374**

Oral Argument January 12, 2027, at 9:00 a.m., Pasadena

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**JUNG WOOK NA,**

Petitioner-Appellee and Cross-Appellant,

v.

**JASMINE PEARL NA,**

Respondent-Appellant and Cross-Appellee.

Appeals from the United States District Court
for the Central District of California
No. 8:25-cv-02479-DOC-ADS
Hon. David O. Carter, District Judge

## EXCERPTS OF RECORD
## Volume 6 of 7

Filings and Documentary Exhibits

Submitted by Respondent-Appellant and Cross-Appellee

STEPHANE QUINN, CFLS (SBN 278188)
DAVID DWORAKOWSKI, CFLS, CALS (SBN 135285)
**QUINN & DWORAKOWSKI, LLP**
2050 Main Street, Sixth Floor, Suite 600
Irvine, California 92614
(949) 660-1400
quinn@orangecountyfamilylaw.com
david@orangecountyfamilylaw.com
Attorneys for Jasmine Pearl Na

Merritt McKeon, Esq.
24001 Calle de la Magdalena #2845
Telephone: (949) 584-1281
E-Mail: Merrittmck@hotmail.com

*Attorney for Petitioner*
*Jung Wook Na*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DISTRICT**

JUNG WOOK NA.
*Petitioner,*

vs.

JASMINE NA,
*Respondent.*

CASE NO.: 8:25-CV-02479-DOC-ADS

**PETITIONER'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Pursuant to this Court's order, Petitioner ("Father") respectfully submits his Memorandum of Contentions of Fact and Law:

## I. PROPOSED FACTUAL FINDINGS

A. Habitual Residence

1. The Court finds that Father has proven by a preponderance of the evidence that the parties' minor children, K.E.N. ([redacted] 2014) and S.A.N. ([redacted] 2019) were habitual residents of the Republic of Korea at the time Respondent-Mother ('Mother") removed them from Korea to California on July 31, 2025.

2. Father also meets his burden of establishing by a preponderance of the evidence the removal of the children by Mother was in breach of Father's custody rights under the laws of Korea, and that Father was exercising those rights at the time of the removal. Although no formal order was in place at the time, in Korea, both parents enjoy the same right of travel with the children as the other parent would, absent any order.

3. During a visit with K.E.N. and S.A.N., on July 31, 2025, Mother wrongfully removed the children from Korea, when Petitioner was out of town on a church retreat. Rather than taking the children to an agreed upon holiday to Tokyo Disneyland, located in Tokyo, Japan, Mother instead took the children to California on an airplane, using their Korean passports, to enter the United States of America. Despite Father's repeated pleas emphasizing the children's need to return to Korea for the school year, Mother ceased all communication with Father from early August 2025, to early November 2025, a period of nearly three months, during which time the children, Mother and Father had no communication.

4. At the time of the removal, Father had resided in Korea for approximately 20 years, and had not been to the United States since he left, in October 2005. He completed his college degree and also participated in Korean Army service, using his English skills as a translator in Korean Courts. He had been incarcerated in 2004, and his family had been found to have entered the United States when he was ten years old, using improper visas. As a result, Father has been unable to enter the United States, and has participated in these proceedings from Korea via Zoom. He is ineligible to obtain a visa to the United States.

5. At the time of the removal, the children had resided with Father in his family apartment home in Seoul, Korea, along with his parents, and a nanny. The family home was provided comfortable living quarters, where the children's pets also lived. The children had a strong familial support system in Korea, including

their paternal grandparents, an uncle and his wife and child, and their father's extended family of cousins, who were actively involved in their daily lives.

6. At the time of the removal, the children had spent most of their lives in Korea. They were both born in Korea. Their Mother, the Respondent, had lived in Korea part of the time, giving birth to the children, and leaving to reside in one of her parents' homes in Irvine, California, for most of the marriage after separating from Father in 2020, moving in 2021 back to California. The children were enrolled in the Korean International School and had their friends, social activities, medical checkups and after school activities planned by Father.

7. The children never relocated to the United States despite spending less than one year in Irvine with Father's full knowledge, consent, and support. They were enrolled in Irvine schools from July 2021 to December 2021, when S.A.N. returned to Korea. K.E.N. was returned to Korea in June 2022 to reside with Father. The record is clear that Father never restricted Mother from taking the children to visit Irvine, and agreed to let the children stay in 2021-2022, despite the fact he, Father, could not enter the United States. Father never demanded nor coerced the return of the children, but resumed caring for them as their primary parent when Mother could not care for the children.

8. The children regularly traveled to other countries such as Japan and Taiwan, either with their Mother or Father, or Mother's parents. Father never restricted the travel and encouraged contact between the children and their mother, providing her with a fully furnished apartment, and living separately from her when she requested to have her own space. According to the Joint Stipulated Facts, the Children visited the United States in December 2024. Since 2021, Mother has visited the children in South Korea on multiple occasions, including June 2022, August 2022, June 2023, July 2023, March 2025, and July 2025.

9. The eldest daughter, K.E.N., had a medical issue requiring her to wear metal and plastic braces on her legs for most of the day and night, when she was 7

and 10 years old, between 2022 and 2024. Testimony from both parents was that Father had been the parent responsible for taking K.E.N. to her doctor, and placing the braces on K.E.N.'s legs over her protests. K.E.N. had not liked to wear the braces; Father testified he would put them on her when she was asleep and if she took them off during the day, he would admonish her and sometimes tap her with the braces and insist she had to wear them. Though accused by Mother of hitting K.E.N. with the braces on her legs, and also by Mother's Expert Dr. Dobson, K.E.N. herself testified that no one had ever hit her with the leg braces.

10. Father has readily admitted that in April of 2024, he physically disciplined K.E.N., when she was nine years old, by having her kneel before him and he hit her with a thin plastic stick, which was how he testified he had been disciplined as a child by his parents. Father testified he kept K.E.N. out of school and took her to a children's park, and believed she had suffered no damage or bruising at the time, but he does clearly recall placing bandages on the red marks left by the discipline. He has accepted responsibility for his actions and has expressed regret and remorse.

11. Father does not clearly recall any other physical abuse or discipline; he recalls having his daughter K.E.N. kneel and hold out her hands and he would wave a small plastic child's clothes hanger or other small household item and tell her he would hit her, but he denies actually hitting her. K.E.N. disputes this, saying she recalls at some time when she was in Kindergarten, he would hit her. From age 5 to age 9, K.E.N. does not recall any physical discipline. She did express fear her father might hit her again "if she does something wrong."

12. Father denies ever abusing his wife, Jasmine. He presented evidence of text messages from Respondent/mother which clearly state she intends to castrate him, cut off his testicles, and graphically described having sexual relations with other men, detailing her perception of Korean men being inadequate. Text messages from Father to Mother ask Mother not to hit him in front of the children.

Father's testimony was that Mother hit him occasionally in front of the children and though he was not physically afraid of her, it took an emotional toll on him. Father testified he felt humiliated and tried to ignore these words and physical abuse, but later went through treatment as a victim of abuse in Korea, to further explore and heal, after the children were removed from Korea by Mother. His personal therapy was concluded in Korea earlier in 2026, with evidence of his participation and completion presented to the Court.

13. Mother testified that in January 2017, when [redacted] was 2 years old, Father held her over a balcony in their apartment and tried to push her off the balcony. She testified Father had struck her with a glass nightstand, shattering it on her. Mother did not testify that she had sustained any injury nor did she seek any medical treatment; she did not make a police report nor tell anyone at all about the alleged abuse.

14. Mother testified that in 2023, she and Father had an argument over her phone, and that Father had hit her chest with the phone during the argument. She asked him to take her to an emergency room, where they waited for many hours before being seen by the medical staff. The medical records indicate that there was no bruising, redness, nor any apparent injury, and that the parties were interviewed. Father told the medical staff that he and Mother had argued and that she had grabbed the phone from his hand and perhaps she had struck herself with it when he let go of the phone, while Mother insisted he had hit her with the phone. Mother was advised to return if any bruising occurred, or if she felt shortness of breath or felt any pain. She did not return for any further evaluation. Father testified that Mother had grabbed her cell phone out of his hand and when he let go, the force of her hand holding her phone hit her in her chest.

15. Mother's expert, Dr. Dobson, testified that because of "extreme abuse" by Father to Mother and K.E.N., the court should not permit the children to see him at all, ever. Abuse testified to by the expert included allegations that Father

had beaten K.E.N. with her leg braces when she was very young, and had attempted to throw Mother off the balcony and broke a glass nightstand over Mother when [redacted] was 2 years old. The expert testified that she was an expert in domestic abuse, and works with traumatized veterans and their families, in VA hospitals and treatment centers. She testified that by having K.E.N. wear a bandage and telling [redacted] not to tell anyone about being hit, that [redacted] was forever traumatized and that no contact at all should take place between the children and their father, as the abuse was too severe and traumatizing.

16. Mother's legal and social expert testified that in Korea, outsiders or foreigners have difficulty in integrating into the society, and that child and spousal abuse often occurs. The expert was unaware of recent changes to the law, making any corporal punishment of children a crime in Korea. He testified that a Korean judge in a Korean court would follow the law. The expert reviewed news reports about the Child Welfare Act in Korea, which he had not known about on his own, and testified that he believed a Korean Court would follow its own laws. On June 5, 2026, Petitioner's counsel asked the Court to take judicial notice of the Korean Child Welfare Act, which has been enacted in 2011 and revised every year except 2022 and 2024-6. The act gives personal rights to children which are detailed in Article 3 of the Act.

17. The Court interviewed the children on March 11, 2026. K.E.N. testified that Father had hit her in 2024, with a plastic stick, covered marks on her skin with bandaids, and told her not to tell anyone. She testified she went to school, was questioned by her teachers about the bandages, went home, and her Father took her to a children's park. She also recalled, after direct questions, that when she was much younger, maybe in Kindergarten, that Father had made her kneel and hold out her hands, and had hit her with small children's clothing hangers, rice paddles or spoons, and other small objects. She said he had promised never to do it again and when he hit her in 2024, it made her distrust her Father. She also

testified that she would like to go to Korea and that she was afraid her father would hit her again if she, in her words, did something wrong. She testified she would like to live in either the USA or Korea, and was ambivalent about where she would prefer to attend school, agreeing that she would like to spend summers in Korea or traveling.

18. In June 2026, the Court ordered [redacted] would go to Korea for the summer. [redacted], on stipulation of the parties, visited Korea. According to the Joint Status report, [redacted] had multiple dental issues and needed a root canal after spending nearly a year in the US. [redacted] was placed in therapy by her Father, and the Korean Court ordered an investigation. All parties were ordered by the Korean Family Court to participate, and Respondent and K.E.N. took part by Zoom with the Korean court investigation. According to the July 2026 Joint Case Status Report, a copy of the Korean Court investigation will be available later in 2026. Petitioner has requested that the Court wait to receive this report before determining the children will not be returned due to a Grave Risk under Article 13 of The Hague Convention, which requires a court considering a Grave Risk defense to return, to consider social reports regarding the children if created by a judicial or administrative authority in the State of Habitual Residence of the children. On August 22, 2026, [redacted] returned to the U.S., after about two months visit to Korea.

19. Father has voluntarily enrolled in a Batterer Intervention Program in Los Angeles, and has participated each week, completing 25 of 52 weeks of the program as of the time of closing arguments. He has undergone parenting classes, personal therapy, and courses in parenting adolescents and children. Mother has reportedly undergone personal therapy.

20. The Court appointed Loni Klein as the children's Guardian ad Litem (GAL). Ms. Klein reported that K.E.N. had expressed a desire to move to Korea, but investigated and has told the Court that Father had promised the child she

could have things such as her own snack area in her bedroom, if K.E.N., moved to Korea.

21. Father has offered to the court proposed ameliorative measures which could be adopted in the US if the Court found there was a grave risk if the children were returned to Korea. He offered testimony that he had asked the Korean Court to appoint a GAL for the children in Korea, and that they would go to therapy. He offered to make a furnished apartment available for Mother if she wanted to live in Korea or just visit the children at any time. He testified he had asked the Korean Court to assure that Mother would not be arrested for removing the children without his knowledge, and that he has not made a police or other report of any criminal action on Mother's part. His declaration in the July Joint Status Report declares under penalty of perjury that he will not and never has made a police report about the removal of the children by Mother.

22. Father has asked that if he does get an order returning, that the Court make ameliorative measures to assure mother is aware Mother is safe to return and also the children get a GAL appointed in Korea. If the court finds Grave Risk, father has asked for those measures, but even without such a finding, he asks for a return order requiring him to not have mother arrested, her stated fear, and to have the Korean court appoint a GAL, and therapy for the children., as well as providing Mother with housing for any time she wishes to spend in Korea.

23. The children have been in the USA for approximately one year. As of the time of closing arguments, they have never been placed in therapy in the USA, despite repeated requests by the GAL and the full agreement of the Father to enrollment in therapy.

B. <u>Credibility of Mother</u>

24. Mother provided testimony that the minor child K.E.N., had been beaten with her leg braces by Petitioner. She testified that she left the children in the care of Respondent for years, often without phone calls or zoom calls from her

on a regular basis. She testified she asked K.E.N. by text, to confront Father with an accusation that Father had stolen Mother's car, after K.E.N. had revealed to Mother that Father had hit her with a stick, in July 2025.

25. Despite testifying that she and the eldest child had been abused by father, Mother sent the children back to Korea in 2021 and 2022 respectively, after enrolling them in school in Irvine. Until she abducted the children, in July 2025, Mother had never mentioned abuse of herself or K.E.N., to anyone. She had been advised by the U.S. Consulate to seek legal advice and protection under Korean law, by email from the Consulate. She did not do this but is now actively participating in the ongoing Korean Family Court proceedings.

26. Despite testifying she had been abused and the eldest child had been abused, Mother only went into therapy recently herself after Father testified he had sought therapy as early as December 2025, and the children had never been placed in therapy by Mother.

27. Despite testifying that in 2017, she had been nearly thrown off a balcony and had a glass covered nightstand broken over her by Father, she apparently sustained no injury, made no police nor medical report to anyone. Despite testifying that in 2023, she was injured by Father by being hit in the chest with her cell phone, her proffered medical records show no injury, no redness, no bruising.

28. The text messages show emotional abuse by Mother to Father in the form of messages indicating she found him sexually inadequate, and that she was having affairs with multiple partners. She threatened Father with castration and other forms of sexual trauma. Father presented text messages from him to Mother asking her not to hit him in front of the children.

29. Mother has provided no credible evidence that she would be arrested if she returned to Korea for Court proceedings or visitation with the children, nor

has she identified any laws in Korea which she would have violated by removing the children, despite being represented in Korea by Korean Family Lawyers.

C. <u>Credibility of Father</u>

30. Father provided credible testimony that he never beat the minor child K.E.N. with her leg braces, by Petitioner. He testified that Mother had left the children in his care for years, often without regular phone calls or Zoom calls.

31. Father admitted he had hit K.E.N. with a stick, in 2024, and has testified he had been disciplined the same way by his father with a child. He expressed remorse. He voluntarily enrolled in a 52 week Batterer Treatment Program and has completed nearly half of the program, and testified he will continue until he finishes it.

32. Father denied actually hitting K.E.N. with a hanger when she was in Kindergarten, but admitted he did make K.E.N. kneel and tapped her with small objects such as a rice stirring paddle and a small hanger, which is roughly consistent with K.E.N.'s testimony except that K.E.N. recalls being hit by the small hangers or other small items.

33. Father testified he has not asked for an arrest warrant in Korea and wants a GAL appointed for the children there, and offers a furnished apartment for Mother to stay in as much as she would like, and to have the children spend summers and winter holidays in Irvine California with their Mother and maternal grandparents, as they have in the past, when the parties were married.

K.E.N.'s TESTIMONY

32. The March 11, 2026 transcript of K.E.N. does not indicate that she is overtly fearful of her Father. She reports she would be willing to go to school in either the USA or Korea, and that if her Father didn't hit her ever again, she was fine with living in Korea. K.E.N. denied that anyone ever hit her with her leg braces. She recalled when she was in Kindergarten that her Father had hit her arms with small children's clothing hangers, and then promised never to do it again. She

testified she felt that by hitting her again in 2024 with a plastic stick, that he had broken his promise to her.

S.A.N.'s TESTIMONY

34. S.A.N. testified she did not want to answer questions about how her older sister might be disciplined by her Father. She testified neither Mother nor Father yelled at her if she misbehaved. She described missing Korea, where "her entire family" lived except her Mother and grandparents.

35. S.A.N. testified she would like to go to school in Korea, where they regularly took trips to the mountains, and her mother could visit her. She expressed contentment with both parents, and that she missed her Father. At the time of her testimony she was not living with her Mother, and expressed longing to see her. S.A.N. testified ideally everyone would see one another regularly in the future and she would live with her "entire family," which she claimed was in Korea.

## II. PROPOSED CONCLUSIONS OF LAW

A court considering a Hague Convention petition has jurisdiction only over the wrongful removal or retention claim and cannot consider the merits of any underlying custody disputes. See Hague Convention, art. 16. "[T]he Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings." Mota, 692 F.3d at 112; see 22 U.S.C. § 9001(b)(4) (providing that a court may only determine rights under the Convention, not the merits of custody disputes). As such, the Court has not considered any of the evidence before it for the purpose of determining the custody rights of the Na children.

The Hague Convention, does not provide any definition of "habitually resident." Gitter, 396 F.3d at 131. "[T]he Convention instructs courts to interpret the expression according to 'the ordinary and natural meaning of the two words it contains,'" Armiliato v. Zaric-Armiliato, 169 F. Supp. 2d 230, 236 (S.D.N.Y. 2001)

Under ICARA, the party petitioning for the child's return bears the burden of establishing by a preponderance of the evidence that the child was wrongfully removed or retained. 22 U.S.C. § 9003(e)(1). Removal or retention of a child is wrongful when (i) "the child was habitually resident in one State and has been removed to or retained in a different State"; (ii) "the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence"; and (iii) "the petitioner was exercising those rights at the time of the removal or retention." Gitter v. Gitter, 396 F.3d 124, 130-31 (2d Cir. 2005). If a petitioner can establish that the removal or retention of his child was wrongful, he has made out a prima facie case for the child's return. In re D.T.J., 956 F. Supp. 2d 523, 528 (S.D.N.Y. 2013).

Where a petitioner has made out a prima facie case for his child's return, the respondent can prevent the repatriation of the child if he is able to establish that "one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4); see also id. § 9003(e)(2). Relevant here, these exceptions include:

- "[T]he person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention," id., art. 13(a);
- "[T]here is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," art. 13(b).

The first exception must be established by a preponderance of the evidence, see 22 U.S.C. § 9003(e)(2)(B), while the grave risk exception must be established by clear and convincing evidence, see id. § 9003(e)(2)(A).

1. Under the Hague Convention, K.E.N. and S.A.N.'s removal from Korea was wrongful.
2. The children's habitual residence was Korea at the time of removal.

3. The trip to the United States was done without the Father's knowledge or consent.
4. Mother's subjective intent to move does not constitute a change in habitual residence.
5. Respondent did not meet her burden under law that the U.S.A. is the children's State of Habitual Residence. There is no clear and convincing evidence that returning the children to Korea would expose them to a grave risk of harm.
6. Mother's claims of abuse and risk are unsupported and insufficient under Article 13(b).
7. The Court should grant Petitioner's request for the children's immediate return to Korea.
8. The Court should order reimbursement of Petitioner's attorneys' fees and costs pursuant to Article 26 of the Hague Convention.
9. In the event the Court does determine Grave Risk has occurred, the Court must have first made its analysis as follows:

A. ARTICLE 13 OF THE HAGUE CONVENTION AND GRAVE RISK

In a recent US Supreme Court case analyzing the Article 13 Grave Risk defense, the Court found the following facts constituted grave risk:

> As a threshold matter, the court determined that Italy was B. A. S.' habitual residence and that Golan had wrongfully retained B. A. S. in the United States in violation of Saada's rights of custody. The court concluded, however, that returning B. A. S. to Italy would expose him to a grave risk of harm. The court observed that there was "no dispute" that Saada was "violent—physically, psychologically, emotionally, and verbally—to" Golan and that "B. A. S. was present for much of it." App. to Pet. for Cert. 79a. The court described some of the incidents B. A. S. had witnessed as "chilling." *Ibid.* While B. A. S. was not "the target of violence," undisputed expert testimony established that "domestic violence disrupts a child's cognitive and social-emotional development, and

> affects the structure and organization of the child's brain." *Id.,* at 79a–80a, and n. 37.[3] Records indicated that Italian social services, who had been involved with the couple while they lived in Italy, had also concluded that " 'the family situation entails a developmental danger' for B. A. S.*" Id.,* at 80a. The court found that Saada had demonstrated no "capacity to change his behavior," explaining that Saada "minimized or tried to excuse his violent conduct" during his testimony and that Saada's "own expert said . . . that [Saada] could not control his anger or take responsibility for his behavior." *Ibid.*

In the Na case, we have two alleged incidents of DV against Respondent, one in 2017, and one in 2023, neither of which resulted in any reported injury. Two isolated incidents, one of which allegedly occurred when the eldest child K.E.N., was 2 years old, who was asleep when the argument occurred. The second alleged incident did not occur in the presence of either child.

The alleged abuse to K.E.N. was said to have occurred twice, the first time or times when K.E.N. was 5 years old. The next reported incident (admitted by Petitioner) was when K.E.N. was 9 years old. Petitioner believed at the time that the discipline he had received as a child, being hit with a stick, was appropriate.

With regard to abuse allegations, Simcox v. Simcox, 511 F.3d 594 (6th Cir. 2007) is useful. It groups cases into roughly three categories: minor abuse or discipline at one end; plainly grave cases such as sexual abuse, similarly grave physical or psychological abuse, death threats, or serious neglect at the other; and a middle category where the court must carefully assess whether protective arrangements can make return safe. That framework remains useful in the provided post-2022 cases, though the remedial implications must now be read through Golan v. Saada, 142 S.Ct. 1880 (2022).

The line drawn by the cases is not between lawful and unlawful corporal punishment in the abstract, but between ordinary or isolated discipline and abuse

that creates a severe and very high risk of serious harm if the child is returned. Several cases state that sporadic or isolated incidents of physical discipline directed at the child generally do not establish grave risk, Stanley v. Stanley, 2:26-cv-00006 (D. Vt. Mar 26, 2026); Ikezogwo v. Fatiregun, Civil Action 24-5672 (E.D. Pa. Jan 03, 2025); Godinez v. Godinez, Civil Action 22-3596 (GC) (DEA) (D. N.J. May 30, 2023); Mohácsi v. Rippa, 346 F.Supp.3d 295 (E.D. N.Y. 2018). Likewise, spanking, objects thrown near but not at a child, and heated arguments in the child's presence were treated in one case as insufficient without more, Porretti v. Baez, 19 CV 1955 (RJD) (E.D. N.Y. Oct 29, 2019). Another case noted that a small number of spankings did not amount to grave risk, Hart v. Anderson, 425 F.Supp.3d 545 (D. Md. 2019).

By contrast, physical discipline rises to Article 13(b) abuse when the evidence shows something substantially more serious than minimal corporal punishment. The sources repeatedly describe the prohibited risk of harm as severe, serious, repeated, sustained, or likely to recur, Delgado v. Marquez, 23-cv-05141-VKD (N.D. Cal. Feb 09, 2024); Stanley v. Stanley, 2:26-cv-00006 (D. Vt. Mar 26, 2026); Gil-Leyva v. Leslie, No. 18-1209 (10th Cir. Jun 27, 2019). Conduct at that level includes sexual abuse, severe beatings or comparable physical abuse, death threats, serious neglect, or domestic violence in the home that seriously endangers the child or places the child in fear, Golan v. Saada, 142 S.Ct. 1880 (2022); Simcox v. Simcox, 511 F.3d 594 (6th Cir. 2007); Delgado v. Marquez, 23-cv-05141-VKD (N.D. Cal. Feb 09, 2024).

The inquiry is not limited to direct blows to the child. The cases recognize that abuse of the other parent can matter if it seriously endangers the child or if the child is exposed to it in a way that creates grave physical or psychological risk, Delgado v. Marquez, 23-cv-05141-VKD (N.D. Cal. Feb 09, 2024); Royal

Borough of Kensington & Chelsea v. Banfa-Louis, 22-cv-8303 (PKC) (S.D. N.Y. Mar 07, 2023); Mohácsi v. Rippa, 346 F.Supp.3d 295 (E.D. N.Y. 2018). But partner abuse is not enough by itself; the respondent must connect it to a grave risk to the child, not merely to the respondent parent, Royal Borough of Kensington & Chelsea v. Banfa-Louis, 22-cv-8303 (PKC) (S.D. N.Y. Mar 07, 2023); Rubio v. Castro, 19-CV-2524(KAM)(ST) (E.D. N.Y. Oct 15, 2019).

The cases therefore suggest several practical markers for when discipline becomes Article 13(b) abuse: frequency, severity, credible threats, whether the child was a target or close witness, whether the conduct generated fear in the child, whether the danger is likely to recur, whether the home-state authorities can actually protect the child, and whether the risk is physical, psychological, or both, Gil-Leyva v. Leslie Gil-Leyva v. Leslie, No. 18-1209 (10th Cir. Jun 27, 2019); Silva v. Dos Santos Silva v. Dos Santos, 68 F.4th 1247 (11th Cir. 2023). The focus is on present risk upon return, not solely on proving prior injury, Silva v. Dos Santos Silva v. Dos Santos, 68 F.4th 1247 (11th Cir. 2023).

The Court finds that there is no clear and convincing evidence that K.E.N. or S.A.N. would face a grave risk of harm if they are returned to Korea, where the Korean Family Court is conducting an investigation with the participation of both children and both parents, and presumably hearing evidence which has been presented to this Court. The Korean Court is better situated and has the jurisdictional ability to make orders, protective or custodial, for this family.

B. FURTHER ANALYSIS OF DEFENSES TO RETURN UNDER THE CONVENTION

There is a uniform acknowledgement among courts that the defenses available under the Convention should be interpreted narrowly. See, e.g., Nicolson v. Pappalardo, 605 F.3d 100, 107 (1st Cir. 2010); Asvesta v. Petroutsas,

580 F.3d 1000, 1004 (9th Cir. 2009); Baran v. Beaty, 526 F.3d 1340, 1345 (11th Cir. 2008) (using Article 13(b) defense); Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 271 (3d Cir. 2007) (using Article 13 defense); Karkkainen v. Kovalchuk, 445 F.3d 280, 288 (3d Cir. 2006); Miller v. Miller, 240 F.3d 392, 402 (4th Cir. 2001); Diorinou v. Mezitis, 237 F.3d 133, 145 (2d Cir. 2001); England v. England, 234 F.3d 268, 272 (5th Cir. 2000); Friedrich v. Friedrich, 78 F.3d 1060, 1067 (6th Cir. 1996); Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir. 1995).

This is to prevent the Convention from becoming "a dead letter." See Elisa Pérez-Vera, Explanatory Report, in 3 Actes et Documents de la Quatorzième session, 434-35 (1982), https://www.fjc.gov/content/311576/explanatory-report-eliza-perezvera-report (the Pérez-Vera Report is the official commentary of the reporter to the proceedings leading to the adoption of the 1980 Hague Convention by the Hague Conference on Private International Law). In fact, Article 18 provides that the defenses "do not limit the power of a judicial or administrative authority to order the return of the child at any time." Hague Convention art. 18.

Thus, if the return of a child would further the aims of the Convention, Article 18 confers discretion to return a child even if a defense to return has been proven. Id.

C. AMELIORATIVE MEASURES

Petitioner has voluntarily undertaken a 52 week course of treatment via Zoom, through a course offered in Los Angeles. He has admitted to physically disciplining K.E.N. in 2024, and has expressed remorse in his treatment and in the Court.

Petitioner has undergone therapy and taken multiple parenting classes, and during S.A.N.'s visit to Korea from June to July, Petitioner enrolled S.A.N. in

therapy to assist her in recovering from the experience of living in the US and being abducted there.

K.E.N., despite her mother knowing she had been physically disciplined by Petitioner in Korea, had not, as of time of closing arguments, placed K.E.N. Into any sort of therapy at all.

Petitioner has asked the Korean court to order therapy for both children, a Guardian ad Litem for both children, and assurance that Respondent will have a safe, comfortable place to stay in Korea as well as assurance she will not be criminally charged with any crime relating to her removal of the children from Korea. He has asked the Korean court for an order permitting the children to spend summer and winter break in the US with their mother and maternal family.

A sharp contrast between the grave risk factual findings and lack of ameliorative measures in Saada v. Golan points to the conclusion that even if there is grave risk of return to the minor child K.E.N., the continuing involvement of a GAL and therapist, will form a protective measure well beyond most such measures had this factual pattern been seen in a normal custody dispute.

Petitioner has shown remorse. He has taken proactive steps to change the way he guides and assists his daughter as she grows.

He has denied abuse of his wife, and any act outside of threatening K.E.N. with a small children's clothing hanger, and one time hitting K.E.N. with a plastic stick, when K.E.N. was 5 years old.

Ameliorative measures requested by the Court after a finding of grave risk of harm by clear and convincing evidence will include the following:

1. A guardian ad litem (G.A.L.) will be appointed in Korea to protect the minor children from any future harm by either parent.

2. The minor children will be placed into therapy with a licensed child psychologist, who will have access to communicate with the children's G.A.L.

3. Respondent/Mother will have a comfortable, safe, furnished apartment to live in when she stays in Korea either for court proceedings, visitation, or custodial times, provided by Father.

4. Respondent/Mother will be able to travel with the children to Irvine for summer holidays and winter holidays, and travel as can be arranged by the parties. She will have unlimited time in Korea to spend with the minor children.

5. The Order for Return shall include a provision that Petitioner Jung Wook Na has testified he does not want to have Respondent Jasmine Pearl Na, be arrested for removing the children from Korea, as he believes this would be detrimental to the children's best interests. The Order for Return will note that an arrest of the Mother would likely be deeply traumatizing for the children, and the ameliorative measure must be adopted by the Korean Court to include that Mother will not be arrested for removing the children in July 2025.

## CONCLUSION

For the foregoing reasons, the Court should find that the children's removal was unlawful under the Hague Convention, reject Mother's Article 13(b) defense, and order the children's immediate return to Korea. Alternatively the Court should adopt the ameliorative measures recommended by Petitioner. Additionally, the Court should award attorneys' fees and costs to Petitioner or set a hearing to determine appropriate reimbursement.

Date: August 31, 2026

*Respectfully Submitted*,

MERRITT MCKEON, ESQ.

Merritt McKeon

*For Petitioner/Father Jung Wook Na*

**PROOF OF SERVICE**

Case Name: *Na v. Na*

USDC Case No. 8:25-CV-02479-DOC-A

I, Merritt McKeon, the undersigned, am over the age of eighteen years and am a resident of Orange County, California; I am not a party to the above-entitled action; my business address is 24001 Calle de la Magdalena #2845, Laguna Hills, CA 92653.

On August 31, 2026, I electronically submitted for filing PETITIONER'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW with the Clerk of the Court using the District Court's online filing service.

On August 31, 2026, I served, via the Court's online service, a true and correct copy of the PETITIONER'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW on the following interested parties by electronic mail, and by electronic mail from my email address, merrittmck@hotmail.com:

STEPHANE QUINN, Esq.
DAVID DWORAKOWSKI, Esq.
E-Mail: david@orangecountyfamilylaw.com
E-Mail: quinn@orangecountyfamilylaw.com

Loni Klein, Esq.
For the minor children
Loni@centerforchildren.com

I certify under penalty of perjury that the foregoing is true and correct.
Executed this 31st day of August 2026, at Laguna Hills, California.

Merritt McKeon

Merritt McKeon

STEPHANE QUINN CFLS (SBN: 278188)
DAVID DWORAKOWSKI CFLS, CALS (SBN: 135285)
**QUINN & DWORAKOWSKI, LLP**
IRVINE CONCOURSE
2050 Main Street, 6th Floor, Suite 600
Irvine, California 92614
Telephone: (949) 660-1400
E-Mail: david@orangecountyfamilylaw.com
E-Mail: quinn@orangecountyfamilylaw.com
*Attorneys for Respondent*
*JASMINE PEARL NA*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DISTRICT**

| | |
|---|---|
| JUNG WOOK NA, *Petitioner,* vs. JASMINE PEARL NA, *Respondent.* | CASE NO.: 8:25-CV-02479-DOC-ADS<br>**RESPONDENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Pursuant to the Court's order and Federal Rule of Civil Procedure 52(a), Respondent Jasmine Pearl Na ("Mother") respectfully submits the following proposed findings of fact and conclusions of law.

## I. PROPOSED FINDINGS OF FACT.

### A. Proceedings and Credibility.

1. This action arises under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child

Abduction Remedies Act ("ICARA"), 22 U.S.C. section 9001 et seq. Petitioner Jung Wook Na ("Father") seeks the return of the parties' two minor children, K.E.N. and S.A.N., to the Republic of Korea ("Korea") based on Mother's relocation of the children to California on July 31, 2025.

2. The Court considered the testimony of Father, Mother, Guardian ad Litem Loni Klein, Dr. Leslie Dobson, and the other witnesses; the children's in camera statements; the admitted exhibits; Father's February 2, 2026 declaration; the parties' later court-ordered submissions; and the materials submitted concerning Korean law and enforcement practice.

3. The Court credits Mother, the Guardian ad Litem, and Dr. Dobson on the subjects identified below. The Court credits Father's admissions but does not credit his testimony where it conflicts with his later sworn admissions, the contemporaneous communications, the Guardian ad Litem's testimony, or the Court's assessment of the testimony's coherence and plausibility.

**B. <u>Habitual Residence.</u>**

4. Immediately before July 31, 2025, the children had lived in Korea for substantial periods, attended school there, developed routines, and maintained friends and family relationships there. The Court has given those circumstances substantial weight because they favor Father's claim that Korea was their habitual residence.

5. The family's presence in Korea, however, began and continued because Father could not lawfully reenter the United States after immigration authorities discovered that he had been residing under a fraudulent green card, combined with the immigration consequences of his California felony conviction and prior deportation. The family's residence in Korea was therefore tied to an external legal constraint rather than a mutual decision to abandon the United States permanently.

6. Father repeatedly attempted to remove that constraint. In 2021 and again in late 2024, he sought post-conviction relief in California. In sworn filings, Father stated that he sought relief from the conviction's immigration consequences so he could enter the United States and reside here with his wife and children. His final effort was denied in May 2025. (Joint Exs. 115-122.)

7. The parties retained immigration counsel for years and incurred substantial expense pursuing Father's ability to return to the United States. Those sustained efforts show that the family's residence in Korea remained contingent on Father's immigration status and that eventual family residence in the United States remained an active objective.

8. In August 2021, with Father's express consent, Mother relocated with both children to Irvine, California. K.E.N. enrolled in school, and the children lived in California for nearly one year. The arrangement ended after Father withdrew financial support and the parties' agreed family structure broke down, not because the parents reached a settled decision that Korea would be the children's permanent home.

9. The parties' later communications continued to treat the children's residence as reversible. As late as March 2025, Father told Mother that she could take the children to California. In July 2025, Father acknowledged that he had agreed in 2021 to let Mother take the children to the United States and described the children's 2022 return to Korea as temporary. (Joint Exs. 111-112.)

10. The children's education in Korea was oriented toward continuity with the United States. K.E.N. attended an international school using a United States-based curriculum; S.A.N. was expected to attend the same school; English was the primary language at home and school; and the children did not attend Korean public schools or receive their principal

education through a Korean-language curriculum. This evidence does not erase their ties to Korea, but it reduces the weight of school attendance as proof of permanent integration into Korean society and is consistent with the parties' expectation that the children could resume life and education in the United States.

11. Considering all circumstances - including the length of residence and routines in Korea, the children's ages and education, the 2021-2022 California residence, Father's immigration disability and repeated efforts to return to the United States, and the parties' 2025 communications - Father has not proven by a preponderance of the evidence that Korea was the children's habitual residence immediately before July 31, 2025.

**C. Physical Abuse, Concealment, and Credibility.**

12. In 2024, Father struck K.E.N. with a stick. Father admitted that conduct at trial and again in his February 2, 2026 declaration. (Dkt. 34-1, paragraph 3; Joint Ex. 124.)

13. At trial, Father minimized the injury as only a red mark. In his February 2 declaration, Father admitted that the incident left bruises, stating: "I deeply regret not telling Jasmine I had hit K.E.N. [w]ith a stick and left bruises." (Dkt. 34-1, paragraph 7.)

14. Father instructed K.E.N. not to tell anyone about the incident and did not disclose the abuse to Mother. Father admitted both concealment decisions in his February 2 declaration. (Dkt. 34-1, paragraphs 3, 7.)

15. Father knew that Korean law prohibited the conduct and that disclosure could result in loss of custody and criminal prosecution. He also knew that teachers and medical professionals were required to report suspected abuse. (Dkt. 34-1, paragraph 8.)

16. Father denied at trial that he kept K.E.N. home from school to conceal the injuries. The Guardian ad Litem testified that Father kept K.E.N.

out of school so teachers and other mandated reporters would not see the marks and bruises. The Court credits the Guardian ad Litem's testimony and K.E.N.'s disclosure on this point.

17. The stick incident was not isolated. The Guardian ad Litem testified that Father struck K.E.N. with a wire hanger while forcing her to kneel. The Court credits that testimony and finds that the hanger incident occurred.

18. The Court also credits K.E.N.'s disclosure that Father struck her on the head with her metal leg brace in 2023. Father was confronted about that allegation in writing and did not meaningfully address it. His later characterization of the conduct as merely "tapping" the child with the brace is minimization. (Dkt. 34-1, paragraph 3.)

19. The stick, hanger, forced-kneeling, and leg-brace incidents constitute a pattern of physical punishment involving objects, not a single impulsive event. The pattern is aggravated by Father's instruction that the child remain silent and his effort to prevent discovery by Mother and mandated reporters. Father's trial testimony demonstrated continuing lack of insight: he denied having an anger-management problem, denied committing domestic violence, rejected the need for therapy, and minimized his conduct as discipline, while acknowledging that he sometimes "loses it."

20. Father's February 2 declaration materially changed the account he gave under oath at trial: it acknowledged bruising, secrecy, nondisclosure to Mother, awareness of legal consequences, emotional scarring, and a need for treatment. These were not minor inconsistencies. They undermine Father's credibility and the reliability of promises that depend on his self-reporting or voluntary compliance.

**D. Domestic Violence and Psychological Harm.**

21. In 2017, Father pushed Mother to the ground, shattered a glass table or nightstand during the altercation, and dragged or forced her onto the balcony area of the parties' twelfth-floor residence. The conduct created an obvious risk of serious injury. Father's contemporaneous message that he "can't believe [he] let it go that far" corroborates the seriousness of the incident and is inconsistent with his later effort to characterize the conduct as protective or justified. (Joint Exs. 101-109.)

22. In 2023, Father punched Mother in the chest during an argument. Mother thereafter sought emergency medical care. (Joint Exs. 113, 120.)

23. At trial, Father minimized the 2023 incident and claimed that Mother injured herself while attempting to retrieve a cellular telephone. The Court does not find that explanation credible.

24. In his February 2 declaration, Father acknowledged breaking the nightstand, pushing Mother, the 2023 physical struggle, and the need for treatment so he would never again use physical or verbal control over Mother or the children. He stated that such conduct was "unacceptable" and that he "need[ed] to change." (Dkt. 34-1, paragraph 9.) His delayed acknowledgment reinforces the pattern of violence followed by minimization and later reinterpretation.

25. The Guardian ad Litem found K.E.N.'s fear of Father to be grounded in her lived experiences rather than merely the product of parental alienation. The Court credits that assessment.

26. K.E.N. consistently told Mother, Father, and the Guardian ad Litem that she did not want to return to Korea because she was afraid Father would hit her again. On March 11, 2026, during an in-chambers discussion with the Court, K.E.N. again expressed that she remained afraid of Father

and feared that she would be subjected to further abuse if returned to Korea. Her disclosures were detailed and materially consistent with Father's admissions concerning physical punishment, forced kneeling, injury, and secrecy.

27. The psychological harm did not end when the children left Korea. In August 2025, Father sent K.E.N. messages accusing Mother of crimes and abandonment and placed the child directly into the parties' litigation. Those communications compounded K.E.N.'s fear and emotional burden.

**E. <u>Expert Evidence, the Parties' Conduct, and Protective Measures.</u>**

28. The Court credits the portions of Dr. Leslie Dobson's testimony and declaration admitted for the limited purpose of evaluating concealment, trauma-based silence, and the practical operation of protective measures. Dr. Dobson explained that concealing injuries, avoiding mandated reporters, and reframing violence as loving discipline reduce the visibility of harm and make safeguards dependent on reporting and voluntary compliance less reliable. (Dobson Decl., paragraphs 5-12.)

29. Mother sent insulting and disparaging communications during the parties' acrimonious relationship. That conduct was inappropriate. It did not involve physical violence toward the children, concealment of injuries, or evasion of child-protection systems, and it does not negate the risk established by Father's conduct. Mother also complied with this Court's orders, completed anger-management and parenting programs, and continued individual therapy.

30. The Court considered Father's later enrollment in counseling and a 52-week batterer's intervention program. Those efforts began only after the abuse and concealment were exposed and after Father had denied under oath that he needed therapy. The record does not establish completion of the

program, sustained behavioral change, or a period of safe unsupervised parenting sufficient to overcome the other evidence of risk.

31. Father proposed counseling, parenting classes, school reporting, child therapy, appointment of a Korean guardian ad litem, transmission of this Court's order to schools and professionals, separate housing for Mother, and promises of compliance. Each proposed measure depends materially on prompt disclosure, voluntary compliance, reliable monitoring, or enforcement after a violation. Those are the same mechanisms Father previously defeated by abusing K.E.N. in private, directing her silence, withholding the abuse from Mother, and keeping her from school while injuries were visible.

32. Mother's presence in Korea would not sufficiently mitigate the risk. Mother lived in the same household during the relevant period and still did not learn of the 2024 abuse because Father acted privately and compelled K.E.N. to remain silent. Mother cannot reliably protect against conduct she is prevented from seeing or learning about.

33. The materials concerning Korean law and practice further reduce the reliability of temporary undertakings. Korean attorney Jiwon Min explained that recognition of foreign custody-related judgments generally requires finality; temporary or interim orders face substantial recognition and enforcement obstacles; enforcement commonly proceeds through indirect compulsion over an extended period; and international travel obligations may depend heavily on the cooperation of the parent controlling the child. The official 2026 United States Department of State report, considered only for the fact that the Department issued the report and made the stated determinations, records continuing failures to enforce return orders in Korea. That material corroborates, but is not the sole basis for, the Court's case-specific concern. (Min Decl., paragraphs 7-17, 43-55.)

34. The July 2026 temporary travel arrangement involving S.A.N. illustrates the same concern. Although Father represented that S.A.N. was scheduled to return to California, he simultaneously enrolled her in a Korean private school and declared that she should remain in Korea until the Korean court entered custody orders. The Court does not find that this establishes an actual later violation of the travel order; it does find that the conflicting representations materially undermine reliance on Father's promises as the principal safeguard.

35. Considering the admitted physical abuse, use of objects, bruising, secrecy, deliberate avoidance of mandated reporters, repeated domestic violence, K.E.N.'s fact-based fear, continuing psychological harm, Father's minimization and shifting accounts, and the insufficiency of the proposed protective measures, Mother has established by clear and convincing evidence that returning K.E.N. or S.A.N. to Father's primary control and the same household environment in Korea would expose the children to a grave risk of physical or psychological harm or otherwise place them in an intolerable situation.

## II. PROPOSED CONCLUSIONS OF LAW.

### A. Rule 52 and the Court's Limited Function.

Federal Rule of Civil Procedure 52(a)(1) requires the Court, after a bench trial, to find the facts specially and state its conclusions separately. In *Colchester v. Lazaro*, 16 F.4th 712, 727-29 (9th Cir. 2021), the Ninth Circuit held that a Hague ruling must resolve the material factual disputes and credibility questions rather than state only the ultimate conclusion. The findings above identify the evidence credited, the principal conflicts resolved, and the factual basis for the Court's decision.

The Convention and ICARA do not authorize this Court to determine the merits of custody. 22 U.S.C. section 9001(b)(4); Hague Convention arts. 16, 19; *Holder v. Holder*, 392 F.3d 1009, 1013 (9th Cir. 2004). The Court decides only whether the Convention requires or permits return. It does not decide which parent should have custody, the long-term parenting plan, or the ultimate custody forum except to the extent necessary to decide the treaty claim.

### B. Father Bears the Burden of Proving Wrongful Removal.

Under ICARA, Father must prove wrongful removal or retention by a preponderance of the evidence. 22 U.S.C. section 9003(e)(1)(A). He therefore must establish that, immediately before July 31, 2025, the children were habitually resident in Korea; that Mother's removal breached rights of custody attributed to Father under Korean law; and that Father was exercising those rights or would have exercised them but for the removal. Hague Convention art. 3.

Because Father has not carried his threshold burden on habitual residence, the Court need not decide whether the remaining elements of wrongful removal were otherwise satisfied. The failure to prove habitual residence independently requires denial of the Petition.

### C. <u>Father Did Not Prove Habitual Residence Under Monasky and Nisbet.</u>

Habitual residence is the place where the child was "at home" immediately before removal. *Monasky v. Taglieri*, 589 U.S. 68, 76-81 (2020). The inquiry turns on the totality of the circumstances and common sense. No categorical agreement, predetermined formula, or single fact controls. Parental intentions remain relevant when they illuminate the children's actual circumstances, but a shared intent to remain permanently is not a legal prerequisite.

Relevant circumstances include the duration and geography of residence, the children's ages, the immigration circumstances of the children and caregivers, academic activities, social relationships, meaningful connections, language, belongings, and the intentions and circumstances of caregiving parents. *Nisbet v. Bridger*, 124 F.4th 577, 584-90 (9th Cir. 2024). Physical presence and school attendance matter, but neither is dispositive when considered apart from the quality and settled character of the children's connections. *Id.* at 588-89.

The Court has considered the substantial facts favoring Korea: the children lived there for years, attended school, had familiar routines, and maintained relationships. Those facts do not end the inquiry. The family remained in Korea because Father could not lawfully enter the United States; Father repeatedly sought relief so he could live in the United States with his family; Father consented to a nearly year-long California residence in 2021-2022; his later communications continued to treat California residence as available; and the children's education and primary language were deliberately compatible with life in the United States.

On the complete record, the Court concludes that Father has not shown, by the greater weight of the evidence, that Korea had become the

children's settled home immediately before July 31, 2025. This conclusion does not depend on a categorical shared-intent rule. It follows from the totality of the children's circumstances, including the contingent reason for the family's presence in Korea and the repeated treatment of the children's residence as reversible.

**D. Article 13(b) Independently Authorizes Denial of Return.**

Even assuming Father proved wrongful removal, Article 13(b) provides an independent ground to deny return. A court is not bound to order return when the opposing party establishes that return would expose the child to a grave risk of physical or psychological harm or otherwise place the child in an intolerable situation. Hague Convention art. 13(b). Mother bears the burden by clear and convincing evidence. 22 U.S.C. section 9003(e)(2)(A).

The exception is narrow and is not a license to conduct a best-interests comparison. *Cuellar v. Joyce*, 596 F.3d 505, 508-10 (9th Cir. 2010). But abuse can satisfy Article 13(b) where the petitioning parent has actually abused, threatened to abuse, or inspired fear in the children, and domestic violence against the other parent may be relevant to the child's risk. *Colchester*, 16 F.4th at 718.

Article 13(b) does not require certainty that future injury will occur. It requires proof that the conditions attendant to return create a grave risk. Here, the Court evaluates the period following return before a competent custody court can enter and effectively implement durable protective orders. See *In re I.C.J.*, 13 F.4th 753, 765 (9th Cir. 2021).

**E. The Evidence Establishes Grave Risk by Clear and Convincing Evidence.**

The clear-and-convincing showing rests first on direct evidence, not speculation: Father admitted striking K.E.N. with a stick, causing bruises, instructing her not to tell, and failing to inform Mother. He understood the

conduct was unlawful and that teachers and doctors were mandated reporters. The Guardian ad Litem corroborated that Father kept K.E.N. home while the injuries were visible. The Court also credited the hanger, forced-kneeling, and leg-brace incidents.

The evidence establishes an ongoing risk because the abuse was accompanied by concealment and minimization. Father denied or reduced the conduct at trial, rejected the need for therapy, and supplied broader admissions only after trial. A protective system cannot operate reliably when the person whose conduct must be monitored has already hidden the injury, silenced the child, withheld the event from the other parent, and interrupted contact with mandatory reporters.

The household history reinforces that conclusion. The 2017 balcony incident and the 2023 chest-punch incident show physical e[redacted]tion against Mother separated by years, followed by apology, blame, minimization, or reinterpretation. The Court does not rely on domestic violence as a substitute for proof of risk to the children; it relies on that history as corroborating evidence of the same loss-of-control and delayed-accountability pattern shown in Father's treatment of K.E.N.

The psychological risk is independently substantial. K.E.N. repeatedly expressed fear that Father would hit her again, supplied details consistent with the proven conduct, and was found by the Guardian ad Litem not to be merely repeating an alienating narrative. Father then placed K.E.N. into the litigation through accusatory messages about Mother. The Court may consider that fear as evidence of grave risk without deciding a separate mature-child objection.

The younger child, S.A.N., need not first be struck with an object before Article 13(b) protects her. Return would place both children under Father's primary control in the same household system in which violence was

normalized, the older child's injuries were hidden, disclosure was discouraged, and the other parent was unable to detect the abuse. The risk to S.A.N. arises from exposure to that proven environment and Father's demonstrated use of physical and verbal control over family members.

Dr. Dobson's limited testimony was consistent with the factual record: secrecy, fear-driven silence, normalization of violence, and avoidance of mandated reporters make harm less detectable and measures dependent on disclosure less reliable. The Court's finding does not depend on expert opinion alone; the admissions, child disclosures, contemporaneous communications, and credibility evidence independently establish the defense.

**F. Mother's Misconduct Does Not Defeat the Defense.**

The Court has considered Mother's insulting and disparaging communications. They were inappropriate and are relevant to future custody and conduct orders. Article 13(b), however, is not a comparative-fault determination. The issue is not whether Mother was exemplary or whether Father was the worse spouse. It is whether return would expose the children to grave risk. Mother's communications do not negate Father's admitted physical abuse, concealment of injury, domestic violence, and the resulting fear and psychological harm.

Mother's post-removal compliance and completion of programs do not establish that she should receive custody, but they further demonstrate why the parties' misconduct is not equivalent for Article 13(b) purposes. Her conduct has been amenable to ordinary court restraints and treatment; Father's risk-producing conduct involved physical injury and evasion of the very systems proposed to detect recurrence.

### G. Golan Does Not Require Return Merely Because Measures Can Be Proposed.

Once grave risk is established, Article 13(b) lifts the Convention's otherwise-applicable return mandate and leaves the Court with discretion to grant or deny return. *Golan v. Saada*, 596 U.S. 666, 676-82 (2022). A court is not categorically required to examine every imaginable measure before denying return. It ordinarily should address measures raised by the parties or obviously suggested by the circumstances, but it may reject measures that are unworkable, ineffective, would intrude into custody merits, or would prolong the proceeding without reliably protecting the child. *Id.*; *Radu v. Shon*, 62 F.4th 1165, 1169-77 (9th Cir. 2023).

The Court has considered each category of measure Father proposed. Promises against corporal punishment are inadequate because Father previously concealed the abuse and gave materially incomplete sworn testimony. Therapy and a batterer's program do not eliminate the risk because Father began them only after litigation exposure, had earlier denied any need, and did not prove completion or durable change. School, therapist, or guardian reporting cannot sufficiently protect the children because Father previously kept the child from school and directed her not to report. Mother's return cannot serve as the safeguard because she was present in the household when abuse occurred without her knowledge.

The existence of Korean child-protection laws does not resolve the case-specific problem. Father admitted that he knew those laws, feared their consequences, and concealed the abuse for that reason. The question is not whether Korean law prohibits abuse; it does. The question is whether the measures proposed here would sufficiently mitigate the proven risk before and after a violation. The record shows they would not.

The Court therefore exercises the discretion recognized in *Golan* to deny return. The Court does not condition the children's safety on undertakings whose success depends on Father's candor, the children's immediate disclosure, or later enforcement after the children are again within his physical control.

**H. Foreign-Law and Enforcement Materials Reinforce the Case-Specific Finding.**

Federal Rule of Civil Procedure 44.1 permits the Court to consider any relevant material or source in determining foreign law, whether or not admissible under the Federal Rules of Evidence. *Radu*, 62 F.4th at 1173-75. The Court considered Ms. Min's declaration, the parties' submissions, and the official State Department report as sources concerning Korean recognition and enforcement practice.

Ms. Min explained that temporary foreign custody-related orders generally face a finality obstacle under Article 217 of the Korean Civil Procedure Act, that practical enforcement often proceeds through indirect compulsion over months, and that compliance with international travel obligations may ultimately depend on the parent who controls the child. The State Department report's official description of repeated enforcement failures provides corroborative context. The Court does not hold that Korean courts are categorically inadequate or that no Korean order can be enforced. The conclusion is narrower: these proposed temporary undertakings do not furnish a sufficiently prompt and reliable safeguard for these children on this record.

Father's July 2026 conduct reinforces that case-specific conclusion. While agreeing that S.A.N. would return on a stated date, he enrolled her in school in Korea and took the position that she should remain until the Korean court ruled on custody. Even without a finding that he ultimately

violated the travel order, those simultaneous positions demonstrate why a promise of future cooperation is not a sufficient guarantee of performance.

**I. <u>Disposition.</u>**

Father failed to establish by a preponderance of the evidence that Korea was the children's habitual residence immediately before July 31, 2025. The Petition is denied on that ground.

Alternatively and independently, assuming the removal was otherwise wrongful, Mother established by clear and convincing evidence that return would expose the children to a grave risk of physical or psychological harm or otherwise place them in an intolerable situation. The proposed ameliorative measures would not sufficiently mitigate that risk, and the Court exercises its discretion under Article 13(b) to deny return.

Accordingly, judgment shall be entered for Respondent Jasmine Pearl Na, and the Petition for Return is DENIED. This judgment determines only rights under the Hague Convention and ICARA. It does not adjudicate the merits of custody, visitation, or any permanent parenting arrangement.

**CONCLUSION**

For the foregoing reasons, Respondent respectfully requests that the Court adopt the proposed findings and conclusions, deny the Petition, and enter judgment in Respondent's favor.

Date: August 31, 2026

Respectfully Submitted,

**QUINN & DWORAKOWSKI, LLP**

<u>/s/ Stephane Quinn</u>
**STEPHANE QUINN, CFLS**
Attorneys for Respondent
JASMINE PEARL NA

**MERRITT MCKEON, ESQ. (SBN 187983)**
24001 Calle de la Magdalena #2845
Laguna Hills, CA 92653
Phone # (949) 584-1281
Email: merrittmck@hotmail.com
*Attorney for Petitioner JUNG WOOK NA,*

**STEPHANE QUINN, CFLS (SBN: 278188)**
**DAVID DWORAKOWSKI, CFLS, CALS (SBN: 135285)**
**QUINN & DWORAKOWSKI, LLP**
IRVINE CONCOURSE
2050 Main Street, 6th Floor, Suite 600
Irvine, California 92614
Telephone: (949) 660-1400
E-Mail: david@orangecountyfamilylaw.com
E-Mail: quinn@orangecountyfamilylaw.com
*Attorneys for Respondent JASMINE PEARL NA*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DISTRICT**

| | |
|---|---|
| JUNG WOOK NA,<br>*PETITIONER,*<br><br>VS.<br><br>JASMINE PEARL NA,<br>*RESPONDENT.* | CASE NO: 8:25-CV-02479-DOC-ADS<br><br>STIPULATION AND ORDER RE. TEMPORARY TRAVEL OF MINOR CHILD S.A.N. TO THE REPUBLIC OF KOREA |

Petitioner/Father JUNG WOOK NA ("Father") and Respondent/Mother JASMINE PEARL NA ("Mother") (collectively, the "Parties"), by and through their respective counsel, hereby stipulate to the following modification of the temporary emergency orders issued by the Orange County Superior Court on October 29, 2025, in Case No. 25FL001112 (the "Order"), as adopted by this Court and as subsequently modified by the parties' Stipulation and Order dated March 19, 2026:

**RECITAL**

On October 29, 2025, the Honorable Mary Kreber-Varipapa presiding, of the Orange County Superior Court, issued temporary emergency orders in Case No. 25FL001112 (See attached Minute Order dated 10/29/2025), pending the resolution of Father's petition under the Hague Convention on the Civil Aspects of International Child Abduction currently being litigated in the Federal District Court in this case.

Those temporary orders provided, among other things, that the minor children K.E.N. and S.A.N. be placed in the custody of paternal grandfather Chun Jang Na, and that the children would temporarily reside with family friends Randy Hoang and Crystal Hoang.

On March 19, 2026, the Parties entered into a Stipulation and Order (the "March 19, 2026 Stipulation and Order") modifying the October 29, 2025 emergency orders to substitute the maternal grandparents, Joy Chang and Antony "Tony" Chang, in place of Randy Hoang and Crystal Hoang as the persons with whom the minor children temporarily reside, to make the maternal grandparents responsible for the children's school transportation, and to designate the maternal grandparents as the monitors of Respondent/Mother's parenting time in place of a professional monitor, while otherwise leaving the October 29, 2025 orders in full force and effect.

The Parties now wish to modify the Court's Order, as modified by the March 19, 2026 Stipulation and Order, to permit the minor child S.A.N. (date of birth [redacted] 2019) to travel temporarily to the Republic of Korea, accompanied by her maternal grandfather, Antony "Tony" Chang, and to return to the United States on or about August 16, 2026, as set forth below. The Parties further wish to modify the prior orders to lift all restrictions on Respondent/Mother's parenting time, including the requirement of a monitor, and to modify the geographic restrictions on the minor children, as set forth

below. The Parties agree that all other provisions of the prior orders shall remain in full force and effect except as expressly modified herein.

NOW, THEREFORE, the Parties stipulate and agree as follows:

**1. Temporary Travel to the Republic of Korea.**

Notwithstanding the provision of the October 29, 2025, Order requiring the minor children to remain in Orange County, the Parties stipulate that the minor child S.A.N. (date of birth [redacted] 2019) may travel temporarily to the Republic of Korea, accompanied by her maternal grandfather, Antony "Tony" Chang ("Mr. Chang"). Such travel shall occur within five (5) days of the date of this Order. During her stay in the Republic of Korea, S.A.N. shall be in the custody of her father, Petitioner Jung Wook Na.

**2. Return to the United States.**

On or about August 16, 2026, S.A.N. shall be returned to the custody of Mr. Chang, who shall transport S.A.N. from the Republic of Korea back to the United States.

**3. Release of Passports.**

The Office of the Orange County District Attorney is hereby ordered to release to Mr. Chang his passport and the passport of S.A.N. forthwith, to permit the travel authorized by this Stipulation and Order.

**4. Costs of Travel.**

The maternal grandparents, Joy Chang and Antony "Tony" Chang, shall bear the costs of S.A.N.'s travel to the Republic of Korea.

**5. Modification of Respondent/Mother's Parenting Time.**

All restrictions on Respondent/Mother's parenting time with the minor children K.E.N. and S.A.N. are hereby lifted, including the requirement that her parenting time be monitored. Respondent/Mother shall have unmonitored and unrestricted parenting time with the minor children, and the designation of the maternal grandparents, Joy Chang and Antony "Tony" Chang, as

monitors of Respondent/Mother's parenting time under the March 19, 2026, Stipulation and Order is hereby vacated.

Mother shall have video or telephone contact with S.A.N. not less than four times per week.

**6. Modification of Geographic Restrictions.**

The provision of the October 29, 2025, Order requiring the minor children to remain in Orange County is hereby modified. The minor children K.E.N. and S.A.N. may be removed from Orange County. The minor child S.A.N. may travel outside the State of California and outside the United States solely as provided in this Stipulation and Order for purposes of her travel to the Republic of Korea. The minor child K.E.N. shall not be removed from the State of California until further order of the Court.

**7. Pre-Departure Outing.**

The Parties agree that, prior to S.A.N.'s departure for the Republic of Korea, Respondent/Mother may take the minor children K.E.N. and S.A.N. to SeaWorld in San Diego, California.

///

///

///

///

///

///

///

///

///

///

///

///

**8. All Other Orders Remain in Effect.**

Except as expressly modified by this Stipulation, all other provisions of the October 29, 2025, Order, as modified by the March 19, 2026, Stipulation and Order, including but not limited to child communication orders, Petitioner/Father's telephonic/video contact, and the Talking Parents provisions, shall remain in full force and effect and are not modified by this Stipulation. For the avoidance of doubt, the restrictions on Respondent/Mother's parenting time (including the monitor requirement) and the requirement that the minor children remain in Orange County are modified as expressly set forth above.

**THE FOREGOING IS AGREED TO BY:**

Dated: June 9, 2026

____________________________
JUNG WOOK NA
*Petitioner*

Dated: June 9, 2026

____________________________
JASMINE PEARL NA
*Respondent*

**APPROVED AS TO FORM ONLY:**

Dated: June 9, 2026

____________________________
MERRITT MCKEON, Esq.
*Attorney for Petitioner*

Dated: June 9, 2026

____________________________
STEPHANE QUINN, CFLS
*Attorney for Respondent*

Dated: June 9, 2026

____________________________
LONI KLEIN, Esq.
*Guardian Ad Litem/Minor's Counsel*

**IT IS SO ORDERED**

Dated: June 22, 2026



____________________________
HON. DAVID O. CARTER
United States District Judge

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

Jung Wook Na

Plaintiff(s),

v.

Jasmine Pearl Na,

Defendant(s).

Case No. 8:25-CV-02479-DOC-ADS

**ORDER GRANTING STIPULATION [46]**

On MARCH 19, 2026, the Petitioner Jung Wook Na and Respondent Jasmine Na, entered into a stipulation regarding temporary emergency custody of the minor children, K.E.N. and S.N.A., pending resolution by the Court of Petitioner's Hague Convention Petition.

The Court, having considered the Stipulation, hereby **GRANTS** the Stipulation and **ORDERS** as follows:

1. The minor children shall remain in the custody of Paternal Grandfather, Cun Jang Na, and shall temporarily reside with Joy Chang and Tony Chang, the Maternal Grandparents of the minor children, in lieu of Randy Hong and Crystal Hong, pending further order of the Court, forthwith.

Case: 26-6195, 11/17/2026, DktEntry: 27.7, Page 45 of 83

2. Joy Chang and Tony Chang shall now be responsible for transporting the minor children to and from school.

3. Joy Chang and Tony Chang are to be placed on the minor children's school safe pick-up list, replacing Randy Hong and Crystal Hong.

4. Once the children reside with Joy Chang and Tony Chang, the monitoring of Mother's 10 hours of weekly parenting time shall no longer require a professional monitor. Maternal Grandparents shall act as monitors during Mother's parenting time.

5. The scheduling of Mother's monitored parenting time shall be coordinated with Maternal Grandparents.

6. All other aspects of the Minute Order of October 29, 2026, from the Superior Court of California, County of Orange, shall continue in full force and effect.

7. Petitioner Jung Wook Na shall continue to have unmonitored and unlimited telephone, zoom, or video communication and parenting time, with the children.

8. Neither party or custodial person shall permit the children to be subjected to any discussion of the case or the potential residence of the children.

9. The passports belonging to Randy Hong and Crystal Hong, currently in the possession of the Orange County District Attorney's Office, are **ORDERED** released immediately. The passports being held by the Orange County District Attorney's Office which belong to Jasmine Na, Joy Chang, and Tony Chang, will continue to be held by the District Attorney's Office.

IT IS SO ORDERED.

Dated: March 23, 2026

David O. Carter

UNITED STATES DISTRICT JUDGE
HON. DAVID O. CARTER

**MERRITT MCKEON, ESQ. (SBN 187983)**
24001 Calle de la Magdalena #2845
Laguna Hills, CA 92653
Phone # (949) 584-1281
Email: merrittmck@hotmail.com
*Attorney for Petitioner JUNG WOOK NA,*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DISTRICT**

| | |
|---|---|
| JUNG WOOK NA,<br>*PETITIONER,*<br><br>VS.<br><br>JASMINE PEARL NA,<br>*RESPONDENT.* | CASE NO: 8:25-CV-02479-DOC-ADS<br><br>DECLARATION OF PETITIONER IN SUPPORT OF AMELIORATIVE MEASURES OR UNDERTAKINGS FOR THE RETURN OF THE MINOR CHILDREN TO KOREA |

**DECLARATION OF JUNG WOOK "DANIEL" NA**

1. I am the Petitioner in this action and I make this declaration in support of the children's return to Korea, their State of Habitual Residence.

2. I believe the Court will be wanting to know what ameliorative measures can be taken in Korea to assure the minor children, K.E.N., and S.A.N., ages 11 and 6, are safe, well cared for, and emotionally secure if they reside primarily in Korea with me, while in a shared custodial relationship with their Mother, Jasmine Na.

3. I understand that after taking evidence, the Court may be inclined to find there is a Grave Risk under Article 13(b) of The Hague Convention, due to my hitting our daughter K.E.N. with a stick, and telling her not to tell anyone about it. Further, I understand the Court may believe that I not only made K.E.N. kneel when she was younger, but also hit her with a coat hanger. Further, that what I felt was tapping K.E.N. with her metal brace, because she had to wear it or grow to be permanently deformed, was perceived by K.E.N. as being hit.

4. I am very remorseful at hearing this, and am deeply ashamed of ever making my child feel unsafe. I have been the primary caretaker for both of my children for many years, always wanting Jasmine to care for them either here or in the United States with her family in Irvine, and to be able to parent them with Jasmine, whether or not we remained married.

5. While I did not ever want to be separated from them, Jasmine was unable to care for the children by herself in 2021-2022, and so I never felt she could take care of the children without my help. I do want to co-parent with her and give the children the comforts of their familiar home in Korea, friends, and school. I believe Korea has always been the children's state of Habitual Residence, and they want to return home.

6. Jasmine and I have had a very contentious, volatile, and even toxic relationship.

7. I deeply regret not telling Jasmine I had hit K.E.N. With a stick and left bruises. I also regret that I did not get counseling for myself and the children, as I did not realize until Jasmine's expert testified about the trauma of hiding this incident, would make for my precious child. I was very unaware of the effect this would have on K.E.N., and want us all to get counseling so it never happens again. I want safeguards so I am always conscious of my behavior and the imporatance it has on my daughters.

8. The only explanation or "excuse," for these inexcusable acts, is that I did fear Korean law, as it is just as harsh as US or California law. I knew under the newly revised laws, I could lose my children and I could have faced criminal prosecution, which I could still face. I deeply regret my actions and hope to make changes whatever the court decides. Just as child abuse is punished and reportable by teachers and doctors in the USA, so it is in Korea, since the laws have changed in the past 6 years, especially with mandated reporting, in 2023.

9. I am in counseling for years of verbal abuse. I have felt emasculated repeatedly, but I beg the Court not to quote from Jasmine's ugly texts. While she did hit me, and while I did break a nightstand table and push her out of the room in 2017, and we had a tussle over a cell phone in 2023, I did not perceive this as domestic violence. Jasmine obviously has and I want to get treatment so that I never use any form of physical or verbal control over my children or wife, as this is unacceptable and I need to change

10. I have always tried to support Jasmine, as she is a remarkably talented person with skill sets that helped me as I began my career in Korea as an entrepreneur. She wrote a novel which was published but not a best seller, and I do believe she is incredibly talented with writing and art. I want to support that. I want Jasmine to be encouraged to use her gifts as I have been using mine, for the sense of making money for my family. I know she yearns to have self expression and recognition, and I believe in her talents. They should be encouraged, as most writers, I understand, may not succeed with their first novel, but find success later, making that first effort valuable years later.

11. As for my own work, I want to say in the past few weeks, using my skills from the MBA I was awarded in August 2025, and restarting the clothing company which was kind of shut down with little participation by me

while I was studying, from 2024-2025, I have earned money over the past few weeks.

12. I did not have that happening in November 2025. I had exhausted my savings and hired a lawyer, Ms. McKeon, who agreed to do my case for a flat fee of $10,000 due to my reduced circumstances. I had lent money to my dad as I will explain, by investing in a Restaurant.

13. The restaurant is actually run by my brother and sister in law. My brother has a son with his wife. My family has had to make a lot of sacrifices to try to help my brother, as we knew he had a disability; he did so poorly in school and could not hold a job which would support him and his family.

14. My brother was diagnosed with an intellectual disability 20 years ago. He is what used to be called "retarded," but very functional. Between him, his wife, and staff at the restaurant, he is able to support his family.

15. I did lend my dad this money during my marriage, and he pays me as he can. My father came to the US on a limited 90 visa and has returned before his visa ran out, on January 23, 2026, and will be having a surgery. I cannot really expect that he and my brother will be able to repay me in a lump sum, but the repayment of money has supported Randy and Crystal Hong's heroic efforts at caretaking the children during this proceeding. I have relied on rent from the residential building where I have resided with my family and children, to pay the interest only mortgage.

16. My property would instantly go to auction if I miss a payment, and so I stupidly said I have no equity, as I never planned to sell the building while we were living there. I live with my mother, father, children, and the live in Nanny.

17. The Nanny, Brigette, will be able to care for the children if they are returned. She is in the process of renewing her visa.

18. The children have been enrolled in the Korea International School, which is ready to receive them at any time. I have been an active parent there, volunteering and so forth, and I am ready to face whatever happens if the children come back and the school is aware I hit K.E.N. in 2024. I believe they will assure that K.E.N. would report any abuse or verbal threats or anything, because they were deeply concerned by K.E.N. and what I now see in retrospect, was her emotional scarring from my hitting her and telling her not to tell.

19. My income in November 2025 was indeed zero. I had only a few hundred dollars in the bank. I do have a car, a used Maserati, which I plan to sell as I will be probably be needing money. I did not realize this was an asset I should have disclosed, as its value is $25,000 or so and I need a car for the children and myself, and business, so a used car will still cost about that much, but I should have discosed it. I am very sorry I did not explain this in the FL-150 form. At the time I signed it, I was broke and depending on my disabled brother's business to repay an investment I never thought I would need money from. The rents in our building provide a minimal $2,000 a month which has paid the interest-only mortgage. We pay for our housing cost, through the rent, with very little over that.

20. I wanted the court to understand this was complicated and I recently began to earn money from the business which was semi shut a year or more ago so I could go to school and work on my MBA.

21. I plan to take only part time courses to do my PhD., if I need to reduce my hours of schooling.

22. I propose the following ameliorative measures:

a. Both parents to enroll in counseling with a focus on healing their own trauma and understanding the effect their actions have had on their children;

b. Formal 52 week "batterer treatment" or as directed by the court;

c. Formal parenting classes, in-person, with certificates to be presented to the Court as well as respective Family Courts in both countries, Korea and the USA, for both parents;

d. Children to be enrolled in child centered therapy as recommended by their GAL Loni Klein;

e. Counsel for the children to be hired in Korea, as a GAL so that their interests are protected by the attorney there, with annual reports made to the courts, assuring the children are indeed safe;

f. Minor children K.E.N. and S.A.N., shall be informed that they may contact their GAL, if they have any concerns or questions about how they are being cared for in either country, by either parent, so that if it rises to a level of concern for the GAL, the GAL may make an *ex parte* request in the respective country's family court, or addressed at the discretion of the GAL, or take any other measure the GAL deems necessary;

g. The State which the Court determines is the appropriate jurisdiction to determine custody, may change any order made in order to conform to the best interests of the children, after it makes its own determinations and holds further hearings;

h. GAL in Korea to be chosen by both parties through their attorneys, to assure the GAL is in communication with Loni Klein in Orange County, California;

i. Family Court in Korea to be made aware of the Grave Risk finding so that the Family Court in Korea may further inquire and potentially pose more restrictions;

j. Jasmine Na shall be provided with a comfortable safe place to stay when she is in Korea; assistance shall be given to her by

Petitioner Jung Wook Na to assure she has easy entry to the country and may stay there for custodial time with the children;

k. The children's schools, GAL, and therapists will have a copy of the order.

13. I believe that a form of this order could be adopted by the Court regardless of where the Court orders,

14. I want the children to be returned to their state of habitual residence as soon as possible, mindful that the court and attorneys will need time to assure I am in compliance with the orders and that all guardrails are in place.

15. I do not believe it is in the children's best interests to remain with Randy and Crystal Hong, but rather, that so long as they have a therapist in place in Irvine, they should return to their mother and she should also be doing parenting and other counseling.

16. If we are all doing this, I think the children can come to me in Summer and return well prior to school starting, to have a progress report made.

17. On Sunday, February 1, 2026, at approximately 6:45 pm PST, I had a call with K.E.N. where she expressed a strong desire to return to Korea, to be with her friends and school friends. I have attached a copy of the rough transcript of the call and have sent the recording and transcript to both counsel for Respondent and the GAL, and to the Court clerk.

18. I believe the Court may order the GAL to speak with K.E.N. again, to see if K.E.N. sincerely wants to return to Korea, and if she is being pressured by me or her mom, or anyone. I do not believe I have pressured the children.

19. If the Court adopts a form of Ameliorative Measures, the children can tell always the GAL in whichever court they are in, how they feel without manipulation by either parent. The children could continue therapy via zoom, or be enrolled in a therapy program in Korea.

20. I believe that this is a very robust and workable undertaking or ameliorative measures, and that the court can consider this in order to relieve the court of concern that harm will come to the children.

21. I ask again that whatever the court orders, that in its decision, Jasmine's ugly words to me not be included. I believe she was angry with me. She did not want to stay in Korea, and she believed I was unfaithful which I deny.

22. I am not sure if Jasmine really meant any of the really horrible texts about other men. Perhaps she was simply inventing these ugly scenes in her mind, wanting to provoke me or expressing her anger in the most painful way she knew. I beg the court not to use those words in any decision it makes, as it would haunt the children and taint Jasmine's reputation unfairly. Of course I am also humiliated by the thought of these words being repeated in a publicly available document. I ask that the Court consider this request as I believe I was traumatized and that publication of the words will re traumatize me, forever.

23. Jasmine and I can learn to coparent, with help. I know we both love the girls. Neither one of us can, alone, raise these precious children.

24. I believe my proposal that Jasmine enjoy time with the girls every summer, winter, and spring break, in the USA, and as often as she desires to come to Korea or even meet for a weekend in Tokyo, or

another country, with regular zoom calls for me and for her with the girls, regardless of where the girls live, is a true shared parenting plan.

25. Korea, much like Japan, does not have joint bank accounts or joint custody orders, unless agreed to by parents.

26. I will make every effort to obtain an expungement or reduction of my criminal record in the California Courts, so that I can visit the girls if they are ordered to live there, but it is highly uncertain.

27. My criminal record in Korea is actually expunged and the record used in the trial states it is for my personal use. It is actually a crime to have this record used, but I do not think it is necessarily a bar to me getting a visa in the future to the USA.

28. I ask the Court to consider the effect that giving K.E.N. a voice in this matter, and to have the GAL interview her now, before they come back to Korea, and during visits or custodial time in the USA.

29. K.E.N. will be 12 in December, and the Korean courts would hear from her. I understand the age of 14 is the age in California where family courts are mandated to hear from children in a custody decision.

30. My eldest daughter should be given a voice in these proceedings, now and when entered as orders in Family Courts in either country, she should have the same right as she would in Korea.

31. Hiring an agreed GAL for her in Korea makes sense no matter what the Court decides. S.A.N., now 6, is also recommended to be assisted as she moves from either country, by K.E.N.'s shared GAL.

32. I understand the court's deep concern for the children. I thank the Court for the opportunity to try to work things out with

Jasmine, and those efforts so far have not proven fruitful. Perhaps with more time, we could come to an agreement.

33. I remain hopeful the children can return to school here. We both had discussed educational plans together over the years and I believe Jasmine was fine with the girls attending Korea International School, but of course, when she learned I had hit K.E.N., she left with the children.

34. I am hopeful that the court will know I have not been accused by Jasmine except through her expert, of using drugs. I have never been accused of using methamphetamine. Jasmine and I both tried that drug in 2003, when we were very young, and we both stopped using the drug because we saw the effect it had on the people we knew who used it regularly. I am willing to do regular hair follicle testing, and have not been concerned that Jasmine is doing drugs. I did take the expert's testimony about the trauma of hiding abuse, to heart, despite feeling blindsided with the accusation of being a drug abuser. I am very sober and do not use drugs of any kind, and limit any alcohol use.

35. My church does not approve of spousal abuse, child abuse, or drug abuse. They are all considered both sinful and unlawful. I am ashamed and have sought prayer and will do whatever it takes to assure my children are physically and emotionally safe in my home.

36. I remain ready to follow any order of the Court which will assure the court has ample means to enforce its order, including placing a lien on the building I own and which the children have resided, for years, I have no intention of breaking the order, no matter what the order is, whether the Court believes this offer of Ameliorative Measures is sufficient to keep the children from being returned, or

whether the Court only permits me custodial time in Korea on a limited basis.

37. Thank you for your consideration of my intentions and behavior.

38. I certify that the foregoing is true and correct.

Dated:

JUNG WOOK "Daniel" NA
*Petitioner*

signature page attached

whether the Court only permits me custodial time in Korea on a limited basis.

37. Thank you for your consideration of my intentions and behavior.

38. I certify that the foregoing is true and correct.

Dated: 02/02/2026

JUNG WOOK "Daniel" NA
*Petitioner*

RushTranslate
+1 206-672-5052 I support@rushtranslate.com

ata
MEMBER #263976

# Certification of Translation Accuracy

Translation of **Text About Bruises and Forgiveness** from **Korean** to **English**

As an authorized representative of RushTranslate, a professional translation services agency, I hereby certify that the above-mentioned document has been translated by an experienced, qualified and competent professional translator, fluent in the above-mentioned language pair and that, in my best judgment, the translated text truly reflects the content, meaning, and style of the original text and constitutes in every respect a complete and accurate translation of the original document. This document has not been translated for a family member, friend, or business associate.

This is to certify the correctness of the translation only. I do not make any claims or guarantees about the authenticity or content of the original document. Further, RushTranslate assumes no liability for the way in which the translation is used by the customer or any third party, including end-users of the translation.

A copy of the translation is attached to this certification.

Mike Bortscheller
Authorized Representative
Order Date: November 10, 2025

RushTranslate
640 South Fourth Street
Suite 300
Louisville, KY 40202
United States

TRANSLATION
CERTIFIED
ATA MEMBER
# 263976
RUSHTRANSLATE

RushTranslate
+1 206-672-5052 I support@rushtranslate.com

ata
MEMBER #263976

Messages – No Name (+821062699213) +19492026220, +821062699213, [redacted], +821074219213

7/31/25 10:57:54 PM PDT

No Name (+821062699213)
Did you feed Snoopy?

7/31/25 10:58:02 PM PDT

Yeah

7/31/25 10:58:12 PM PDT

No Name (+821062699213)
When did you last feed him?

7/31/25 10:58:20 PM PDT

Today

7/31/25 10:58:22 PM PDT

No Name (+821062699213)
Did you take him to Japan?

7/31/25 10:58:49 PM PDT

No Name (+821062699213)
Did you go to Oya-dong today?

7/31/25 10:58:57 PM PDT

No Name (+821062699213)
Answer a video call for a second.

7/31/25 11:02:49 PM PDT

No Name (+821062699213)
[redacted]

7/31/25 11:05:23 PM PDT

No Name (+821062699213)
I'm saying this because I'm genuinely worried. I'm about to call the police right now.

7/31/25 11:05:38 PM PDT

. Dad, I don't want to live with you. I want to live with Mom.
You hit me, and because of that, I got bruises and scars.

Messages – No Name (+821062699213) +19492026220, +821062699213, [redacted], +821074219213

7/31/25 11:05:52 PM PDT

No Name (+821062699213)
Is that why you went to the US?

7/31/25 11:06:09 PM PDT

No Name (+821062699213)
I told you I was so wrong back then and asked you to forgive me.

7/31/25 11:14:05 PM PDT

No Name (+821062699213)
So when are you coming back from Japan?

7/31/25 11:14:16 PM PDT

No Name (+821062699213)
Where is Snoopy? Uncle Louis told me to come get him.

7/31/25 11:25:56 PM PDT

No Name (+821062699213)
[redacted], please just talk to me.

8/1/25 12:12:14 AM PDT

No Name (+821062699213)
[redacted]?

8/1/25 12:39:16 AM PDT

No Name (+821062699213)
No matter where you are, don't worry because Dad loves you.
Have fun with Mom in the US, but you have to be back before school starts, okay?

8/1/25 1:33:33 AM PDT

No Name (+821062699213)
Are you in Japan? Did you go to Disney?

8/1/25 6:07:52 PM PDT (Edited 8/1/25 6:08:11 PM PDT)

No, I'm not going back. If I do, you'll just hit me again.
(Edited)

Text me when it’s done



I left it here

Text message
2025-07-27 오후 11:59:11

0.3gp

**제목없음**
[국외발신]

iMessage
2025-07-28 오전 12:57:10

Jasmine,

I’m asking you to please stop for a moment and truly listen to me.

Lately, I’ve been feeling that your anger is overwhelming everything between us. Some of the messages you've sent have felt extremely disrespectful and hurtful. I don’t understand why you would send me messages describing intimate things with other men—that’s not only painful but damaging to any chance of healthy communication between us.

Just an hour ago, you accused me of seeing someone else simply because I went to a movie alone. This level of distrust is exhausting, and it feels like I’m constantly being punished or blamed no matter what I do.

I know we’ve grown apart over the years. I’ve made mistakes—especially early on when we got married and moved to Korea. I was immature, but I genuinely tried to work hard, take care of the kids, and support you. When I saw your mental health declining, I was truly scared. That’s why I agreed to let you take the kids and move back to the U.S.—it was the hardest decision I’ve ever made. I knew the risks, including that we might not recover as a couple.

When you left and Ben passed away, I fell into a deep depression. I ended up reconnecting with old friends and spent one night socializing and drinking. Nothing inappropriate happened, but I lied about it at the time because I was afraid you'd react harshly—based on past experiences. That was wrong, and I apologize.

You've also made mistakes, and I've tried to forgive them. When you were unfaithful, I chose to understand and move forward. I told myself maybe you were trying to find happiness during a hard time. But the pattern didn't stop, and eventually it wore me down. Meanwhile, you said taking care of the kids was too much, and I agreed to take them back, thinking it was temporary.

What hurt me deeply was [redacted] telling her school counselor she felt like her mom didn't like her. The counselor said a five-minute call each week would make a huge difference. When I shared this with you, your response was that you couldn't promise something you might not keep. That moment broke something in me. It was when I truly started believing that divorce might be the only way forward.

Regarding the video you sent—yes, I did discipline [redacted] physically twice, once when she was little and once last year. I regret it deeply and would never do it again. I love her, and I've always tried to make things right afterward. I'm not perfect, but I've always tried to learn from my mistakes.

About Taeyeon's mom—there has never been anything romantic between us. We were friends who bonded over parenting. Her husband misunderstood a situation involving mutual friends, and after that, we stopped seeing each other. I'm not seeing anyone now. I'm not in a place emotionally or financially to even think about dating.

Please stop accusing me of things that aren't true. I'm trying my best with what little energy I have left. I know you've gone through your own struggles too—including substance use and difficult relationships. I was genuinely worried for you. But if you're clean now and focused on building a better future, I sincerely support that and respect your effort.

As for the divorce, I know you're counting on some financial support, but I'm truly struggling. I don't spend money on luxuries or go out like I used to. I'm doing my best to provide for the kids and keep things afloat.

We can figure out custody arrangements together, but I also want to be practical about your situation in Korea—especially your visa and health insurance. If it helps you to stay covered, I'm willing to find a solution that works for both of us.

I'm not your enemy, Jasmine. I want peace—for you, for me, and most importantly, for our children.

2025-07-28 오전 2:20:26

I'm so grateful God didn't allow u back into USA

I didn't understand at the time but everything happens for a reason

U can rot here forever





L - 002

2017-01-07 오후 7:03:39

Randy is here

2017-01-07 오후 7:04:02

Im gonna pick him up from the entrance of the community and walk up

2017-01-07 오후 8:17:01

Jasmine Pearl Na (+821068789213)

Uh r u coming back

2017-01-07 오후 8:17:30

Ofc

2017-01-08 오후 5:50:46

Baby im really sorry. I have no excuse no matter what

2017-01-08 오후 8:48:21

Jasmine Pearl Na (+821068789213)

I hate u go die

2017-01-08 오후 8:48:49

Jasmine Pearl Na (+821068789213)

It's over for good

2017-01-08 오후 8:49:04

Jasmine Pearl Na (+821068789213)

I will never go back with u ever

2017-01-08 오후 8:49:55

Jasmine Pearl Na (+821068789213)

I just hope someone will kick ur fucking ass for me like the little bitch u deserve

2017-01-08 오후 11:27:58

Im
So sorry it will never happen again i cant believe i let it go that far

2017-01-08 오후 11:49:51

Jasmine Pearl Na (+821068789213)

no it's over



Exported from: D (D6GL7MJHJQ) on 2025.11.01, 21:46 with iMazing 3.4.0 by DigiDNA
Database date when extracted: 2025.08.20, 17:38
Backup checksum: C3ACE93658AC2351E3209E82AF95E28846B5D3D435E540581314B89D5B23EDF0

2017-01-08 오후 11:49:56

Jasmine Pearl Na (+821068789213)
there's no chance

2017-01-08 오후 11:50:14

Jasmine Pearl Na (+821068789213)
we're turning in divorce papers asap

2017-01-08 오후 11:53:07

Jasmine Pearl Na (+821068789213)
u better get all the forms ready tmw

2017-01-09 오전 3:42:12

Sorry im so sorry

2017-01-09 오전 3:42:20

Give me a chance

2017-01-09 오전 9:30:00

Where are you

2017-01-09 오전 9:30:06

Hello?

2017-01-09 오전 9:30:08

Where are you

2017-01-09 오전 9:30:19

Are u wth another man?

2017-01-09 오전 9:47:13

Please where are you

2017-01-09 오전 9:57:26

Baby where are u

2017-01-09 오전 9:57:36

I sweat i will be good husband

2017-01-09 오전 9:58:08

Never lie never cheat never treat you wrong. Treat you like the most important person you are

2017-01-09 오전 9:58:35

I am nothing without you. You are the best thing that has ever happen to me. Please forgive me last time

2017-01-09 오후 12:19:35

Ill goto counseling. I will do anything please give me one last chance

2017-01-09 오후 12:19:43

Where are you please answer me

2017-01-09 오후 12:19:49

I looked everywhere for you

2017-01-09 오후 1:19:12

Jasmine Pearl Na (+821068789213)

no Daniel

2017-01-09 오후 1:19:16

Jasmine Pearl Na (+821068789213)

it's over

2017-01-09 오후 1:19:21

Jasmine Pearl Na (+821068789213)

u abused me

2017-01-09 오후 1:19:26

Jasmine Pearl Na (+821068789213)

u have been for many times now

2017-01-09 오후 1:19:31

Jasmine Pearl Na (+821068789213)

throwing nightstand at me

2017-01-09 오후 1:19:36

Jasmine Pearl Na (+821068789213)

u went too far

2017-01-09 오후 1:19:46

Jasmine Pearl Na (+821068789213)

u tried to throw me off the window and told me to die!



Exported from: D (D6GL7MJHJQ) on 2025.11.01, 21:46 with iMazing 3.4.0 by DigiDNA
Database date when extracted: 2025.08.20, 17:38
Backup checksum: C3ACE93658AC2351E3209E82AF95E28846B5D3D435E540581314B89D5B23EDF0

2017-01-09 오후 1:19:51

Jasmine Pearl Na (+821068789213)
u forget?

2017-01-09 오후 1:19:53

Jasmine Pearl Na (+821068789213)
I hate u

2017-01-09 오후 1:19:58

Jasmine Pearl Na (+821068789213)
and that's all I feel for u now

2017-01-09 오후 1:20:08

Jasmine Pearl Na (+821068789213)
I just want u to get beat up by someone else

2017-01-09 오후 1:20:14

Jasmine Pearl Na (+821068789213)
I will never be with u again

2017-01-09 오후 1:20:17

Jasmine Pearl Na (+821068789213)
I'm not stupid

2017-01-09 오후 1:20:22

Jasmine Pearl Na (+821068789213)
u getting worse and worse

2017-01-09 오후 1:20:24

I didnt mean any of that. I just love you too much

2017-01-09 오후 1:20:28

I wont ever

2017-01-09 오후 1:20:30

Jasmine Pearl Na (+821068789213)
if there is a first time there will be a second time

2017-01-09 오후 1:20:34

Jasmine Pearl Na (+821068789213)
Chris swore up and down



Exported from: D (D6GL7MJHJQ) on 2025.11.01, 21:46 with iMazing 3.4.0 by DigiDNA
Database date when extracted: 2025.08.20, 17:38
Backup checksum: C3ACE93658AC2351E3209E82AF95E28846B5D3D435E540581314B89D5B23EDF0

2017-01-09 오후 1:20:36

And i will go counseling

2017-01-09 오후 1:20:41

Jasmine Pearl Na (+821068789213)
u think he was crazy the first time

2017-01-09 오후 1:20:46

No

2017-01-09 오후 1:20:50

But im different

2017-01-09 오후 1:20:54

I can control my self

2017-01-09 오후 1:20:57

Jasmine Pearl Na (+821068789213)
I'm gonna get out of this relationship before it gets worse and I'm damaged for years again

2017-01-09 오후 1:20:59

Where are you

2017-01-09 오후 1:21:01

Im scared

2017-01-09 오후 1:21:02

Jasmine Pearl Na (+821068789213)
no u clearly cannot

2017-01-09 오후 1:21:08

You with another man?

2017-01-09 오후 1:21:11

Jasmine Pearl Na (+821068789213)
my phone is out of batteries soon

2017-01-09 오후 1:21:15

Jasmine Pearl Na (+821068789213)
maybe

2017-01-09 오후 1:21:20

Please

2017-01-09 오후 1:21:33

Jasmine Pearl Na (+821068789213)
funny how David was the one there for me last night

2017-01-09 오후 1:21:43

Jasmine Pearl Na (+821068789213)
once I realized yes he never hit me

2017-01-09 오후 1:21:52

You messaged him?

2017-01-09 오후 1:22:04

Jasmine Pearl Na (+821068789213)
ur just full of excuses

2017-01-09 오후 1:22:06

Jasmine Pearl Na (+821068789213)
yes I did

2017-01-09 오후 1:22:13

Jasmine Pearl Na (+821068789213)
our marriage is over Daniel

2017-01-09 오후 1:22:18

Jasmine Pearl Na (+821068789213)
it's been a long time coming

2017-01-09 오후 1:22:23

It wont ever happen again

2017-01-09 오후 1:22:27

I promise

2017-01-09 오후 1:22:36

If i do again you can leave

2017-01-09 오후 1:22:42

Jasmine Pearl Na (+821068789213)
I'm not gonna get abused and not reach out to anyone

**Page 372 of 7300**



Page 372 of 7300

2017-01-09 오후 1:22:46

Jasmine Pearl Na (+821068789213)
no

2017-01-09 오후 1:22:57

Did u go to the host bar?

2017-01-09 오후 1:22:59

Jasmine Pearl Na (+821068789213)
I'm not gonna get emotional damage that takes years for me to get over

2017-01-09 오후 1:23:03

Where are you

2017-01-09 오후 1:23:05

Jasmine Pearl Na (+821068789213)
I'm not gonna do it

2017-01-09 오후 1:23:07

Jasmine Pearl Na (+821068789213)
y did u

2017-01-09 오후 1:23:10

Jasmine Pearl Na (+821068789213)
where were u?

2017-01-09 오후 1:23:11

It wont ever happen again

2017-01-09 오후 1:23:22

I was at my parents

2017-01-09 오후 1:23:22

Jasmine Pearl Na (+821068789213)
u didn't even realize I was gone

2017-01-09 오후 1:23:25

With [redacted]

2017-01-09 오후 1:23:29

Jasmine Pearl Na (+821068789213)
just ditched [redacted] and went out



Exported from: D (D6GL7MJHJQ) on 2025.11.01, 21:46 with iMazing 3.4.0 by DigiDNA
Database date when extracted: 2025.08.20, 17:38
Backup checksum: C3ACE93658AC2351E3209E82AF95E28846B5D3D435E540581314B89D5B23EDF0

Name Merritt McKeon, Esq. REEL FATHERS RIGHTS APC
Address 18881 Von Karman Ave. Suite 1600
City, State, Zip Irvine, CA 92612
Phone 951-460-2003
Fax
E-Mail tearmmerritt@reelfathersrights.com
☐ FPD ☐ Appointed ☐ CJA ☐ Pro Per ☒ Retained

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Jung Wook Na<br>PLAINTIFF(S),<br>v.<br>Jasmine Pearl Na<br>DEFENDANT(S). | CASE NUMBER:<br>8:25-CV-02479-DOC-ADS<br>**NOTICE OF APPEAL** |

NOTICE IS HEREBY GIVEN that Jung Wook Na hereby appeals to
*Name of Appellant*
the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify):
Order dated 9/4/2026, Docket # 69, Returning one child to Korea, not both
☒ Judgment (specify):
Order dated 9/4/2026, Docket # 69, Returning one child to Korea, not both.
☐ Other (specify):

Imposed or Filed on September 4, 2026. Entered on the docket in this action on September 4, 2026.

A copy of said judgment or order is attached hereto.

September 28, 2026
Date

[signature]
Signature
☐ Appellant/ProSe ☒ Counsel for Appellant ☐ Deputy Clerk

**Note:** The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party. Also, if not electronically filed in a criminal case, the Clerk shall be furnished a sufficient number of copies of the Notice of Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

Case: 26-6105, 11/17/2026, DktEntry: 27.7, (71 of 83)

Name STEPHANE QUINN, CFLS; DAVID DWORAKOWSKI, CFLS, CALS
Address QUINN & DWORAKOWSKI, LLP - 2050 MAIN STREET, 6TH FLOOR, SUITE 600
City, State, Zip IRVINE, CALIFORNIA 92614
Phone (949) 660-1400
Fax
E-Mail quinn@orangecountyfamilylaw.com; david@orangecountyfamilylaw.com

☐ FPD ☐ Appointed ☐ CJA ☐ Pro Per ☑ Retained

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JUNG WOOK NA, v. JASMINE PEARL NA. | CASE NUMBER: 8:25-cv-02479-DOC-ADS |
| | NOTICE OF APPEAL |

# NOTICE OF APPEAL

**NOTICE IS HEREBY GIVEN that** Jasmine Pearl Na (Name of Appellant) hereby appeals to the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:
☐ Bail status:

**Civil Matter**

☐ Order (specify):
☑ Judgment (specify): Order and Judgment Granting Petition in Part; Findings of Fact & Conclusions of Law (Dkt. 69)
☐ Other (specify):

Imposed or Filed on September 4, 2026 Entered on the docket in this action on September 4, 2026

A copy of said judgment or order is attached hereto.

9/15/2026
Date

/s/ Stephane Quinn
Signature

☐ Appellant/Pro Se ☑ Counsel for Appellant ☐ Deputy Clerk

**Note:** The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party. Also, if not electronically filed in a criminal case, the Clerk shall be furnished a sufficient number of copies to permit prompt compliance with FRAP 3(d).

ACCO,(ADSx),APPEAL,CLOSED,MJDAP_OUT

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Southern Division - Santa Ana)
# CIVIL DOCKET FOR CASE #: 8:25-cv-02479-DOC-ADS

Jung Wook Na v. Jasmine Pearl Na
Assigned to: Judge David O. Carter
Referred to: Magistrate Judge Autumn D. Spaeth
Case in other court: Orange County Superior Court, 25FL001112
9th CCA, 26-06105
9th CCA, 26-06374
Cause: 28:1441 Notice of Removal

Date Filed: 11/04/2025
Date Terminated: 09/04/2026
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Petitioner**

**Jung Wook Na** represented by **Merritt Lori McKeon**
Reel Fathers Rights APC
18881 Von Karman Ave., Suite 1600
Irvine, CA 92612
951-460-2003
Email: teammerritt@reelfathersrights.com
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**Jasmine Pearl Na** represented by **Stephane Quinn**
Quinn and Dworakowski LLP
2050 Main Street, 6th Floor, Suite 600
Irvine, CA 92614
949-660-1400
Email: quinn@orangecountyfamilylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Anthony Dworakowski**
Quinn and Dworakowski LLP
2050 Main Street, 6th Floor, Suite 600
Irvine, CA 92614
949-660-1400
Email: david@orangecountyfamilylaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/04/2025 | 1 | NOTICE OF REMOVAL from Orange County Superior Court, case number 25FL001112 Receipt No: ACACDC-40848034 - Fee: $405, filed by Respondent Jasmine Pearl Na. (Attachments: # 1 Exhibit Hague Petition, # 2 Exhibit Hague Convention, # 3 Exhibit Protective Custody Warrants, # 4 Exhibit Request for Order, # 5 Exhibit Temporary Ex Parte Orders, # 6 Exhibit Notice of Removal, # 7 Exhibit Minute Order) (Attorney |

| | | |
|---|---|---|
| | | Stephane Quinn added to party Jasmine Pearl Na(pty:res))(Quinn, Stephane) (Entered: 11/04/2025) |
| 11/04/2025 | | CONFORMED COPY OF COMPLAINT against Respondent Jasmine Pearl Na., filed by Petitioner Jung Wook Na. [FILED IN STATE COURT 10/13/25. SUBMITTED AS ATTACHMENT NO. 1 TO THE NOTICE OF REMOVAL 1 ] (mza) (Entered: 11/12/2025) |
| 11/05/2025 | 2 | CIVIL COVER SHEET filed by Respondent Jasmine Pearl Na. (Attachments: # 1 Civil Cover Sheet JS 044, # 2 CV-30 - Interested Parties)(Quinn, Stephane) (Entered: 11/05/2025) |
| 11/07/2025 | 3 | Notice Of Service of Filings filed by Respondent Jasmine Pearl Na. (Quinn, Stephane) (Entered: 11/07/2025) |
| 11/12/2025 | 4 | NOTICE OF ASSIGNMENT to a U.S. Magistrate Judge and Declination of Consent. This case has been randomly assigned to Magistrate Judge John D. Early. (mza) (Entered: 11/12/2025) |
| 11/12/2025 | 5 | NOTICE OF DEFICIENCIES in Attorney Case Opening RE: Civil Cover Sheet (CV-71) 2 . The following error(s) was found: Other error(s) with document(s): Attachment #2-CV-30 Notice of Interested Parties. The document(s) should have been filed separately using their true events. You are not required to take any action to correct this deficiency unless the Court so directs. (mza) (Entered: 11/12/2025) |
| 11/13/2025 | 6 | This case has been assigned to a magistrate judge under the Direct Assignment of Civil Cases to Magistrate Judges Program. Per Local Civil Rule 73-2.1, Removing Defendant is ORDERED to serve the Notice of Assignment to a U.S. Magistrate Judge and Declination of Consent form (Dkt. 4, "Notice") upon Plaintiff(s) and each newly served party, or, if warranted, upon counsel for such party, and, WITHIN THREE (3) DAYS of such service, file proof(s) of such service. COMPLIANCE WITH THE FOREGOING IS EXCUSED IF Removing Defendant submits a compliant Declination of Consent Form to the Clerk's Office as explained in the Notice within seven (7) days from the date of the Notice. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (aro) TEXT ONLY ENTRY (Entered: 11/13/2025) |
| 11/14/2025 | 7 | Declination of Consent form received on 11/13/2025 was submitted within deadline set forth in L.R. 73-2.1. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (aro) TEXT ONLY ENTRY (Entered: 11/14/2025) |
| 11/17/2025 | 8 | NOTICE OF REASSIGNMENT of case from Magistrate Judge John D. Early to Judge David O. Carter for all further proceedings. Any discovery matters that may be referred to a Magistrate Judge are assigned to U.S. Magistrate Judge Autumn D. Spaeth. The case number will now reflect the initials of the transferee Judges 8:25-cv-02479-DOC-(ADSx). (pd) (Entered: 11/17/2025) |
| 11/19/2025 | 9 | NOTICE OF MOTION AND MOTION to Remand Case to ORANGE COUNTY SUPERIOR COURT filed by PETITIONER Jung Wook Na. Motion set for hearing on 12/15/2025 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Exhibit 1 OF 4, # 2 Exhibit 2 OF 4, # 3 Exhibit 3 OF 4, # 4 Exhibit 4 OF 4, # 5 Memorandum MOTION FOR REMAND, # 6 Declaration NOTICE OF HEARING, # 7 Declaration DECLARATION OF ATTORNEY) (Attorney Merritt Lori McKeon added to party Jung Wook Na(pty:pet)) (McKeon, Merritt) (Entered: 11/19/2025) |
| 11/24/2025 | 10 | SCHEDULING NOTICE by Judge David O. Carter: Motion to Remand set for hearing on 12/15/2025 is ADVANCED to 8:30 AM on 12/8/2025. Respondent's reply to the Motion to Remand is due by 12/5/2025. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (mpa) TEXT ONLY ENTRY (Entered: 11/24/2025) |

| | | |
|---|---|---|
| 11/25/2025 | 11 | OPPOSITION to NOTICE OF MOTION AND MOTION to Remand Case to ORANGE COUNTY SUPERIOR COURT 9 filed by Respondent Jasmine Pearl Na. (Quinn, Stephane) (Entered: 11/25/2025) |
| 12/05/2025 | 12 | ORDER by Judge David O. Carter: Denying 9 Petitioner's MOTION to Remand. For the reasons set forth above, the Court DENIES Petitioner's Motion to Remand and SETS AN EVIDENTIARY HEARING on this matter for January 12, 2026 at 1:30 PM. The court also SETS A CASE MANAGEMENT CONFERENCE considering the evidentiary hearing on December 8, 2025 at 8:30 AM. At this hearing, the court will decide time constraints for the evidentiary hearing. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 12/05/2025) |
| 12/08/2025 | 13 | MINUTES OF Scheduling Conference held before Judge David O. Carter. Evidentiary Hearing (3 day estimate) RESET for 1/20/2026 at 8:30 AM before Judge David O. Carter. Petitioner to appear via Zoom. Petitioner's attorney: Merritt Lori McKeon; Respondent's attorney: Stephane Quinn; Courtroom Deputy: Deborah Lewman; CART Captioner: C. Marie Villarreal; Court Reporter: Miriam Baird; Time in Court: :22. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. TEXT ONLY ENTRY. (dgo) (Entered: 12/09/2025) |
| 12/30/2025 | 14 | First EX PARTE APPLICATION for Appointment of Loni Jo Poyner Klein as Guardian ad Litem for K.E.N and S.A.N filed by Respondent Jasmine Pearl Na. (Attachments: # 1 Memorandum, # 2 Proposed Order) (Quinn, Stephane) (Entered: 12/30/2025) |
| 01/05/2026 | 15 | TRIAL BRIEF *PETITIONER'S SUMMARY OF EVIDENCE* filed by PETITIONER Jung Wook Na.. (Attachments: # 1 Declaration Petitioner's declaration, # 2 Exhibit Petitioner's exhibit list)(McKeon, Merritt) (Entered: 01/05/2026) |
| 01/05/2026 | 16 | TRIAL BRIEF *Respondent's Trial Statement* filed by Respondent Jasmine Pearl Na.. (Quinn, Stephane) (Entered: 01/05/2026) |
| 01/05/2026 | 17 | Exhibit List *Respondent's Exhibit List* filed by Respondent Jasmine Pearl Na.. (Quinn, Stephane) (Entered: 01/05/2026) |
| 01/05/2026 | 18 | Witness List filed by Respondent Jasmine Pearl Na.. (Quinn, Stephane) (Entered: 01/05/2026) |
| 01/05/2026 | 19 | Witness List filed by Respondent Jasmine Pearl Na.. (Quinn, Stephane) (Entered: 01/05/2026) |
| 01/05/2026 | 20 | TRIAL BRIEF *AMENDED SUMMARY OF EVIDENCE* filed by PETITIONER Jung Wook Na.. (McKeon, Merritt) (Entered: 01/05/2026) |
| 01/13/2026 | 21 | OPPOSITION filed by Petitioner Jung Wook Na. (McKeon, Merritt) (Entered: 01/13/2026) |
| 01/13/2026 | 22 | SCHEDULING NOTICE by Judge David O. Carter The Evidentiary Hearing set for 1/20/2026 is CONTINUED to 1/22/2026 08:30 AM before Judge David O. Carter. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 01/13/2026) |
| 01/14/2026 | 23 | REPLY In Support First EX PARTE APPLICATION for Appointment of Loni Jo Poyner Klein as Guardian ad Litem for K.E.N and S.A.N 14 filed by Respondent Jasmine Pearl Na. (Attachments: # 1 Declaration Declaration of Loni Klein, Esq.)(Quinn, Stephane) (Entered: 01/14/2026) |

| | | |
|---|---|---|
| 01/14/2026 | 24 | NOTICE OF MOTION re First EX PARTE APPLICATION for Appointment of Loni Jo Poyner Klein as Guardian ad Litem for K.E.N and S.A.N 14 filed by Petitioner Jung Wook Na. (McKeon, Merritt) (Entered: 01/14/2026) |
| 01/21/2026 | 25 | OPPOSITION filed by Respondent Jasmine Pearl Na. (Quinn, Stephane) (Entered: 01/21/2026) |
| 01/21/2026 | 26 | TRIAL BRIEF *Parties' Joint Sttatement of Stipulated Facts* filed by Petitioner Jasmine Pearl Na.. (Quinn, Stephane) (Entered: 01/21/2026) |
| 01/22/2026 | 27 | MINUTES OF Evidentiary Hearing before Judge David O. Carter (not held): Evidentiary Hearing (2 day estimate) is RESET for 1/28/2026 at 9:00 AM before Judge David O. Carter. Petitioner to appear via Zoom. Petitioner's attorney: Merritt Lori McKeon; Respondent's attorney: Stephane Quinn; Courtroom Deputy: Karlen Dubon; Court Reporter: Miriam Baird and Deborah Parker; Time in Court: {00:15}. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. TEXT ONLY ENTRY. (kdu) (Entered: 01/22/2026) |
| 01/26/2026 | 28 | TRIAL BRIEF *Memorandum Re: Admissibility Of Article 13(B) Evidence And Request For Factual Findings* filed by Respondent Jasmine Pearl Na.. (Quinn, Stephane) (Entered: 01/26/2026) |
| 01/26/2026 | 29 | SUPPLEMENT to Trial Brief 28 filed by Respondent Jasmine Pearl Na. (Quinn, Stephane) (Entered: 01/26/2026) |
| 01/27/2026 | 30 | TRIAL BRIEF filed by Petitioner Jung Wook Na.. (Attachments: # 1 Supplement supplement and opposition)(McKeon, Merritt) (Entered: 01/27/2026) |
| 01/27/2026 | 31 | JOINT Exhibit List filed by RE Jasmine Pearl Na.. (Quinn, Stephane) (Entered: 01/27/2026) |
| 01/27/2026 | 32 | REPLY filed by Respondent Jasmine Pearl Na to Trial Brief 30 (Quinn, Stephane) (Entered: 01/27/2026) |
| 01/28/2026 | 36 | MINUTES OF Evidentiary Hearing held before Judge David O. Carter; EVIDENTIARY HEARING RE HAGUE CONVENTION ARGUMENTS (DAY 1). The Court receives exhibits. Granting 14 EX PARTE APPLICATION to Appoint Guardian ad Litem. Appointing Loni Jo Poyner Klein as Guardian ad Litem for K.E.N. and S.A.N. Evidentiary Hearing continued to Thursday, 1/29/2026 08:00 AM before Judge David O. Carter. Court Reporter: Court Smart. (twdb) (Entered: 02/06/2026) |
| 01/29/2026 | 33 | DECLARATION of Loni Klein, Esq. filed by Respondent Jasmine Pearl Na. (Quinn, Stephane) (Entered: 01/29/2026) |
| 01/29/2026 | 37 | MINUTES OF Evidentiary Hearing held before Judge David O. Carter. EVIDENTIARY HEARING RE HAGUE CONVENTION ARGUMENTS (DAY 2). The Court hears sworn testimony from witnesses. The court receives exhibits. Evidentiary Hearing continued to 2/2/2026 at 05:00 PM before Judge David O. Carter. Court Reporter: Court Smart. (twdb) (Entered: 02/06/2026) |
| 02/02/2026 | 34 | TRIAL BRIEF *request judicial notice* filed by petitioner Jung Wook Na.. (Attachments: # 1 Declaration declaration of petitioner)(McKeon, Merritt) (Entered: 02/02/2026) |
| 02/02/2026 | 38 | MINUTES OF Evidentiary Hearing (Day 3) before District Judge David O. Carter (held and continued). The case is called. The Court and counsel confer. The Evidentiary Hearing is CONTINUED to February 3, 2026 at 3:30 PM before Judge David O. Carter. Petitioner to appear via Zoom. Petitioner's attorney: Merritt Lori McKeon; Respondent's attorney: David Anthony Dworakowsk; Courtroom Deputy: None Present; Court |

| | | |
|---|---|---|
| | | Reporter: Court Smart; Time in Court: {00:01}. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 02/10/2026) |
| 02/03/2026 | 35 | MINUTES OF Evidentiary Hearing (Day 4) before District Judge David O. Carter (held and continued). The case is called. The Court and counsel confer. Jo Payner Klein, Guardian ad Litem is placed under oath and questioned by the Court. For the reasons stated on the record, the Evidentiary Hearing is CONTINUED to February 6, 2026 at 3:30 PM before Judge David O. Carter. Petitioner to appear via Zoom. Petitioner's attorney: Merritt Lori McKeon; Respondent's attorney: David Anthony Dworakowsk; Courtroom Deputy: Priscilla Deason for Karlen Dubon; Court Reporter: Miriam Baird; Time in Court: {00:31}. Modified on 2/3/2026 (pd). THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. TEXT ONLY ENTRY (Entered: 02/03/2026) |
| 02/06/2026 | 39 | MINUTES OF Evidentiary Hearing RE Hague Convention Arguments (DAY 5) held before Judge David O. Carter. The Court and counsel confer. The evidentiary hearing is continued to February 12, 2026 at 1:00 PM. Court Reporter: Court Smart. (twdb) (Entered: 02/10/2026) |
| 02/12/2026 | 40 | MINUTES OF Evidentiary Hearing (Day 6) held before Judge David O. Carter. For the reasons set forth on the record, the Evidentiary Hearing is CONTINUED to March 5, 2026 at 1:00pm in Courtroom 10A. Court Reporter: Deborah Parker. (twdb) (Entered: 02/13/2026) |
| 03/03/2026 | 41 | SCHEDULING NOTICE by Judge David O. Carter: the Evidentiary Hearing SET for March 5, 2026, at 1:00 p.m. will be held in **Courtroom 9D** on the 9th Floor of the Ronald Reagan Federal Building and United States Courthouse at 411 W. Fourth Street Santa Ana, California, at that date and time. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (pd) TEXT ONLY ENTRY (Entered: 03/03/2026) |
| 03/05/2026 | 42 | MINUTES OF Evidentiary Hearing (Day 7) held before Judge David O. Carter. Witnesses called. The evidentiary hearing is continued to March 5, 2026 at 8:00 AM. Court Reporter: Miriam Baird. (twdb) (Entered: 03/09/2026) |
| 03/06/2026 | 43 | MINUTES OF Evidentiary Hearing (Day 8) held before Judge David O. Carter. Witnesses called. The evidentiary hearing is CONTINUED. Evidentiary Hearing continued to 3/9/2026 at 11:00 AM in Courtroom 10A, before Judge David O. Carter. Court Reporter: Miriam Baird/Court Smart 3/6/26. (twdb) (Entered: 03/09/2026) |
| 03/09/2026 | 44 | ORDER RE: TRANSPORTATION OF THE MINOR CHILDREN FROM SCHOOL TO THE LAMOREAUX JUSTICE CENTER FOR INTERVIEW by Judge David O. Carter. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 03/09/2026) |
| 03/09/2026 | 45 | MINUTES OF EVIDENTIARY HEARING (DAY 9) held before Judge David O. Carter The case is called. The Court and counsel confer. The evidentiary hearing is continued to a date set by the Court. Court Reporter: CourtSmart 3/9/26. (es) (Entered: 03/11/2026) |
| 03/23/2026 | 46 | STIPULATION for Order permit children to live with grandparents filed by Petitioner Jung Wook Na.(McKeon, Merritt) (Entered: 03/23/2026) |
| 03/23/2026 | 47 | ORDER GRANTING STIPULATION by Judge David O. Carter 46 . SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 03/24/2026) |
| 04/27/2026 | 48 | ORDER (IN CHAMBERS) by District Judge David O. Carter: The Court hereby ORDERS the parties to file a Joint Status Report re Resolution Progress no later than April 30, 2026. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 04/27/2026) |

| | | |
|---|---|---|
| 04/30/2026 | 49 | STATUS REPORT *Re. REsolution Progress (JOINT)* filed by Respondent Jasmine Pearl Na. (Quinn, Stephane) (Entered: 04/30/2026) |
| 06/01/2026 | 50 | SCHEDULING NOTICE by Judge David O. Carter: The Court sets the Evidentiary Hearing re Hague Convention Arguments to resume 6/9/2026 at 08:00 AM before Judge David O. Carter. The Court hereby ORDERS the parties to file a Joint Status Report re remaining arguments and/or witnesses no later than June 5, 2026.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 06/01/2026) |
| 06/05/2026 | 51 | Notice REQUEST FOR NOTICE filed by PETITIONER Jung Wook Na. (McKeon, Merritt) (Entered: 06/05/2026) |
| 06/05/2026 | 52 | STATUS REPORT *Joint* filed by Respondent Jasmine Pearl Na. (Quinn, Stephane) (Entered: 06/05/2026) |
| 06/08/2026 | 53 | REQUEST FOR JUDICIAL NOTICE *OF U.S. DEPARTMENT OF STATES 2026 ANNUAL REPORT ON INTERNATIONAL CHILD ABDUCTION* filed by Respondent Jasmine Pearl Na. (Attachments: # 1 Exhibit, # 2 Proposed Order)(Quinn, Stephane) (Entered: 06/08/2026) |
| 06/09/2026 | 54 | MINUTES OF EVIDENTIARY HEARING RE HAGUE CONVENTION ARGUMENTS (DAY 10) held before Judge David O. Carter: The case is called. The Court and counsel confer. The evidentiary hearing is continued to August 6, 2026 at 7:30 AM. The parties are ordered to file a stipulation re protocols for the eldest child's travel. The parties are ordered to file a status report re the Korean court proceedings by July 15, 2026. Court Reporter: Court Smart. (bm) (Entered: 06/10/2026) |
| 06/22/2026 | 55 | STIPULATION AND ORDER RE. TEMPORARY TRAVEL OF MINOR CHILD S.A.N. TO THE REPUBLIC OF KOREA 46 by Judge David O. Carter. SEE DOCUMENT FOR DETAILS. (es) (Entered: 06/22/2026) |
| 07/15/2026 | 56 | STATUS REPORT *JOINT* filed by Respondent Jasmine Pearl Na. (Quinn, Stephane) (Entered: 07/15/2026) |
| 07/27/2026 | 57 | *G120 Transcript Request* (McKeon, Merritt) (Entered: 07/27/2026) |
| 07/31/2026 | 58 | SCHEDULING NOTICE by Judge David O. Carter Evidentiary Hearing set for 8/6/2026 is CONTINUED to 8/24/2026 09:00 AM before Judge David O. Carter. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 07/31/2026) |
| 08/13/2026 | 59 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Miscellaneous Document 57 . The following error(s) was found: Wrong Event was used for the transcript request. Use the correct when you refile your request for transcript. You must electronically refile the above referenced Request for Transcript in this case to correct this deficiency. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (cr) TEXT ONLY ENTRY (Entered: 08/13/2026) |
| 08/17/2026 | 60 | TRANSCRIPT ORDER as to Attorney for Court Smart (CS). Court will contact Merritt McKeon at merrittmck@hotmail.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (cr) (Entered: 08/17/2026) |
| 08/18/2026 | 61 | TRANSCRIPT for proceedings held on 6/9/2026, Evidentiary Day 10. Court Reporter/Electronic Court Recorder: EXCEPTIONAL REPORTING SERVICES, INC., phone number (361) 949-2988. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for |

| | | |
|---|---|---|
| | | Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 9/8/2026. Redacted Transcript Deadline set for 9/18/2026. Release of Transcript Restriction set for 11/16/2026. (aa) (Entered: 08/18/2026) |
| 08/18/2026 | 62 | NOTICE OF FILING TRANSCRIPT filed for proceedings 6/9/2026, Evidentiary Day 10 re Transcript 61 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (aa) TEXT ONLY ENTRY (Entered: 08/18/2026) |
| 08/19/2026 | 63 | SCHEDULING NOTICE by Judge David O. Carter The Evidentiary Hearing set for 8/24/2026 is CONTINUED to 11:00 AM before Judge David O. Carter. **TIME CHANGE ONLY**THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 08/19/2026) |
| 08/24/2026 | 64 | MINUTES OF Evidentiary Hearing (Day 11) before Judge David O. Carter (held and continued). The case is called. The Court and counsel confer. For the reasons stated on the record, the Evidentiary Hearing (Day 12) is CONTINUED to August 25, 2026 at 11:00 a.m before Judge David O. Carter in Courtroom 10A. Petitioner to appear via Zoom. Petitioner's attorney: Merritt Lori McKeon; Respondent's attorney: David Anthony Dworakowsk; Courtroom Deputy: Priscilla Deason for Karlen Dubon; CourtSmart: 8/24/26; Time in Court: {00:43}. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (pd) TEXT ONLY ENTRY (Entered: 08/24/2026) |
| 08/25/2026 | 67 | MINUTES OF Evidentiary Hearing (Day 12) before District Judge David O. Carter (held and completed). The case is called. The Court and counsel confer. The Court hears oral argument from the parties. For the reasons stated on the record, the Court DIRECTS the parties to lodge by August 31, 2026 their proposed Findings of Fact and Conclusions of Law. The Petition will be TAKEN under SUBMISSION. Order to Issue. Petitioner to appear via Zoom. Petitioner's attorney: Merritt Lori McKeon; Respondent's attorney: David Anthony Dworakowsk, Stephane Quinn; Courtroom Deputy: Priscilla Deason for Karlen Dubon; CourtSmart: C/S - 8/25/26; Time in Court: {01:21}. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (pd) TEXT ONLY ENTRY (Entered: 09/02/2026) |
| 08/31/2026 | 65 | NOTICE OF LODGING filed *Proposed Findings of Fact and Conclusions of Law* re Evidentiary Hearing,, 64 (Attachments: # 1 Proposed Order Proposed FIndings of Facts and Conclusions of Law)(Quinn, Stephane) (Entered: 08/31/2026) |
| 09/01/2026 | 66 | NOTICE OF LODGING filed *SEPTEMBER 1, 2025* re Notice of Lodging 65 (Attachments: # 1 Proposed Order PROPOSED FINDINGS)(McKeon, Merritt) (Entered: 09/01/2026) |
| 09/04/2026 | 68 | OBJECTIONS to Notice of Lodging 65 filed by Petitioner Jung Wook Na. (McKeon, Merritt) (Entered: 09/04/2026) |
| 09/04/2026 | 69 | ORDER AND JUDGMENT GRANTING PETITION IN PART; FINDINGS OF FACT & CONCLUSIONS OF LAW by Judge David O. Carter, Related to: Evidentiary Hearing, 67 . The Court held an eleven-day evidentiary hearing (the trial). For the reasons described below, the Court ORDERS the return of S.A.N to South Korea, while K.E.N shall remain in the United States. The Court will not be addressing custody arrangements, as this is an inappropriate use of judicial power under ICARA. See document for details. (MD JS-6, Case Terminated). (es) (Entered: 09/08/2026) |
| 09/15/2026 | 70 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Respondent Jasmine Pearl Na. Appeal of Judgment,, 69 . (Appeal Fee - $605 Fee Paid, Receipt No. ACACDC-43320984.) (Attachments: # 1 Representation Statement, # 2 Proof of Service)(Quinn, Stephane) (Entered: 09/15/2026) |

| | | |
|---|---|---|
| 09/15/2026 | 71 | NOTICE OF MOTION AND MOTION to Stay pending The Return of S.A.N. Pending the Appeal filed by Respondent Jasmine Pearl Na. Motion set for hearing on 10/19/2026 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Declaration Declaration of Counsel, # 2 Declaration Declaration of Respondent, # 3 Proposed Order Proposed Order, # 4 Proof of Service) (Quinn, Stephane) (Entered: 09/15/2026) |
| 09/15/2026 | 72 | First EX PARTE APPLICATION to Withdraw NOTICE OF MOTION AND MOTION to Stay pending The Return of S.A.N. Pending the Appeal 71 filed by Respondent Jasmine Pearl Na. (Attachments: # 1 Declaration Declaration of Counsel, # 2 Declaration Declaration of Respondent, # 3 Proposed Order Proposed Order, # 4 Proof of Service) (Quinn, Stephane) (Entered: 09/15/2026) |
| 09/16/2026 | 73 | OPPOSITION to First EX PARTE APPLICATION to Withdraw NOTICE OF MOTION AND MOTION to Stay pending The Return of S.A.N. Pending the Appeal 71 72 *73* filed by Petitioner Jung Wook Na. (Attachments: # 1 Affidavit Affidavit of Jung Wook Na, # 2 Proposed Order Proposed Order Denying Stay)(McKeon, Merritt) (Entered: 09/16/2026) |
| 09/17/2026 | 74 | REPLY In Support First EX PARTE APPLICATION to Withdraw NOTICE OF MOTION AND MOTION to Stay pending The Return of S.A.N. Pending the Appeal 71 72 filed by Respondent Jasmine Pearl Na. (Attachments: # 1 Declaration Declaration of Respondent, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B, # 4 Exhibit Exhibit C, # 5 Exhibit Exhibit D, # 6 Proposed Order Proposed Order, # 7 Proof of Service)(Quinn, Stephane) (Entered: 09/17/2026) |
| 09/18/2026 | 75 | Order Denying Respondent's Motion for Stay Pending Appeal and Ex Parte Application for Administrative Stay and Granting Respondent's Request for a Seven-Day Bridge Stay As To Minor Child S.A.N. by Judge David O. Carter. The portion of the September 4, 2026, Order and Judgment (Dkt. 69 ) directing that S.A.N. be returned to the Republic of Korea and reside with Petitioner is STAYED until September 25, 2026, pending the Respondent's filing to seek emergency relief from the Ninth Circuit. (SEE DOCUMENT FOR FURTHER DETAILS) (chk) (Entered: 09/21/2026) |
| 09/18/2026 | 76 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 26-6105 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 70 as to Respondent Jasmine Pearl Na. (san) (Entered: 09/21/2026) |
| 09/22/2026 | 77 | NOTICE of Change of firm name and address by Merritt Lori McKeon attorney for Petitioner Jung Wook Na. Changing firm name to Reel Fathers Rights APC and address to 18881 Von Karman Ave. Suite 1600 Irvine, CA 92612. Filed by Petitioner Jung Wook Na. (McKeon, Merritt) (Entered: 09/22/2026) |
| 09/23/2026 | 78 | ORDER from Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 70 filed by Jasmine Pearl Na. CCA # 26-6105. The court has received the emergency motion for a stay pending appeal. The request for an administrative stay is granted. [SEE ORDER FOR FURTHER INFORMATION.] (san) (Entered: 09/25/2026) |
| 09/28/2026 | 79 | NOTICE OF APPEAL to the Federal Circuit Court of Appeals filed by petitioner Jung Wook Na. Appeal of Judgment,, 69 . (Appeal Fee - In Forma Pauperis Request.) (McKeon, Merritt) (Entered: 09/28/2026) |
| 09/28/2026 | 80 | First NOTICE OF MOTION AND MOTION for Leave to Appeal In Forma Pauperis, Judgment,, 69 , *73* filed by petitioner Jung Wook Na. Motion set for hearing on 10/8/2026 at 08:00 AM before Judge David O. Carter. (McKeon, Merritt) (Entered: 09/28/2026) |
| 09/29/2026 | 81 | TRANSCRIPT ORDER re: Court of Appeals case number 26-6105, as to Respondent Jasmine Pearl Na for Court Reporter. Court will contact Stephane Quinn at quinn@orangecountyfamilylaw.com with further instructions regarding this order. |

| | | |
|---|---|---|
| | | Transcript preparation will not begin until payment has been satisfied with the court reporter. (Quinn, Stephane) (Entered: 09/29/2026) |
| 09/29/2026 | 82 | TRANSCRIPT ORDER re: Court of Appeals case number 26-6105, as to Respondent Jasmine Pearl Na for Court Reporter. Court will contact Stephane Quinn at quinn@orangecountyfamilylaw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Quinn, Stephane) (Entered: 09/29/2026) |
| 09/29/2026 | 83 | TRANSCRIPT ORDER re: Court of Appeals case number 26-6105, as to Respondent Jasmine Pearl Na for Court Smart (CS). Court will contact Stephane Quinn at quinn@orangecountyfamilylaw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Quinn, Stephane) (Entered: 09/29/2026) |
| 09/29/2026 | 84 | NOTICE TO FILER OF DEFICIENCIES in Filed Document RE: Notice of Appeal to Federal Circuit Court of Appeals 79 . The following error(s) was/were found: Incorrect event selected. Correct event should have been used is : NOTICE OF APPEAL to the 9th Circuit Court of Appeals.. Other error(s) with document(s): File a Notice of Errata. Then refile the Notice of Appeal using the correct category event.. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (mat) (Entered: 09/29/2026) |
| 09/29/2026 | 85 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by petitioner Jung Wook Na. Appeal of Judgment,, 69 . (Appeal Fee - In Forma Pauperis Request.) (Attachments: # 1 Unredacted Document notice of errata)(McKeon, Merritt) (Entered: 09/29/2026) |
| 09/29/2026 | 86 | DESIGNATION of Record on Appeal by Respondent Jasmine Pearl Na re 70 (Quinn, Stephane) (Entered: 09/29/2026) |
| 09/29/2026 | 87 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Cross Appeal Docket No. 26-6374 assigned to Notice of Appeal to 9th Circuit Court of Appeals 85 as to petitioner Jung Wook Na. (mat) (Entered: 09/30/2026) |
| 10/07/2026 | 88 | SCHEDULING NOTICE by Judge David O. Carter. The Court finds Petitioner's Motion for Leave to Appeal In Forma Pauperis 80 appropriate for decision without oral argument. Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the motion hearing set for 10/8/2026, is removed from the calendar and the motion is TAKEN UNDER SUBMISSION. No appearances are necessary on 10/08/2026. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 10/07/2026) |
| 10/22/2026 | 89 | ORDER by Judge David O. Carter: Denying 80 REQUEST to Proceed (Non-Prisoner Case). SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 10/23/2026) |
| 10/28/2026 | 90 | FINANCIAL ENTRY: Received $605.00 into the registry of the Court from Reel Fathers Rights on behalf of Jung Wook Na. Re: Notice of Appeal to 9th Circuit Court of Appeals 85 , Order on Motion for Leave to Appeal In Forma Pauperis 89 . Receipt number 2985. (pd) (Entered: 10/28/2026) |
| 11/05/2026 | 91 | TRANSCRIPT for proceedings held on 12/8/25. Court Reporter/Electronic Court Recorder: MIRIAM BAIRD, phone number velizbairdmiriam@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 11/27/2026. Redacted Transcript |

| | | |
|---|---|---|
| | | Deadline set for 12/7/2026. Release of Transcript Restriction set for 2/3/2027. (Baird, Miriam) (Entered: 11/05/2026) |
| 11/05/2026 | 92 | TRANSCRIPT for proceedings held on 1/22/26. Court Reporter/Electronic Court Recorder: MIRIAM BAIRD, phone number velizbairdmiriam@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 11/27/2026. Redacted Transcript Deadline set for 12/7/2026. Release of Transcript Restriction set for 2/3/2027. (Baird, Miriam) (Entered: 11/05/2026) |
| 11/05/2026 | 93 | TRANSCRIPT for proceedings held on 3/5/26. Court Reporter/Electronic Court Recorder: MIRIAM BAIRD, phone number velizbairdmiriam@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 11/27/2026. Redacted Transcript Deadline set for 12/7/2026. Release of Transcript Restriction set for 2/3/2027. (Baird, Miriam) (Entered: 11/05/2026) |
| 11/05/2026 | 94 | TRANSCRIPT for proceedings held on 3/6/26. Court Reporter/Electronic Court Recorder: MIRIAM BAIRD, phone number velizbairdmiriam@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 11/27/2026. Redacted Transcript Deadline set for 12/7/2026. Release of Transcript Restriction set for 2/3/2027. (Baird, Miriam) (Entered: 11/05/2026) |
| 11/05/2026 | 95 | TRANSCRIPT - EVIDENTIARY HEARING, DAY 1 for proceedings held on 1/28/2026. Court Reporter/Electronic Court Recorder: EXCEPTIONAL REPORTING SERVICES, INC., phone number (361) 949-2988. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 11/27/2026. Redacted Transcript Deadline set for 12/7/2026. Release of Transcript Restriction set for 2/3/2027. (ls) (Entered: 11/06/2026) |
| 11/05/2026 | 96 | TRANSCRIPT - EVIDENTIARY HEARING, DAY 2 for proceedings held on 1/29/2026. Court Reporter/Electronic Court Recorder: EXCEPTIONAL REPORTING SERVICES, INC., phone number (361) 949-2988. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 11/27/2026. Redacted Transcript Deadline set for 12/7/2026. Release of Transcript Restriction set for 2/3/2027. (ls) (Entered: 11/06/2026) |
| 11/05/2026 | 97 | TRANSCRIPT - EVIDENTIARY HEARING, DAY 5 for proceedings held on 2/06/2026. Court Reporter/Electronic Court Recorder: EXCEPTIONAL REPORTING SERVICES, INC., phone number (361) 949-2988. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 11/27/2026. Redacted Transcript Deadline set for 12/7/2026. Release of Transcript Restriction set for 2/3/2027. (ls) (Entered: 11/06/2026) |

| | | |
|---|---|---|
| 11/05/2026 | 98 | NOTICE OF FILING TRANSCRIPT filed for proceedings 1/28/2026, 1/29/2026, and 2/06/2026 re Transcript 96 , 95 , 97 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ls) TEXT ONLY ENTRY (Entered: 11/06/2026) |
| 11/06/2026 | 99 | TRANSCRIPT ORDER re: Court of Appeals case number 26-6105, as to Respondent Jasmine Pearl Na for Court Smart (CS). Court will contact Stephane Quinn at quinn@orangecountyfamilylaw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Quinn, Stephane) (Entered: 11/06/2026) |
| 11/09/2026 | 100 | PARTIAL TRANSCRIPT for proceedings held on Thursday, February 12, 2026. Electronic Court Recorder: Exceptional Reporting Services, Inc, phone number 361-949-2988. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 11/30/2026. Redacted Transcript Deadline set for 12/10/2026. Release of Transcript Restriction set for 2/8/2027. (mci) (Entered: 11/09/2026) |
| 11/09/2026 | 101 | NOTICE OF FILING TRANSCRIPT filed for proceedings Thursday, February 12, 2026 re Transcript 100 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (mci) TEXT ONLY ENTRY (Entered: 11/09/2026) |
| 11/09/2026 | 102 | PARTIAL TRANSCRIPT for proceedings held on 3/9/2026, 12:05 p.m.. Electronic Court Recorder: Exceptional Reporting Services, Inc., phone number 361 949-2988. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 11/30/2026. Redacted Transcript Deadline set for 12/10/2026. Release of Transcript Restriction set for 2/8/2027. (siv) (Entered: 11/09/2026) |
| 11/09/2026 | 103 | TRANSCRIPT for proceedings held on 8/24/2026, 11:19 a.m.. Electronic Court Recorder: Exceptional Reporting Services, Inc., phone number 361 949-2988. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 11/30/2026. Redacted Transcript Deadline set for 12/10/2026. Release of Transcript Restriction set for 2/8/2027. (siv) (Entered: 11/09/2026) |
| 11/09/2026 | 104 | TRANSCRIPT for proceedings held on 8/25/2026, 10:57 a.m.. Electronic Court Recorder: Exceptional Reporting Services, Inc., phone number 361 949-2988. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 11/30/2026. Redacted Transcript Deadline set for 12/10/2026. Release of Transcript Restriction set for 2/8/2027. (siv) (Entered: 11/09/2026) |
| 11/09/2026 | 105 | NOTICE OF FILING TRANSCRIPT filed for proceedings 3/9/2026, 8/24/2026, 8/25/2026 re Transcript 103 , 104 , 102 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (siv) TEXT ONLY ENTRY (Entered: 11/09/2026) |
| 11/09/2026 | 106 | TRANSCRIPT for proceedings held on 2/3/26. Court Reporter/Electronic Court Recorder: MIRIAM BAIRD, phone number velizbairdmiriam@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 11/30/2026. Redacted Transcript |

| | | |
|---|---|---|
| | | Deadline set for 12/10/2026. Release of Transcript Restriction set for 2/8/2027. (Baird, Miriam) (Entered: 11/09/2026) |
| 11/09/2026 | 107 | NOTICE OF FILING TRANSCRIPT filed for proceedings 12/8/25; 1/22/26; 2/3/26;3/5/26; 3/6/26 re Transcript 94 , 93 , 106 , 91 , 92 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Baird, Miriam) TEXT ONLY ENTRY (Entered: 11/09/2026) |
| 11/13/2026 | 108 | NOTICE of Manual Filing filed by Respondent Jasmine Pearl Na of Reporters transcripts of March 11, 2026 in-chambers interviews of minor children K.E.N. and S.A.N. (OCSC No. 25FL001112), lodged under seal on USB flash drive. (Quinn, Stephane) (Entered: 11/13/2026) |

*PACER billing receipt omitted*